## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CHEM RX CORPORATION, *et al.*,[1] | Case No. 10-11567 (MFW) |
| Debtors. | (Joint Administration Pending) |

## DECLARATION OF GARY M. JACOBS
## IN SUPPORT OF THE DEBTORS' CHAPTER 11
## PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

GARY M. JACOBS hereby declares, under penalty of perjury, as follows:

1.      I am the Chief Financial Officer (the "**CFO**") of Chem Rx Corporation ("**Chem Rx**" and, together with its above-captioned affiliated chapter 11 debtors and debtors-in-possession, the "**Debtors**"). I perform my duties out of the Debtors' headquarters located at 750 Park Place in Long Beach, New York. I submit this declaration (the "**Declaration**") in support of the Debtors' chapter 11 petitions and requests for relief contained in certain "first day" applications and motions filed on or shortly after the date hereof (the "**First Day Motions**").

2.      I have more than 30 years of experience as a finance professional, including 13 years on the audit staff of an international public accounting firm and more than 20 years in various industries as an operations and finance officer. I am a certified public accountant and hold a Bachelor's Degree in Business Administration and Accounting. I have been an officer of Chem Rx since June 12, 2008. Since that time, I have overseen the Debtors' operations and worked closely with the Debtors' other personnel who handle business operations and financial management, the Debtors' outside counsel and other advisors. I have also participated directly

---

[1] The Debtors and the last four digits of each Debtor's tax identification number are: Chem Rx Corporation (8469), B.J.K. Inc. (5997), ChemRx New Jersey, LLC (9370), ChemRx/Salerno's, LLC (5981), ChemRx-Boca Raton, LLC (8021) and ChemRx Care, LLC (0826).

or indirectly in communications and negotiations with the Debtors' secured lenders, vendors and customers, as well as other constituencies.

3.    As the CFO of Chem Rx, I am authorized by the Board of Directors of Chem Rx (the "**Board**") to submit this Declaration on behalf of the Debtors. Except as indicated otherwise, all statements in this Declaration are based upon my personal knowledge or my review of the Debtors' books and records, other relevant documents and information prepared or collected by the Debtors' employees. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein. In making the statements herein, I have relied in part upon others to accurately record, prepare and collect necessary documentation and information.

4.    Part I of this Declaration provides a brief overview of the Debtors and a summary of these Cases (as defined below). Part II of this Declaration describes in more detail the Debtors' business, the developments which led to the Debtors' chapter 11 filing and their goals in these Cases (as defined below). Part III sets forth relevant details of the various First Day Motions.

## I.
## INTRODUCTION

5.    Founded more than 40 years ago, the Debtors are a leading long-term care pharmacy serving multiple institutions, including skilled nursing homes, group homes, correctional institutions and other long-term care facilities. The Debtors provide prescription and non-prescription drugs, intravenous medications, durable medical equipment items and surgical supplies for residents of these institutions in New York, New Jersey, Pennsylvania, and Florida. Annually, the Debtors provide over six million prescriptions to more than 69,000 residents of more than 400 institutional customers. The Debtors' operations are conducted as a

single business segment through separate corporate entities in each jurisdiction in which they are licensed to provide pharmacy services.

6.     Although the Debtors' businesses remain strong, the Debtors are too highly leveraged and lack adequate liquidity to sustain operations long term without a restructuring. The Debtors have been in default under their Prepetition Loans (as defined below) since the beginning of 2009 and have been operating without an effective forbearance agreement since the end of June 2009. The Debtors have attempted over the last year to negotiate with their secured lenders over a consensual restructuring of their assets and liabilities to permit them to continue as a going concern. Those negotiations did not result in a consensus over a viable restructuring alternative.

7.     On May 10, 2010, the Debtors' First Lien Lenders (as defined below) filed an action in New York State Court to enjoin the Debtors' use of cash that is subject to the First Lien Lenders' liens. If the First Lien Lenders were successful in enjoining the Debtors' use of their cash, the Debtors would be unable to continue operations. As a result, the Debtors, in the exercise of their reasonable business judgment and having reviewed their remaining alternatives, determined that the most effective way to maximize the value of the Debtors' estates for the benefit of their creditor constituencies was to seek bankruptcy protection in order to pursue a sale or restructuring of their assets and liabilities.

8.     To minimize the adverse effects of the commencement of these Chapter 11 cases (the "**Cases**") on their business, the Debtors request various types of relief in the First Day Motions. The First Day Motions are described in greater detail in Part III below. Pursuant to the First Day Motions, the Debtors seek, among other things, to: (a) establish procedures for efficient administration of these Cases, (b) continue the Debtors' operations with as little

disruption as possible; (c) maintain the confidence and support of the Debtors' employees; (d) obtain authority to use cash collateral; and (e) retain appropriate professionals. Gaining and maintaining the support of the Debtors' key constituencies, as well as operating the Debtors' day-to-day business with minimal disruption and erosion, will be crucial to the success of the Debtors' efforts in these Cases.

