# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CHEM RX CORPORATION, *et al.*,[1] | Case No. 10-11567 (MFW) |
| Debtors. | (Joint Administration Pending) |

## EMERGENCY MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (A) AUTHORIZING THE USE OF CASH COLLATERAL, (B) DEEMING PREPETITION SECURED LENDERS ADEQUATELY PROTECTED, AND (C) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby move the Court (the "**Motion**") for entry of interim and final orders pursuant to sections 361 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"): (a) authorizing the Debtors' use of Cash Collateral (as defined below) in accordance with the Budget (as defined below), (b) deeming the Lenders (as defined below) adequately protected in connection with the Debtors' use of Cash Collateral, (c) scheduling a final hearing pursuant to Bankruptcy Rule 4001 for the continued use of Cash Collateral, and (d) providing additional relief required in order to effectuate the foregoing. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors and the last four digits of each Debtor's tax identification number are: Chem Rx Corporation (8469), B.J.K. Inc. (5997), ChemRx New Jersey, LLC (9370), ChemRx/Salerno's, LLC (5981), ChemRx-Boca Raton, LLC (8021) and ChemRx Care, LLC (0826).

## Preliminary Statement

1. The use of the Cash Collateral is critical to the Debtors' ability to preserve and protect the value of their assets and operations for the benefit of their creditors and estates. Concurrent with the need to preserve and protect the value of their assets and operations, it is also imperative that the Debtors' operations not be interrupted. Annually, the Debtors provide over six million prescriptions to more than 69,000 residents of more than 400 institutional customers. These people rely upon the Debtors for the timely delivery of vital prescription medication.

2. Although the Debtors are hopeful that they will reach agreement with the First Lien Lenders on the terms of consensual use of Cash Collateral before the hearing on this Motion, as of the date of this Motion, the Lenders have not consented to the use of Cash Collateral.[2] As a result, the Debtors are now compelled to request approval of the use of Cash Collateral in order to have sufficient funds to operate their business and to facilitate a smooth transition into chapter 11. The Debtors require immediate access to the Cash Collateral to fund and support ordinary business expenditures including payroll and employee benefits, purchase of pharmaceutical goods and packaging materials, and other necessary operating expenses. Absent immediate and uninterrupted access to Cash Collateral, the Debtors will not have sufficient liquidity to preserve and maintain their operations. The value of the Debtors' estates is heavily dependent upon their ability to serve their customers and pay their vendors. Accordingly, the Debtors seek emergency and interim relief, as well as permanent authorization to use Cash Collateral.

---

[2] In the event the First Lien Lenders consent to the use of Cash Collateral, the Second Lien Lenders are precluded from objecting pursuant to the terms of the Intercreditor Agreement (as defined below).

## Status of the Case and Jurisdiction

3. On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4. The Debtors have continued in possession of their properties and are operating and managing their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not yet been appointed in these cases.

6. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1408. This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

7. The statutory predicates for the relief sought herein are sections 361 and 363 of the Bankruptcy Code, Bankruptcy Rules 4001, 6004 and 9014 and Local Rule 4001-2.

## Bankruptcy Rule 4001 Concise Statement[3]

8. By this Motion, the Debtors request, *inter alia*, the prompt entry of an interim order (the "**Interim Order**") pending determination on a final basis (the "**Final Order**") authorizing the use of Cash Collateral and providing Adequate Protection to the Lenders. The material provisions of the Debtors' request for use of Cash Collateral are summarized as follows and set forth in the following sections of the proposed Interim Order and Final Order:

(a) <u>Name of Each Entity with Interest in the Cash Collateral</u>. The entities with an interest in the Cash Collateral include: (i) Canadian Imperial Bank of Commerce, New York Agency, under that certain First Lien Pledge and Security Agreement dated as of October 26, 2007 (as amended, restated, supplemented or otherwise modified from time to time) and the lenders thereto, and (ii) S.A.C. Domestic Capital Funding Ltd., successor as collateral agent, under that certain Second Lien

---

[3] Capitalized terms used but not defined in the Rule 4001 Statement are defined below.