9.      On the date hereof (the "**Petition Date**"), the Debtors commenced their chapter 11 cases by filing voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

## II.
## BACKGROUND

### A.      Overview of the Debtors

10.      Chem Rx was founded in 1958 by Jerry Silva, the current Chairman and Chief Executive Officer of the Debtors, as a single retail pharmacy in New York, initially serving individual customers with their prescriptions. Since its inception, through organic growth and selective acquisitions, the Debtors have grown into the third largest long-term care pharmacy in the United States, after Omnicare, Inc. and PharMerica Corporation, serving a wide range of long-term healthcare institutions. Today, the Debtors serve more than 400 accounts, providing pharmacy services to residents of skilled nursing homes, adult homes, group homes, assisted living facilities, addiction treatment centers, and correctional institutions.

11.      Chem Rx conducts its business through its wholly owned Operating Subsidiaries (as defined below) and set forth on the organizational chart annexed hereto as Exhibit "**A.**" The Debtors' operations are conducted as a single business segment through four separate corporate entities in four different states in which they are licensed—B.J.K. Inc. ("**BJK**") in Long Beach

and Albany, New York; ChemRx New Jersey, LLC ("**ChemRx NJ**") in South Plainfield, New Jersey; ChemRx/Salerno's, LLC ("**ChemRx PA**") in Sciota, Pennsylvania; and ChemRx-Boca Raton, LLC ("**ChemRx FL**") in Deerfield Beach, Florida (collectively, the "**Operating Subsidiaries**").[2] The Debtors maintain off-site storage in New York and New Jersey to warehouse certain of their medical records in compliance with the State Board of Pharmacy regulations.

12. The Debtors purchase pharmaceutical products in bulk quantities from wholesalers and manufacturers and dispense both prescription and non-prescription drugs in patient-specific packaging in accordance with physician orders. The Debtors use a computer-based order processing and fulfillment system to enhance efficiency and accuracy, while maintaining confidentiality of patient information. Each of the Debtors' Operating Subsidiaries is equipped with necessary system and personnel to fill prescriptions, check for any drug-to-drug interactions, check the formulary status of each prescription, ensure the ongoing availability of drugs, provide customized medication packaging, deliver prescription packages with tracking services, and provide numerous other customer services tailored to suit the specific needs of each customer. The Debtors' pharmacist service is available 365 days per year with pharmacists instantly available by phone, fax or e-mail to address any questions or issues.

## B. Corporate Structure

13. Between 1994 and 1999, the Debtors went through a period of rapid growth, increasing their customer base from approximately 14,000 beds to nearly 30,000 beds in New York State. In 2000, in order to respond to the growing customer base, the Debtors expanded their operating space in New York from 17,000 sq. ft. to 75,000 sq. ft. Between 2006 and 2008,

---

[2] ChemRx Care, LLC is a holding company without an operating facility and has a 49.9% equity ownership in a non-debtor, ChemRx-Chicago, LLC.

the Debtors expanded their geographic presence by opening ChemRx NJ, acquiring Salerno Pharmacy which subsequently became ChemRx PA, and beginning to operate in Florida through ChemRx FL. Following the opening ChemRx NJ, acquisition of ChemRx PA and inception of ChemRx FL, the Debtors serviced as many as 71,000 beds in over 400 institutions, though the majority of such beds and institutions were serviced from the Debtors' main operating facility in Long Beach, New York. As of March 2010, the Debtors serviced 69,456 beds.

14.     In 2005, a special purpose acquisition company known as Paramount Acquisition Corp. ("**Paramount**") was created, with the sole purpose of identifying and acquiring an operating business, and underwent an initial public offering (the "**IPO**"). On October 26, 2007, Paramount merged with the Debtors, changed its name to "Chem Rx Corporation" and became the parent holding company for all of the Debtors' Operating Subsidiaries (the "**Merger**"). As consideration for the Merger, Paramount paid a combination of cash and stock to the then stockholders of BJK.

15.     In addition to the IPO proceeds, Chem Rx received certain term and revolving loans described in greater detail below to fund its on-going operations. The total amount of financing necessary to consummate the Merger aggregated approximately $177 million. In addition, Jerry Silva and Steven Silva personally provided a letter of credit and cash deposit totaling $11 million to AmerisourceBergen Drug Corporation ("**ABDC**") to secure the Debtors' line of credit with ABDC.