Pledge and Security Agreement dated October 26, 2007 (as amended, restated, supplemented or otherwise modified from time to time) and the lenders thereto.

(b) Use of Cash Collateral. The Debtors shall use the Cash Collateral to: (i) maintain their business in the ordinary course consistent with prepetition practices; (ii) pay chapter 11 fees and expenses including U.S. Trustee fees; and (iii) pay allowed professional fees incurred in these Cases (as defined below).

(c) Termination Date. The Debtors' use of the Cash Collateral shall continue until a Final Order is entered and then until the effective date of a chapter 11 plan or conversion of these Cases to cases under chapter 7 of the Bankruptcy Code.

(d) Adequate Protection. The Debtors will provide the Lenders adequate protection (the "**Adequate Protection**") in the form of replacement liens on substantially all of the assets of the Debtors to extent that the use of the Cash Collateral results in the diminution in the value of the Lenders' interest in the Cash Collateral from and after the Petition Date.

(c) Carve-Out. The liens and claims granted to the Lenders will be subject to a carve-out for postpetition professional fees and for the payment of the U.S. Trustee fees in the Cases as provided in the Budget to be submitted in connection with a proposed Final Order relating to the use of Cash Collateral (collectively, the "**Carve-Out**").

## BACKGROUND

9. Founded more than 40 years ago, the Debtors are a leading long-term care pharmacy serving multiple institutions, including skilled nursing homes, group homes, correctional institutions and other long-term care facilities. The Debtors provide prescription and non-prescription drugs, intravenous medications, durable medical equipment items and surgical supplies for residents of these institutions in New York, New Jersey, Pennsylvania, and Florida. Annually, the Debtors provide over six million prescriptions to more than 69,000 residents of more than 400 institutional customers. The Debtors' operations are conducted as a single business segment through separate corporate entities in each jurisdiction in which they are licensed to provide pharmacy services.

10. Although the Debtors' businesses remain strong, the Debtors are too highly leveraged and lack adequate liquidity to sustain operations long term. The Debtors have been in default under their secured loans since the beginning of 2009 and have been operating without an effective forbearance agreement since the end of June 2009. The Debtors have attempted over the last year to negotiate with their secured lenders over a consensual restructuring of their assets and liabilities to permit them to continue as a going concern. Those negotiations did not result in a consensus over a viable restructuring alternative.

11. On May 10, 2010, the Debtors' First Lien Lenders filed an action in New York State Court to enjoin the Debtors' use of cash that is subject to the First Lien Lenders' liens. If the First Lien Lenders were successful in enjoining the Debtors' use of their cash, the Debtors would be unable to continue operations. As a result, the Debtors, in the exercise of their reasonable business judgment and having reviewed their remaining alternatives, determined that the most effective way to maximize the value of the Debtors' estates for the benefit of their creditor constituencies was to seek bankruptcy protection in order to pursue a sale or restructuring of their assets and liabilities.

12. A more detailed factual background of the Debtors' business and operations, as well as the commencement of these chapter 11 cases (the "**Cases**"), is more fully set forth in the *Declaration of Gary M. Jacobs in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief,* (the "**First Day Declaration**")[4] filed on the Petition Date and incorporated herein by reference.

---

[4] Terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Declaration.

### A. Prepetition Secured Debt

13. Prior to the Petition Date, the Debtors obtained $152 million principal amount of secured debt financing. There are two tranches of secured debt: (i) a senior secured loan in the original principal amount of $125,000,000 comprised of a $80,000,000 term loan, a $20,000,000 delayed draw term loan, and a $25,000,000 revolving line of credit; and (ii) a second lien term loan in the original principal amount of $37,000,000. The respective rights and obligations between and among the first-lien and second-lien loans are governed by their Intercreditor Agreement (as defined below).