16.     Contemporaneously and in order to consummate the Debtors' IPO, Jerry Silva and Steven Silva in their individual capacities and in their respective capacities as life tenant and remainderman of a life tenancy (collectively, the "**Silva Put Parties**") entered into three separate put option agreements (the "**Put Options**") with certain institutional investors pursuant to which

each investor was granted an option to require the Silva Put Parties to purchase up to a total of 5,169,749 shares of Chem Rx. Beginning July 22, 2008, and ending October 27, 2008, each institutional investor exercised its Put Option causing the Silva Put Parties to purchase all 5,169,749 shares in Chem Rx for $30,196,225 which resulted in the Silvas and their affiliates owning 54.22% of Chem Rx's outstanding shares of common stock. As of the Petition Date, Chem Rx has approximately 14,000,000 shares of stock outstanding; approximately 52% of the outstanding shares are owned by the Silvas or their affiliated trusts. Initially listed on the NASDAQ Stock Market, Chem Rx stock has been delisted and its stock is trading over-the-counter on the Pink Sheets Electronic Quotation service.

## C.    **Prepetition Capital Structure**

### (i)    **First-Lien Loans**

17.    On or about October 26, 2007, Chem Rx, as borrower (the "**Borrower**"), the other Debtors, as guarantors, and CIBC World Markets Corp. ("**CIBC**"), as agent, sole lead arranger and sole book runner (the "**First Lien Agent**") and certain lenders (together with the First Lien Agent, the "**First Lien Lenders**") entered into that certain First Lien Credit and Guaranty Agreement (as amended, supplemented or otherwise modified or restated, the "**First Lien Agreement**"), pursuant to which, *inter alia*, the First Lien Lenders agreed to make certain loans and financial accommodations to the Borrower in the aggregate principal amount of up to $125,000,000, consisting of $80,000,000 aggregate principal amount of initial term loans, $20,000,000 aggregate principal amount of delayed draw term loans, and up to $25,000,000 aggregate principal amount of a revolving line of credit (collectively, the "**First Lien Loans**"). The First Lien Loans are secured by prepetition first priority liens on and security interests in the collateral set forth in the documents evidencing the First Lien Loans (the "**Prepetition Collateral**"). Approximately $103 million (inclusive of interest, facility fees, costs, expenses,

swap exposure and indemnities) is outstanding under the First Lien Agreement as of the Petition Date.

### (ii)  Second Lien Loans

18.  On or about October 26, 2007, Chem Rx, as borrower, and the other Debtors, as guarantors, and CIBC, as agent, sole lead arranger and sole book runner and certain lenders (together with the Second Lien Agent (as defined below), the "**Second Lien Lenders**" and together with the First Lien Lenders, the "**Prepetition Lenders**") entered into that certain Second Lien Credit and Guaranty Agreement (as amended, supplemented or otherwise modified or restated, the "**Second Lien Agreement**"), pursuant to which, *inter alia*, the Second Lien Lenders agreed to make certain loans and financial accommodations to the Borrower in the aggregate principal amount of up to $37,000,000 of a term loan (the "**Second Lien Loans**", and together with the First Lien Loans, the "**Prepetition Loans**"). The Second Lien Loans are secured by prepetition second priority liens on and security interests in the Prepetition Collateral. As of April 30, 2009, S.A.C. Domestic Capital Funding, Ltd. (the "**Second Lien Agent**"), replaced CIBC as the Second Lien Agent, pursuant to the Second Amendment to the Second Lien Agreement. Approximately $37 million plus interest, facility fees, costs, expenses and indemnities is outstanding under the Second Lien Agreement as of the Petition Date.

19.  The respective rights and obligations between and among the First Lien Lenders and the Second Lien Lenders are set forth in the Amended and Restated Intercreditor Agreement, amended and restated as of November 28, 2007 (the "**Intercreditor Agreement**"). The Intercreditor Agreement provides, among other things, that (i) the liens securing the First Lien Loans are senior in all respects and prior to any lien securing the Second Lien Loans; (ii) the liens securing the Second Lien Loans are junior and subordinate in all respects to all liens

securing the First Lien Loans; (iii) the Second Lien Lenders waive any right to contest the priority, validity, perfection or enforceability of any lien held by or on behalf of any of the First Lien Lenders; (iv) the Second Lien Lenders agree not to raise objection to the First Lien Lenders' acquiescence to the Debtors' requests to obtain financing pursuant to section 364 of the Bankruptcy Code; (v) the Second Lien Lenders agree that they will raise no objection or oppose a motion to sell or otherwise dispose of any of the Prepetition Collateral free and clear of their liens or other claims under section 363 of the Bankruptcy Code; (vi) the Second Lien Lenders may vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments, objections and motions that are, in each case, not inconsistent with the terms of the Intercreditor Agreement; (vii) to the extent that the Debtors' obligations under the Prepetition Loans distributed pursuant to a plan of reorganization are secured by liens upon the same property, the provisions of the Intercreditor Agreement survive such distribution pursuant to such plan; and (viii) the obligations under the First Lien Loans and those under the Second Lien Loans are to be classified separately in any plan of reorganization.