#### i. First- Lien Debt

14. On or about October 26, 2007, Chem Rx, as borrower (the "**Borrower**"), the other Debtors, as guarantors, and CIBC World Markets Corp. ("**CIBC**") as agent, sole lead arranger and sole book runner (the "**First Lien Agent**") and certain lenders (together with the First Lien Agent, the "**First Lien Lenders**") entered into that certain First Lien Credit and Guaranty Agreement (as amended, supplemented or otherwise modified or restated, the "**First Lien Agreement**"), pursuant to which, *inter alia*, the First Lien Lenders agreed to make certain loans and financial accommodations to the Borrower in the aggregate principal amount of up to $125,000,000, comprised of $80,000,000 aggregate principal amount of initial term loan facilities, $20,000,000 aggregate principal amount of delayed draw term loans, and up to $25,000,000 aggregate principal amount of a revolving loan (collectively, the "**First Lien Debt**").

15. The First Lien Debt is secured by prepetition first priority liens on, and security interests in, the Debtors' cash and cash equivalents (the "**Cash Collateral**") as well as substantially all of the Debtors' assets as set forth in the documents evidencing the First Lien

6

Debt (the "**Prepetition Collateral**"). Approximately $103 million (inclusive of interest, facility fees, costs, expenses, swap exposure and indemnities) was outstanding under the First Lien Debt as of the Petition Date. A copy of the First Lien Agreement is annexed hereto as **Exhibit "A"**.

    ii.    <u>**Second-Lien Debt**</u>

16. On or about October 26, 2007, Chem Rx, as borrower, and the other Debtors, as guarantors, and CIBC, as agent, sole lead arranger and sole book runner and certain lenders (together with the Second Lien Agent (defined below), the "**Second Lien Lenders**" and together with the First Lien Lenders, the "**Lenders**") entered into that certain Second Lien Credit and Guaranty Agreement (as amended, supplemented or otherwise modified or restated, the "**Second Lien Agreement**"), pursuant to which, inter alia, the Second Lien Lenders agreed to make certain loans and financial accommodations to the Borrower in the aggregate principal amount of up to $37,000,000 of a term loan (the "**Second Lien Debt**," and together with the First Lien Debt, the "**Prepetition Loans**"). The Second Lien Debt is secured by prepetition second priority liens on, and security interests in, the Prepetition Collateral. As of April 30, 2009, S.A.C. Domestic Capital Funding, Ltd. ("**S.A.C.**"), replaced CIBC as the second lien agent, pursuant to the Second Amendment to the Second Lien Agreement. Approximately $37 million (exclusive of interest, fees, costs, expenses and indemnities) was outstanding under the Second Lien Debt as of the Petition Date. A copy of the Second Lien Agreement is attached hereto as **Exhibit "B"**.

    iii.    <u>**Intercreditor Agreement**</u>

17. The respective rights and obligations between and among the First Lien Lenders and the Second Lien Lenders are set forth in the Amended and Restated Intercreditor Agreement, amended and restated as of November 28, 2007 (the "**Intercreditor Agreement**"). A copy of the Intercreditor Agreement is attached hereto as **Exhibit "C"**.

7

NY 240,016,254v7

18. The Intercreditor Agreement provides, among other things, that (i) the liens securing the First Lien Debt are senior in all respects and prior to any lien securing the Second Lien Debt; (ii) the liens securing the Second Lien Debt are junior and subordinate in all respects to all liens securing the First Lien Debt; (iii) the Second Lien Lenders waive any right to contest the priority, validity, perfection or enforceability of any lien held by or on behalf of any of the First Lien Lenders; (iv) the Second Lien Lenders agree not to raise objection to the First Lien Lenders' acquiescence to the Debtors' requests to obtain financing pursuant to section 364 of the Bankruptcy Code, use of Cash Collateral as defined in section 363(a) of the Bankruptcy Code or request for adequate protection with respect thereto; (v) the Second Lien Lenders agree that they will raise no objection or oppose a motion to sell or otherwise dispose of any of the Prepetition Collateral free and clear of their liens or other claims under section 363 of the Bankruptcy Code; (vi) the Second Lien Lenders may vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments, objections and motions that are, in each case, not inconsistent with the terms of the Intercreditor Agreement; (vii) to the extent that the Debtors' obligations under the Prepetition Loans distributed pursuant to a plan of reorganization are secured by liens upon the same property, the provisions of the Intercreditor Agreement survive such distribution pursuant to such plan; and (viii) the obligations under the First Lien Debt and those under the Second Lien Debt are to be classified separately in any plan of reorganization. *See* Intercreditor Agreement, at Section 6.