### (iii)     Subordinated Indebtedness

20.     On or about October 26, 2007, Chem Rx entered into five subordinated notes (collectively, the "**Sub Notes**"), in the aggregate amount of $8,258,748.47 with various payees—Jerry Silva, Steven Silva, the Jody R. Silva Trust, the Jerry Silva 2007 Annuity Trust, and Jerry Silva as life tenant and Steven Silva as remainderman (collectively, the "**Sub Note Payees**"). The Sub Notes are subject to an annual interest rate of 10% and mature on April 30, 2015. The Sub Notes are subordinate to the Prepetition Loans, and each Sub Note sets forth the respective rights and obligations between the Prepetition Lenders and the respective Sub Note Payee. The Sub Notes generally provide, among other things, that (i) Chem Rx shall not make any payment

on the Sub Notes until the Prepetition Loans have been paid in full, (ii) in the event of an insolvency, bankruptcy, liquidation or reorganization, the Prepetition Loans must be paid in full before any payment or distribution is made on account of or applied to the Sub Notes, and (iii) direct or indirect payment or distribution in contravention of the provisions in the Sub Notes shall be paid over or delivered to the Prepetition Lenders until all Prepetition Loans have been paid in full. As of the Petition Date, the full amount of the Sub Notes remained outstanding.

**D.** **Events Leading to The Chapter 11 Filing**

21. In the fourth quarter of 2008, the Debtors recorded certain charges in their books, including an increase in the allowance for doubtful accounts (the "**Fourth Quarter Charges**"), which, along with other factors, led to the Debtors' violation of three financial covenants under the Prepetition Loans as of December 31, 2008 (the "**Covenant Violations**"). These covenants require the Debtors to maintain specified ratios of earnings before interest, taxes, depreciation, and amortization ("**EBITDA**") to fixed charges and total debt, and restrict the amount of capital expenditures by the Debtors. The Fourth Quarter Charges and Covenant Violations caused the Debtors to delay filing their 2008 annual report on form 10-K ("**10-K**") with the Securities and Exchange Commission (the "**SEC**"). The Debtors have not filed a 10-K with the SEC since April 7, 2008.

22. As a result of the Covenant Violations, the First Lien Lenders suspended the Debtors' access to the revolving line of credit under the First Lien Agreement, constraining the Debtors' liquidity and diminishing the confidence of the Debtors' customers and vendors in the Debtors' financial health.

23. Further, upon the announcement of the Covenant Violations and the inability of Chem Rx to timely file the 10-K with the SEC, the Debtors' vendors began to significantly limit their trade credit to the Debtors. In the first half of 2009, the Debtors' trade credit diminished by

more than $15 million. As a result, the Debtors have since been conducting their business on limited liquidity, virtually operating on cash basis. In addition to the Debtors' financial constraints, the Debtors have been negatively affected by broader economic changes, including modifications to New York State Medicaid reimbursement policies on branded drug sales in New York, which has ultimately affected the Debtors' revenues and profits adversely (the "**NY Medicaid Reimbursement Changes**"). The Debtors' loss of customers and the negative impact of the NY Medicaid Reimbursement Changes have resulted in a downward adjustment in the Debtors' revenue, profit projections and gross margin.

24. Together, these events have resulted in a substantial reduction in the Debtors' liquidity position and ultimately, their revenues, which, in turn, have constrained the Debtors' ability to conduct business, completely eliminated their ability to engage in necessary capital expenditures, made them less competitive in the institutional pharmacy industry and limited the Debtors' available options for obtaining financing necessary to remain viable.

25. In order to address the business issues facing the Debtors, the Debtors undertook certain activities designed to improve their operations, such as a reduction in fixed costs and elimination of non-vital capital expenditures. Even with the success in reducing fixed costs and completely eliminating capital expenditures, the Debtors have not and will not be able to generate sufficient cash flow to meet their continuing obligations under the Prepetition Loans and operate their business. Exacerbating the Debtors' liquidity woes and revenue reduction are the continued global economic instability and the unique financial difficulties currently faced by the change in federal funding for and regulations associated with Medicare, Medicaid and nursing homes (one of the primary clients of the Debtors).

26.     In an attempt to address the Covenant Violations, the Debtors began negotiations with the Prepetition Lenders in early 2009. The Debtors and the Prepetition Lenders entered into a forbearance agreement (the "**Forbearance Agreement**") to facilitate a discussion to devise an overall solution in connection with the Covenant Violations. The Forbearance Agreement, effective as of April 30, 2009, first expired on June 15, 2009, and was extended to June 26, 2009. The Debtors have been operating without an effective forbearance agreement since that time.