### The Proposed Use of Cash Collateral

19. All of the Debtors' cash, including cash in their deposit accounts whether as original collateral or products of other Prepetition Collateral, constitutes Cash Collateral of the First Lien Lenders and the Second Lien Lenders. The Debtors seek to use the Cash Collateral on

an interim basis until a Final Hearing and then until the effective date of any chapter 11 plan or conversion of these Cases to cases under chapter 7 of the Bankruptcy Code.

20. The Debtors require the use of their revenues and other Cash Collateral to maintain their operations, as well as to preserve and maximize the value of the Debtors' estates while the Debtors transition into chapter 11 and evaluate whether to conduct a sale of substantially all of their assets or pursue confirmation of a chapter 11 plan. The Debtors will use Cash Collateral as set forth in the three week budget attached hereto as **Exhibit "D"** (the "**Initial Budget**") and any subsequent budget approved by the Court (together with the Initial Budget, the "**Budget**").

### Relief Requested

21. By this Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to use Cash Collateral in accordance with the Budget, (b) deeming the Lenders adequately protected in connection with the Debtors' use of Cash Collateral, (c) scheduling a final hearing pursuant to Bankruptcy Rule 4001 for the continued use of Cash Collateral, and (d) providing additional relief requested in order to effectuate the foregoing. Without the use of Cash Collateral, the Debtors would have to cease operations to the detriment of all parties in interest. Accordingly, without immediate access to Cash Collateral, the Debtors will suffer immediate and irreparable harm. Based on the authority below, the Debtors respectfully submit that the proposed use of Cash Collateral should be granted.

### Basis for Relief

A. **Request for Use of Cash Collateral and Provision of Adequate Protection**

22. The Debtors require access to Cash Collateral in order to operate and maintain the value of their estates during the period that the Debtors evaluate the sale of substantially all of

their assets or reorganization alternatives. As of the filing of this Motion, the Lenders have not consented to such use. Therefore, the Debtors request immediate authority to use Cash Collateral on the terms set forth in the proposed Interim Order to prevent immediate and irreparable harm to the Debtors' estates.

23. A debtor's cash is "the life's blood of the business" and the bankruptcy court must assure that such cash "is available for use even if to a limited extent." *See In re Mickler*, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981). Section 363(c) of the Bankruptcy Code provides as follows:

> (1) If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.
>
> (2) The trustee may not use, sell, or lease Cash Collateral under paragraph (1) of this subsection unless –
>
> > (a) each entity that has an interest in such Cash Collateral consents; or
> >
> > (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c).

24. Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." *See* 11 U.S.C. § 363(e).

25. Section 361 of the Bankruptcy Code provides that:

> [W]hen adequate protection is required . . . of an interest of an entity in property, such adequate protection may be provided by--
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent the . . . use . . . under section

10

>363 of this title . . . results in a decrease in the value of such entity's interest in such property;
>
>(2) providing to such entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of such entity's interest in such property; or
>
>(3) granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent in such entity's interest in such property

11 U.S.C. § 361.

26. Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Martin*, 761 F.2d, 472, 474 (8th Cir. 1985); *Shaw Indus. v. First Nat'l Bank (In re Shaw Indus., Inc.)*, 300 B.R. 861, 865-66 (Bankr. W.D. Pa. 2003) (*quoting In re Sharon Steel Corp.*, 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993)). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Bev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("the whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy") (citation omitted).

27. Neither section 361 nor any other provision of the Bankruptcy Code defines the nature and extent of a secured creditor's "interest in property" for which such secured creditor is entitled to adequate protection under section 361. Section 361, however, plainly provides that a secured creditor's "interest in property" demands protection only to the extent that the use of the secured creditor's collateral will result in a decrease in the "value of such entity's interest in such property." 11 U.S.C. §§ 361, 363(e); *see also In re Pursuit Athletic Footwear, Inc.* 193 B.R. at

11

716; *General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.)*, 25 B.R. 987, 989-90 & n.4 (Bankr. D. Utah 1982).