27.     The Debtors have attempted for approximately a year, without success, to negotiate with the First Lien Lenders and the Second Lien Lenders over a waiver of the Covenant Violations, an amendment to the Prepetition Loans, or other options for restructuring their capital structure out-of-court. In July, 2009, the Debtors received an offer from a strategic buyer (the "**Strategic Buyer**") for the purchase of substantially all of their assets in an out-of-court sale. While negotiations over this proposal were ongoing, Strategic Buyer withdrew its offer and made a second offer at a substantially reduced price. Each of these offers were premised on the consent of all relevant constituencies. The terms of the second Strategic Buyer offer, however, did not provide enough incentives to the Debtors' constituencies for a viable consensual out-of court alternative, and Strategic Buyer refused at that time to agree to purchase the Debtors' assets through a sale under section 363 of the Bankruptcy Code. Although the Debtors marketed their assets from time to time over a period of two years and received several initial indications of interest, no other entity had made a firm offer to the Debtors for purchase of the Debtors' assets.

28.     Without a viable sale alternative, the Debtors, the First Lien Lenders, the Second Lien Lenders, and Jerry and Steven Silva began negotiations over the terms of a chapter 11 restructuring. During many months of negotiations, multiple different restructuring proposals

were discussed among these parties, often with two or three of the parties reaching agreement only to fail to receive the support of the rest of the parties. Ultimately, in October 2009, the Debtors and the First Lien Lenders determined to proceed with a chapter 11 reorganization that was not consented to by the Second Lien Lenders.

29.    In December 2009, however, Strategic Buyer approached the Debtors and the First Lien Lenders with a proposal to purchase substantially all of the Debtors' assets, but, this time, through a sale under section 363 of the Bankruptcy Code (the **"Potential Sale"**). The First Lien Lenders advised the Debtors that the Potential Sale pursuant to the Strategic Buyer offer was preferable to a restructuring without the Potential Sale. After significant negotiations between the Debtors and Strategic Buyer, and with the consent and support of the First Lien Lenders, the Debtors, in January 2010, entered into a non-binding letter of intent with Strategic Buyer, which set forth specific terms for Strategic Buyer's proposed acquisition of the Debtors, including a timeline for Strategic Buyer to complete its due diligence and execute the Strategic Buyer APA with the Debtors, prior to the Debtors' chapter 11 bankruptcy filing. As of the date hereof, Strategic Buyer has failed to proceed to definitive documentation on the Potential Sale and the Debtors obligations under the letter of intent have expired.

30.    As part of the continued negotiations between the Debtors and the First Lien Lenders, the Debtors retained RSR Consulting, LLC to provide Robert Rosenfeld as Chief Restructuring Officer (**"CRO"**). In March 2010, in the absence of an imminent consummation of the Potential Sale, the First Lien Lenders informed the Debtors that it desired to proceed to a consensual reorganization through a chapter 11 plan. The Debtors and the First Lien Lenders further negotiated a term sheet (the **"March Term Sheet"**) wherein the Debtors would hire an investment banker to market their assets and pursue a transaction for the sale of substantially all

of the Debtors' assets and, if no offer acceptable to the First Lien Lenders was received, a reorganization with the First Lien Lenders would receiving substantially all of the equity in the reorganized entity, each through a plan of reorganization.

31.     On May 1, 2010, the Debtors retained Lazard Middle Market LLC ("**Lazard**") as its investment bankers to organize and run a sales a marketing process.  Even before Lazard has had an opportunity to begin its process, the Debtors were in active negotiations with several parties over a sales transaction and had begun due diligence with others.  The Debtors anticipate that once Lazard has an opportunity to actively engage in a sale process other parties will express interest in discussing a potential transaction.

32.     Although the Debtors were proceeding to implement the restructuring contemplated by the March Term Sheet, including most notably through the active engagement of Lazard, without notice to the Debtors on May 10, 2010, the First Lien Lenders filed an action in New York State Court to enjoin the Debtors' use of its cash that is subject to the First Lien Lenders' liens.  The First Lien Lender's exercise of remedies foreclosed the Debtors' ability to continue its attempts to reorganize outside of the protections of chapter 11.  Given the First Lien Lenders' exercise of remedies, Chapter 11 is the only viable option to maximize the value of the Debtors' estates and to reduce potential risks, contingencies and uncertainties.  The Debtors believe that the chapter 11 protection will allow the Debtors to sell their assets as a going concern or otherwise restructure while maintaining its business operations.  In order to maintain the Debtors' enterprise value pending the sale or restructuring, the Debtors require the use of cash collateral to fund their business in the ordinary course, including the funding of payroll, additional drug purchases, other general expenses and interest expenses.  Each relief sought in the First Day Motions is necessary in minimizing disruption in the Debtors' business and

preventing further erosion of the Debtors' enterprise value in these Cases. A prompt and orderly chapter 11 proceeding will maximize the value of the estates and, therefore, are in the best interests of all stakeholders.

## III.
## FIRST DAY MOTIONS [3]

33. Concurrently with filing the voluntary petitions to commence these Cases, the Debtors will be filing a number of First Day Motions. The Debtors anticipate that the Court will conduct a hearing within a business day or two after the commencement of the Cases (the "**First Day Hearing**"), during which the Court will entertain the argument of counsel with respect to the relief sought in each of the First Day Motions.