28.  The phrase "value of such entity's interest", although not defined in the Bankruptcy Code, was addressed by the Supreme Court in the landmark decision *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988). In reaching a determination as to the meaning of "value of such entity's interest," the Supreme Court was guided by section 506(a), which defined a creditor's allowed secured claim:

> The phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral.' H.R. Rep. No. 950-595, pp. 181, 356 (1977); *see also* S. Rep. No. 95-989, p. 68 (1978), U.S. Code Cong. & Admin. News, 1978 pp. 5787, 5854, 6141, 6312. <u>We think the phrase 'value of such entity's interest' in § 361(1) and (2), when applied to secured creditors, means the same.</u>

*Id.* at 630 (emphasis added). *Timbers* teaches that a secured creditor is entitled to "adequate protection" only against diminution in the value of the collateral securing the creditor's allowed secured claim. Thus, where the "value of the collateral" is not diminishing by its use, sale or lease, the creditor's interest is adequately protected.

29.  Nevertheless, adequate protection must be determined on a case-by-base basis, in light of the particular facts and circumstances presented, the focus being that which is required to protect a secured creditor from diminution in the value of its interest in the particular collateral during the use period. *In re Ledgmere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990); *Delbridge v. Production Credit Assoc. and Federal Land Bank*, 104 B.R. 824, 827 (E.D. Mich. 1989); *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). Courts routinely recognize that the granting of replacement liens on assets generated during the postpetition period is an acceptable form of adequate protection. *See, e.g., Swedeland*, 16 F.3d at 564, 566; *In re Int'l Design & Display*

NY 240,016,254v7

*Group, Inc.*, 154 B.R. 362, 364 (Bankr. S.D. Fla. 1993); *In re Karl A. Neise, Inc.*, 16 B.R. 602, 603 (Bankr. S.D. Fla. 1981). Courts generally conclude that where a secured creditor's interest is being maintained and cash collateral is to be used to meet operating and overhead expenses, a debtor may provide adequate protection for the use of proceeds derived from postpetition assets by granted a secured creditor a replacement lien on postpetition assets. *See Int'l Design*, 154 B.R. at 364; *Karl Neise*, 16 B.R. at 603.

30. The Lenders have not consented to the Debtors' use of Cash Collateral. Approval of the Debtors' use of Cash Collateral is nevertheless appropriate because the Lenders' interests will be adequately protected as the Debtors will provide the Lenders replacement liens on substantially all assets of the Debtors to extent that the use of the Cash Collateral results in a decrease in the value of the Lenders' interest in the Cash Collateral. Thus, the Debtors have satisfied the requirements of section 363(c)(2)(A) authorizing the Debtors' use of the Cash Collateral.

31. Subject to the Carve-Out for professional fees and U.S. Trustee fees incurred in these Cases, the Debtors propose to provide a replacement lien on all cash and accounts receivable to the extent that the use of the Cash Collateral results in a decrease in the value of the Lenders' interest in such Cash Collateral. The provision of replacement liens on all cash and accounts receivable to extent that the use of the Cash Collateral results in a decrease in the value of the Lenders' interest in such property provides adequate protection to the Lenders on account of their Prepetition Loans. Accordingly, the adequate protection proposed herein to protect the Lenders' interest in the Cash Collateral is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

NY 240,016,254v7

32. By this Motion, pursuant to the proposed Interim Order and the Final Order, the Debtors seek to grant the Lenders the adequate protection described above to the extent that the use of the Cash Collateral results in a decrease in the value of the Lenders' interest in such Cash Collateral. Such adequate protection will be subject and subordinate to the Carve-Out for professional fees and U.S. Trustee fees incurred in connection with these chapter 11 Cases.