34. Generally, the First Day Motions have been designed to meet the immediate goals of: (a) establishing procedures for the efficient administration of the Cases; (b) continuing the Debtors' operations during these Cases with as little disruption and loss of productivity as possible; and (c) maintaining the confidence and support of the Debtors' other key constituencies. I have reviewed each of the First Day Motions, including the exhibits attached thereto, and believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve success in these Cases.

35. The First Day Motions are summarized below:

**A.    Motion of the Debtors for Entry of an Order**
**Directing Joint Administration of Chapter 11 Cases**

36. Chem Rx is the ultimate parent entity of all of the other Debtors in these Cases, such that all of the Debtors constitute "affiliates" of one another within the meaning of 11 U.S.C.

---

[3] Capitalized terms used in Part IV and not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Motions.

§ 101(2).[4] Joint administration of these Cases (a) is warranted because the Debtors' financial affairs and business operations are closely related, and (b) will ease the administrative burden on the Court and parties-in-interest in these Cases. The Debtors anticipate that numerous notices, applications, motions, other documents, pleadings, hearings, and orders in these Cases will affect all of the Debtors. With six affiliated Debtors, each with its own case docket, the failure to administer these Cases jointly would result in numerous duplicative pleadings being filed and served upon parties identified in separate service lists. Such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Debtors, the Clerk of this Court, creditors, and other parties-in-interest in these Cases.

37.     Joint administration will permit the Clerk to use a single general docket for the Debtors' Cases and to combine notices to creditors and other parties-in-interest of the Debtors' respective estates. Joint administration also will protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective Cases will be apprised of the various matters before the Court in all of these Cases.

**B.      Motion of the Debtors for Entry of an Order (A) Authorizing the Use of Cash Collateral, (B) Deeming Prepetition Secured Lenders Adequately Protected, and (C) to Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001**

38.     All of the Debtors' cash, including cash in their deposit accounts whether as original collateral or the product of the Debtors' other prepetition collateral as set forth in the documents evidencing the First Lien Debt constitutes cash collateral of the First Lien Lenders and the Second Lien Lenders (the "**Cash Collateral**"). The Debtors seek to use the Cash

---

[4] Section 101(2) of the Bankruptcy Code defines "affiliate" to include, in relevant part, a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor…" 11 U.S.C. §101(2).

Collateral until a Final Hearing and then until the effective date of any chapter 11 plan as set forth in the budget attached to the Cash Collateral Motion (the "**Budget**").

39.　　The use of the Cash Collateral is critical to the Debtors' ability to preserve and protect the value of their assets and operations for the benefit of their creditors and estates. The Debtors require immediate access to the Cash Collateral to fund and support ordinary business expenditures including payroll and employee benefits, purchase of pharmaceutical goods and packaging materials, and other overhead expenses. Absent immediate and uninterrupted access to use the Cash Collateral, the Debtors will not have sufficient liquidity to preserve and maintain their operations. Accordingly, the Debtors seek emergency and interim relief, as well as permanent authorization to use Cash Collateral.

**C.**　　**Motion of the Debtors for Entry of an Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms, (B) Authorizing the Continued Use of Existing Cash Management System, (C) Waiving Certain Investment and Deposit Guidelines, and (D) Granting Administrative Expense Status to Postpetition Intercompany Claims**

40.　　The Debtors filed a motion to preserve their consolidated cash management system, which builds in efficiencies that should be preserved during the chapter 11 Cases, in order to keep costs and administration to a minimum, which will benefit all creditors (the "**Cash Management Motion**"). Prior to the commencement of their chapter 11 Cases, and in the ordinary course of their business, the Debtors maintained 19 bank accounts (the "**Bank Accounts**") that the Debtors desire to continue to use. A list of all Bank Accounts used by the Debtors is attached to the Cash Management Motion as **Exhibit "A"**. The Bank Accounts are part of a carefully constructed and highly-automated cash management system (the "**Cash Management System**") that ensures the Debtors' ability to efficiently monitor and control their cash position, as is more fully described in the Cash Management Motion and as set forth in the account flow chart attached to the Cash Management Motion as **Exhibit "B"**.

41.     The Debtors' transition into chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of these Cases with the same account numbers and, where applicable, automated relationship. The Debtors further request authority to deposit funds in and withdraw funds from all such accounts by all usual means including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers, and other debits and to treat the Bank Accounts for all purposes as debtor-in-possession accounts.

42.     To minimize administrative expense and delay, the Debtors also request authority to continue to use their pre-printed correspondence, and business forms, including, but not limited to, letterhead, envelopes, promotional materials, and other business forms (collectively, the "**Business Forms**"), substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' "Debtor-in-Possession" status.