33. Without the use of the Cash Collateral, the Debtors will not be able to operate while pursuing the sale of substantially all of their assets and confirmation of a liquidating chapter 11 plan. The Debtors' use of Cash Collateral will allow the Debtors to maximize the value of their estates and enhance creditor recoveries for all parties-in-interest. The Debtors therefore request that the Court authorize the Debtors' use of Cash Collateral and the grant the proposed form of adequate protection contemplated by the Debtors.

**B.     Immediate Need for Use of Cash Collateral to Avoid Irreparable Harm**

    **i.     Request Under Bankruptcy Rule 4001 for Expedited Hearing**

34. Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use Cash Collateral may not be commenced earlier than fifteen (15) days after the service of such motion. However, upon request, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of Cash Collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

35. Pursuant to Bankruptcy Rule 4001(b), the Debtors request the Court conduct an expedited preliminary hearing on this Motion and (a) authorize the Debtors to use Cash Collateral on an interim basis, pending entry of the Final Order, in order to (i) maintain and finance their ongoing operations, and (ii) avoid immediate and irreparable harm and prejudice to

14

NY 240,016,254v7

the Debtors' estates and all parties-in-interest, and (b) schedule a hearing to consider the entry of the Final Order.

36. The Debtors have an urgent need to use the Cash Collateral. All of the Debtors' cash is Cash Collateral. As shown in the Budget, absent the immediate authority to use the Cash Collateral, the Debtors will not have sufficient funds with which to operate and pay administrative expenses incurred in connection with their chapter 11 cases. The inability of the Debtors to operate their business would severely impair the value of the value of the Debtors' estates, and potentially the health and well being of the thousands who rely upon the Debtors for timely delivery of prescription medication each day. Thus, the Debtors have a critical need for the immediate use of the Cash Collateral and respectfully request an immediate hearing for consideration of the Interim Order.

### ii. Request for Waiver of Stay

37. The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of ten (10) days after entry of the order, unless the court orders otherwise." As set forth above, the relief requested herein is essential to prevent irreparable damage to the Debtors' operations, preserve going-concern value, and facilitate a smooth transition into chapter 11 while the Debtors evaluate whether to seek to sell substantially all of the Debtors' assets or seek to confirm a chapter 11 plan.

38. Accordingly, the relief requested herein is appropriate under the circumstances and under Bankruptcy Rule 6004(h).

## Reservation of Rights

39. Nothing in this Motion, or in any Order approving the relief requested herein, shall constitute an admission or determination as to the nature, validity or priority of any claims, liens, security interests or other rights of the Lenders, and the Debtors hereby reserve all rights with respect to any claims, liens, security interests and other rights asserted in connection with the Prepetition Credit Agreements or any other purported security interest in property of the Debtors or their estates.

## Notice

40. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to the Debtors' prepetition secured lenders; (c) counsel to the Debtors' postpetition secured lenders; (d) creditors holding the thirty (30) largest unsecured claims as set forth in the consolidated list filed with the Debtors' petitions; (e) the Office of the United States Attorney General for the District of Delaware; (f) the International Revenue Service; and (g) the Securities and Exchange Commission. As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion in accordance with the Local Rules. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

41. No prior request for the relief sought in this Motion has been made to this or any other court.

## Conclusion

**WHEREFORE**, the Debtors request entry of an order, substantially in the form attached hereto, (a) authorizing the Debtors to use Cash Collateral on an interim basis, (b) deeming the

Lenders adequately protected from the Debtors' use of Cash Collateral (c) scheduling a final hearing for the use of Cash Collateral, and (d) providing such other and further relief the Court deems just and proper.

Dated: Wilmington, Delaware
May 11, 2010

GREENBERG TRAURIG, LLP

*/s/ Dennis A. Meloro*
Scott D. Cousins (DE Bar No. 3079)
Dennis A. Meloro (DE Bar No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email: cousinss@gtlaw.com
melorod@gtlaw.com

-and-

Nancy A. Mitchell
Maria J. DiConza
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: mitchelln@gtlaw.com
diconzam@gtlaw.com

Proposed Counsel for the Debtors
and Debtors-in-Possession