43.     The Debtors also maintain business relationships with each other that give rise to intercompany claims (the "**Intercompany Transactions**"). The Debtors maintain records of substantially all Intercompany Transactions, including fund transfers, and thus can ascertain, trace and account for Intercompany Transactions. The Debtors reconcile all Intercompany Transactions on a monthly basis. The Debtors will continue to maintain records and appropriately reconcile all Intercompany Transactions postpetition. The Debtors request authority to grant administrative expense priority to the Intercompany Transactions.

44.     Each relief requested in the Cash Management Motion will help ensure the Debtors' smooth transition into chapter 11 and prevent the possible disruptions and distractions that could otherwise divert the Debtors' attention from more pressing matters during the initial days of these chapter 11 Cases.

**D.  Motion of the Debtors for Entry of an Order (I) Authorizing Debtors to Pay (A) All Prepetition Employee Obligations, and (B) Prepetition Withholding Obligations, and (II) Directing Banks to Honor Related Prepetition Transfers**

45.     One vital First Day Motion is the Debtors' Motion for Entry of an Order (i) Authorizing Debtors to Pay (a) All Prepetition Employee Obligations, and (b) Prepetition Withholding Obligations and (ii) Directing Banks to Honor Related Prepetition Transfers (the "**Employee Wage Motion**"). Employees are essential to the continued operation of the Debtors' business and the Employees' morale directly affects their effectiveness and productivity. Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date. If the checks issued and electronic fund transfers requested in payment of any of the compensation or other Employee obligations are dishonored, or if such obligations are not timely paid postpetition, the Employees may likely suffer extreme personal hardship and may be unable to pay their daily living expenses. A loss of employee morale and goodwill at this crucial juncture would undermine the Debtors' stability, and undoubtedly would have a negative effect on the Debtors, their customers, the value of their assets and business, and their ability to achieve their objectives in chapter 11.

46.     In order to enable the Debtors to retain their current Employees (as described and discussed in the Employee Wage Motion) to minimize the personal hardship such Employees may suffer if prepetition employee-related obligations are not paid when due, or honored as expected, and to maintain morale, the Debtors filed a motion to seek authority, in their discretion, to pay and/or honor (a) all prepetition claims of Employees, up to the statutory cap of $10,950 per Employee, (b) any claims or payments pursuant to the Employee Benefit Plans, and (c) all prepetition federal and state withholding obligations, as well as an order directing all banks to honor the Debtors' prepetition checks or electronic transfers for payment of the

foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

**E.   Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Pay Prepetition Use, Franchise and Similar Taxes and Regulatory Fees in the Ordinary Course of Business, and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

47.     The Debtors further intend to file a motion, seeking authority to pay, in the Debtors' sole discretion, prepetition Taxes and Fees (as defined below) owed to the Taxing and Regulatory Authorities (as defined below), including, without limitation, Taxes and Fees subsequently determined to be owed for periods prior to the Petition Date, in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared on the Petition Date) not to exceed $65,000 which is the aggregate maximum sum that the Debtors currently believe will be due on account of prepetition Taxes and Fees (the "**Tax Motion**").

48.     In connection with the normal operation of their business, the Debtors pay an assortment of use, franchise, and similar taxes (collectively, the "**Taxes**") to various federal, state, and local taxing authorities (collectively, the "**Taxing Authorities**") and pay various regulatory fees ("**Regulatory Fees**," and together with the Taxes, the "**Taxes and Fees**") to federal, state, and local regulatory authorities (collectively, the "**Regulatory Authorities**," and together with the Taxing Authorities, the "**Taxing and Regulatory Authorities**"), including, but not limited to, those Taxing and Regulatory Authorities listed on **Exhibit "A"** attached to the Tax Motion.[5]

49.     To the extent any check issued or electronic transfer initiated prior to the Petition Date to satisfy any prepetition obligation on account of Taxes or Regulatory Fees has not cleared

---

[5] Inclusion of a Taxing or Regulatory Authority on **Exhibit "A"** does not constitute an acknowledgement by the Debtors that the Debtors owe any obligation to such authority or that such authority will be paid pursuant to any order entered on this Motion.

the banks as of the Petition Date, the Debtors request the Court to authorize the banks, when requested by the Debtors in their sole discretion, to receive, process, honor, and pay such checks or electronic transfers, provided that there are sufficient funds available in the applicable accounts to make such payments. The Debtors also seek authorization to issue replacement checks, or to provide for other means of payment to the Taxing and Regulatory Authorities, to the extent necessary to pay such outstanding Taxes and Fees owing for periods prior to the Petition Date.[6]

50.     For the reasons described above, the payment of prepetition Taxes and Fees will help the Debtors avoid serious disruption to their operations that would result from the failure to pay such Taxes and Fees, including the distraction and adverse affect on morale that could result from liability for nonpayment imposed upon the Debtors' directors and officers. Furthermore, nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in applicable jurisdictions, and seeking to lift the automatic stay, all of which could disrupt the Debtors' day-to-day operations, impose significant costs on the Debtors' estates, and destroy the going-concern value of the Debtors' business.

**F.     Motion of the Debtors for Entry of Interim and Final Orders
Pursuant to Sections 105(a) and 366 of the Bankruptcy Code
(I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service,
(II) Deeming Utilities Adequately Assured of Future Performance, and
(III) Establishing Procedures for Determining Adequate Assurance of Payment**

51.     In connection with the operation of their business and management of their estates, the Debtors obtain electricity, gas, water, sewer services, telephone services, and/or other

---

[6] Because each of the checks or electronic transfers is readily identified as relating directly to an authorized payment of prepetition Taxes and Fees, the Debtors believe that checks and electronic transfers for payments that are not authorized will not be honored inadvertently.

similar services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Providers**"), including those listed on **Exhibit "A"** attached to the Utilities Motion (as defined below) (the "**Utility Provider List**").

52.     The Debtors intend to file a motion (the "**Utilities Motion**") to seek entry of a bridge order and a final order giving effect procedures for the provision of adequate assurance of performance to the Utilities Providers. Uninterrupted utility services are essential to the preservation of the Debtors' estates and assets, and therefore, to the success of these Cases. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' ability to preserve and maximize the value of their respective estates could be severely and irreparably harmed. Specifically, lack of electricity and phone service would render the Debtors' burglar and fire alarm systems, which are necessary to maintain insurance coverage, inoperable. In addition,  the lack of electricity would cause a shut-down of the Debtors' refrigeration units which would destroy all of the Debtors' inventory requiring refrigeration as well as significant value for all creditor-constituencies with respect to such inventory loss and loss in customer receipts in connection with the sale of such inventory. Finally, the loss of electricity may cause malfunction to the Debtors' computerized tracking of controlled substances which must be accounted for to maintain the welfare and safety of the public. It is therefore critical that utility services continue uninterrupted.

**G.**     **Motion of the Debtors for Entry of an Order Authorizing**
         **Debtors to (I) Maintain Existing Insurance Policies and Pay All Policy**
         **Premiums and Broker's Fees Arising Thereunder, and (II) Continue**
         **Insurance Premium Financing Programs and Pay Insurance**
         **Premium Financing Obligations Arising in Connection Therewith**

53.     The Debtors believe it is in the best interests of their estates to permit the Debtors to honor their obligations under the current insurance contracts (including related brokers fees) and, therefore, intend to file a motion to seek authority to honor those obligations (the

"**Insurance Motion**").  In the ordinary course of the Debtors' business, the Debtors maintain numerous insurance policies providing coverage for, *inter alia,* general liability, umbrella liability, automobiles, commercial output, equipment breakdown, director and officer, excess director and officer, employment practices, fiduciary, crime, workers compensation and an ERISA fidelity bond (collectively, the "**Policies**").  A list of the Policies is attached to the Insurance Motion as **Exhibit "A."**  These Policies are essential to the preservation of the Debtors' business, properties, and assets, and, in many cases, such insurance coverages are required by various regulations, laws, and contracts that govern the Debtors' business conduct. As a result, the Debtors seek authority to continue making payments under their insurance policies as well as to continue their premium financing arrangements with respect to the Policies.

## H.    Chapter 11 Professionals

54.    In the early days of the Cases, the Debtors anticipate seek entry of orders authorizing them to employ and retain various professionals to assist them in the conduct of these cases, including:

(a)    Greenberg Traurig, LLP as counsel for the Debtors;

(b)    Cypress Associates LLC as financial advisor to the Debtors;

(c)    Lazard Middle Market LLC as investment bankers for the Debtors;

(d)    RSR Consulting, LLC to provide chief restructuring officer and additional personnel and appointing Robert Rosenfeld as chief restructuring officer to the Debtors; and

(e)    Professionals Utilized by the Debtors in the Ordinary Course of Business.

55.    The Debtors further anticipate filing an application for an administrative order establishing procedures for the interim and monthly compensation and reimbursement of expenses of professionals.

# IV.
## CONCLUSION

56.     The primary purpose of the filing of these Cases is to prevent deterioration and to

protect the going-concern value of the business operated by the Debtors.  In the interim, through

the Motions and Applications described above, the Debtors seek to minimize certain adverse

affects that these Cases might otherwise have on their business, while honoring the spirit of the

chapter 11 process.

57.     To preserve the value of their business to the fullest extent possible, the Debtors'

immediate objective is to maintain "business as usual" following the commencement of these

Cases by minimizing the adverse impact of the filing on the Debtors' assets and operations.  For

the reasons described herein and in the First Day Motions, I believe that the prospect for

achieving these objectives for the benefit of creditors and other stakeholders will be substantially

enhanced if this Court grants the relief requested in each of the First Day Motions and

respectfully request the Court to do so.

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is

true and correct to the best of my information, knowledge and belief.

Dated: May 11, 2010

_____
GARY M. JACOBS
CHIEF FINANCIAL OFFICER
Chem Rx Corporation,
Debtor and Debtor-in-Possession