## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CHEM RX CORPORATION, *et al.*,[1] | Case No. 10-11567 (MFW) |
| Debtors. | (Jointly Administered) |

**MOTION OF THE DEBTORS FOR ENTRY OF ORDERS: (A)(I) APPROVING BID PROCEDURES RELATING TO SALE OF THE DEBTORS' ASSETS; (II) APPROVING BID PROTECTIONS; (III) SCHEDULING A HEARING TO CONSIDER THE SALE; (IV) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION; (V) ESTABLISHING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS; AND (VI) GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION, SALE AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby move the Court (the "**Motion**"), pursuant to sections 105(a), 363, 365 and 503(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of two orders: (a) one, substantially in the form annexed hereto as **Exhibit "A"** (the "**Bid Procedures Order**"), (i) approving the procedures (the "**Bid Procedures**") substantially in the form annexed hereto as **Exhibit "B"**, including the bid protections as set forth in the asset purchase agreement

---

[1] The Debtors and the last four digits of each Debtor's tax identification number are: Chem Rx Corporation (8469), B.J.K. Inc. (5997), ChemRx New Jersey, LLC (9370), ChemRx/Salerno's, LLC (5981), ChemRx-Boca Raton, LLC (8021) and ChemRx Care, LLC (0826). The addresses for the Debtors are: Chem Rx Corporation, 750 Park Place, Long Beach, New York, 1561; B.J.K. Inc., 750 Park Place, Long Beach, New York 11561; ChemRx New Jersey, LLC, 4041 Hadley Road, Bldg M, South Plainfield, New Jersey 07080; ChemRx/Salerno's, LLC, Route 209 & Bossardsville Road, Scotia, Pennsylvania 18354; ChemRx-Boca Raton, LLC 5001 NW 13th Ave, Suite H&I, Deerfield Beach, Florida 33064; ChemRx Care, LLC, 750 Park Place, Long Beach, New York 11561.

(the "**Agreement**") between the Debtors, as sellers, Chem Rx Acquisition Sub, LLC, as buyer ("**PharMerica Sub**"), and PharMerica Corporation, as guarantor ("**PharMerica**" and, together with PharMerica Sub, the "**Stalking Horse Bidder**"), with respect to the proposed sale (the "**Sale**") of substantially all of the assets (as discussed in greater detail below, the "**Acquired Assets**"), (ii) scheduling a hearing (the "**Sale Hearing**") on the Sale and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of an auction for the Acquired Assets (the "**Auction**"), (iv) establishing procedures to determine cure amounts and deadlines for objections for certain contracts and leases to be assumed and assigned by the Debtors (the "**Assumed and Assigned Agreements**"); and (v) granting related relief; and (b) a second order, substantially in the form annexed hereto as **Exhibit "C"** (the "**Sale Order**"), (i) authorizing and approving the Agreement; (ii) authorizing the sale free and clear of liens, claims, encumbrances, and interests, pursuant to the Agreement, a copy of which is attached hereto as **Exhibit "D"**, with such liens, claims, encumbrances and interests to attach to the proceeds received by the Debtors from the Sale (the "**Sale Proceeds**") and such Sale Proceeds less the amount of cash necessary to fund (a) the Carve-Out (as defined in and subject to the provisions of the *Final Order (I) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 (Docket No. 110) in all respects*), (b) the Break-Up Fee, if any (as defined in the Agreement), and (c) such other wind up costs as may be agreed upon between the Debtors and First Lien Lenders (the "**Net Sale Proceeds**") to be paid over to the First Lien Agent at the closing of the Sale; (iii) authorizing the assumption and sale of the Assumed and Assigned Agreements, and (iv) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

NY240,554,153v8

## Status of the Case and Jurisdiction

1. On May 11, 2010 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2. The Debtors have continued in possession of their properties and are operating and managing their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. On May 21, 2010, the United States Trustee for Region 3 appointed an Official Committee of Unsecured Creditors. No request has been made for the appointment of a trustee or examiner in these cases.

4. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1408. This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

5. The statutory predicates for the relief sought herein are section 105(a), 363, 365 and 503(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rule 6004-1.

## Background

6. Founded approximately 50 years ago, the Debtors are a leading long-term care pharmacy serving multiple institutions, including skilled nursing homes, group homes, correctional institutions and other long-term care facilities. The Debtors provide prescription and non-prescription drugs, intravenous medications, durable medical equipment items and surgical supplies for residents of these institutions in New York, New Jersey, Pennsylvania, and Florida. Annually, the Debtors provide over six million prescriptions to more than 69,000 residents of more than 400 institutional customers. The Debtors' operations are conducted as a

single business segment through separate corporate entities in each jurisdiction in which they are licensed to provide pharmacy services.

7. Although the Debtors' businesses remain strong, the Debtors are too highly leveraged and lack adequate liquidity to sustain operations long term. The Debtors have been in default under their secured loans since December 2008 and have been operating without an effective forbearance agreement since the end of June 2009. The Debtors have attempted over the last year to negotiate with their secured lenders over a consensual restructuring of their assets and liabilities to permit them to continue as a going concern. Those negotiations did not result in a consensus over a viable restructuring alternative.

8. On May 10, 2010, the lenders under the Debtors' first lien loans (the "**First Lien Lenders**") filed an action in New York State Court to enjoin the Debtors' use of cash that is subject to the First Lien Lenders' liens. If the First Lien Lenders were successful in enjoining the Debtors' use of their cash, the Debtors would be unable to continue operations. As a result, the Debtors, in the exercise of their reasonable business judgment and having reviewed their remaining alternatives, ultimately determined that the most effective way to maximize the value of the Debtors' estates for the benefit of their creditor constituencies was to seek bankruptcy protection in order to pursue a sale or restructuring of their assets and liabilities.

9. A more detailed factual background of the Debtors' business and operations, as well as the commencement of these chapter 11 cases (the "**Cases**"), is more fully set forth in the *Declaration of Gary M. Jacobs in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief,* (the "**First Day Declaration**") filed on the Petition Date and incorporated herein by reference.

## A. The Debtors' Secured Debt

10. On or about October 26, 2007, Chem Rx, as borrower (the "**Borrower**"), the other Debtors, as guarantors, and Canadian Imperial Bank of Commerce, New York Agency ("**CIBC**"), as agent, sole lead arranger and sole book runner (the "**First Lien Agent**") and certain lenders (together with the First Lien Agent, the "**First Lien Lenders**") entered into that certain First Lien Credit and Guaranty Agreement (as amended, supplemented or otherwise modified or restated, the "**First Lien Agreement**"), pursuant to which, *inter alia*, the First Lien Lenders agreed to make certain loans and financial accommodations to the Borrower in the aggregate principal amount of up to $125,000,000, consisting of $80,000,000 aggregate principal amount of initial term loans, $20,000,000 aggregate principal amount of delayed draw term loans, and up to $25,000,000 aggregate principal amount of a revolving line of credit (collectively, the "**First Lien Loans**"). The First Lien Loans are secured by prepetition first priority liens on and security interests in substantially all of the Debtors' assets (the "**Prepetition Collateral**"). Approximately $105 million (inclusive of interest, facility fees, costs, expenses, swap exposure and indemnities) was outstanding under the First Lien Agreement as of the Petition Date. As of the Petition Date, approximately $37 million plus interest, facility fees, costs, expenses and indemnities was outstanding under a second lien credit agreement.[2]

## B. The Chapter 11 Cases

11. Because of the emergency nature of the Debtors' filing, the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code on May 11, 2010, without financing in place or a proposed asset purchase agreement with a stalking horse bidder.

---

[2] After the Petition Date, one or both of the second lien lenders purportedly elected to waive their liens such that as of the date thereof, they would hold wholly unsecured claims. To the extent any liens remain under the second lien credit facility, the Intercreditor Agreement between the first and second lien lenders provides the second lien lenders will not raise an objection or oppose a motion to sell or otherwise dispose of any of the Prepetition Collateral free and clear of their liens or other claims under section 363 of the Bankruptcy Code which has been consented to by the First Lien Lenders.

NY240,554,153v8

Immediately after the filing and prior to the "first day" hearing the Debtors negotiated a stipulation with the First Lien Lenders for authorization to use cash collateral to make certain payments related to payroll and purchase prescription medications to keep the Debtors' businesses running through the first day hearing. The Court approved the stipulation by and between the Debtors and the First Lien Lenders on May 12, 2010 [Docket No. 19].

12.     The Debtors next negotiated an interim order authorizing the use of cash collateral, which the Court entered on May 13, 2010 [Docket No. 37], and a final order (the "**Final Cash Collateral Order**") authorizing the use of cash collateral, which the Court entered on June 3, 2010 [Docket No. 110] (collectively, the "**Cash Collateral Orders**").

13.     As an integral part of the Cash Collateral Orders, the Debtors and First Lien Lenders negotiated and the Debtors agreed expeditiously to pursue a process to sell substantially all of the Debtors' assets (the "**Sale Process**"). The Cash Collateral Orders set forth a timeline in connection with the Sale (the "**Timeline**"), which has since been extended consensually by the Debtors and First Lien Lenders. The Debtors have thus devoted substantial time and resources to the Sale Process.

14.     On May 1, 2010, the Debtors retained Lazard Middle Market LLC ("**LMM**"), as investment banker to advise them in connection with a potential sale or restructuring of the Debtors' business. In connection with its retention, LMM has been actively engaged in planning and executing a process to market the Debtors' business to potential purchasers with the goal of identifying a Stalking Horse Bidder prior to the Debtors' proceeding with an auction and sale process before the Court. In addition, the Debtors' Board of Directors appointed a two person special committee (the "**Special Committee**") comprised of the Debtors' Chief Financial Officer, Gary Jacobs, and Vice President of Purchasing, Evan Selzer, to oversee the sale process and granted the Special Committee authority to take all actions it would deem advisable in

connection with the sale process including selection of the stalking horse and selection of any final bidder. The Special Committee has worked closely with LLM throughout the process to identify the best bidder to be the stalking horse.

15. The efforts of LMM and the Debtors to identify the Stalking Horse Bidder have been as follows:

a. *Due Diligence of the Debtors' Operations.* LMM initially spent time with the Debtors and their management to analyze the Debtors' business and operations. LMM analyzed the Debtors' business plans, financial statements, operating reports (including detail on revenue components, expense categories and profitability), customer relationships and contracts, liquidity and working capital reports and forecasts, descriptions and other information concerning pre- and post-petition liabilities as well as other information concerning the Debtors' operations.

b. *Potential Buyer List.* Shortly after its retention and in conjunction with the Debtors' management, LMM developed a list of those strategic and financial sponsor entities most likely to be interested in purchasing the Acquired Assets. LMM researched public and privately-held companies in the same and similar industries as the Debtors and reviewed proprietary and licensed databases of financial sponsors with a potential interest in investing in companies in similar industries and/or situations as the Debtors. LMM reviewed the data with the Debtors and focused the list to target those companies with the financial wherewithal and/or most compelling strategic rationales to pursue a transaction with the Debtors.

c. *Due Diligence Material.* Concurrently with contacting potential buyers, LMM worked with the Debtors to prepare a confidential information memorandum and an on-line data room containing certain financial and operating data on the Debtors' business. LMM coordinated with the Debtors to maintain and update that information so that potential buyers would have access to relevant financial and operational information while evaluating the opportunity. LMM worked with the Debtors and their advisors to create various materials that also were used during in–person and telephonic diligence meetings with potential buyers. These materials included descriptive information, financial data and other financial and operating detail that enabled the potential buyers to evaluate the Debtors' operating business.

d. *Contacted Potential Buyers.* LMM identified and contacted on behalf of the Debtors approximately 153 prospective purchasers. Of the 153 prospective purchasers, Lazard identified 28 as strategic buyers. The remainder of the prospective purchasers were financial sponsors, some of which were healthcare-focused funds and some of which were funds focused on distressed investing. Sixty-six prospective purchasers signed non-disclosure agreements with the

Debtors and received the confidential information memorandum and access to the on-line data room.

e. *Potential Buyer Diligence and Initial Indications of Interest.* LMM followed up with all interested buyers, provided due diligence information as requested, answered questions about the Debtors and the Sale process and encouraged all parties to move quickly and efficiently to the extent they wished to proceed. In all cases, LMM representatives encouraged qualified buyers to interact with the Debtors' management to obtain a better understanding of the business, Acquired Assets and going forward opportunity. LMM and the Debtors spent time with potential buyers discussing the Debtors' operations, historical performance and prospects, as well as responding to specific follow up questions and due diligence requests from potential buyers. LMM and the Debtors had discussions and conference calls with a number of buyers. The Debtors received thirteen first round bids (four strategic buyers and nine financial sponsors).

f. *Second Round Process.* From the thirteen bids the Debtors selected eight parties to proceed with management presentations and additional diligence based upon those bids the Debtors, with the advice of LLM, believed would yield the highest and best bid for the Debtors assets. The Debtors gave management presentations to those eight parties to further encourage bids from such prospective purchasers. The presentations were of sufficient detail to give the prospective buyers the opportunity to assess the potential purchase of the Acquired Assets and make a preliminary decision as to whether or not to proceed with further due diligence. Following management presentations, LMM facilitated additional due diligence and interaction with management.

g. *Selection of the Stalking Horse.* LMM later sought "best and final" non-binding bids from these parties. The Debtors, upon review of each offer received advice of LMM, counsel and their other professionals and selected two parties to complete confirmatory due diligence and enter into discussions to negotiate a definitive Asset Purchase Agreement. The Debtors and the Stalking Horse Bidder reached agreement on a definitive Asset Purchase Agreement on September 26, 2010, and the parties signed the Agreement.

16. In sum, the Acquired Assets of the Debtors' business have been marketed and solicited by LMM to all potential parties that expressed an interest in pursuing a transaction with the Debtors and all potential parties that LMM believed would be reasonably interested in purchasing the Acquired Assets. Additionally, the Sale of the Acquired Assets has been subject to a marketing process to identify potential buyers that would maximize the value of the Acquired Assets.

## C.    **The Proposed Sale**

17.    After the substantial discussions and negotiations with various parties discussed above, the Special Committee believes that it is in the best interests of the Debtors and their estates to enter into the Agreement.

18.    The following sub-paragraphs summarize key provisions of the Agreement, but are qualified in their entirety by reference to the actual Agreement.[3]

    a.    <u>Purchase Price</u>. The aggregate consideration for the sale and transfer of the Acquired Assets (the "Purchase Price"), shall be: (a) Seventy Million Six Hundred Thousand Dollars ($70,600,000), plus (b) the assumption of Assumed Liabilities, including payment of all Cure Amounts in accordance with the terms of the Sale Order.

    b.    <u>Acquired Assets</u>.[4] Substantially all of the Debtors' assets, including, all direct or indirect, right, title and interests of the Debtors in and to all the tangible and intangible assets, properties, rents, claims and contracts of the Debtors, to the extent transferable, excluding the Excluded Assets as defined in the Agreement.

    c.    <u>Assumed Liabilities</u>. The Buyer will assume and pay, perform or discharge when due or otherwise, certain specified liabilities of the Debtors set forth in the Agreement, including Cure Amounts.

    d.    <u>Excluded Assets</u>. The Acquired Assets are the only assets transferred to, or otherwise acquired by the Buyer under the Agreement. The Acquired Assets do not include (i) any right, title or interest of any Person other than the Debtors in any property or asset,(ii) all Avoidance Actions arising from or in connection with the Debtors' Cases, and (iii) the properties and assets of Debtors listed or described in Section 1.2 of the Agreement. The Acquired Assets also do not include the Debtors membership interests in Chem Rx -Chicago, LLC.

    e.    <u>Excluded Liabilities</u>. Debtors shall retain all liabilities and obligations that are not Assumed Liabilities, as described in Section 1.3 of the Agreement.

---

[3] Capitalized terms in the below sub-paragraphs, otherwise not defined in this Motion, have the meanings ascribed to them in the Agreement and Bid Procedures.

[4] "The Sale may include the transfer of "personally identifiable information," as defined in section 101(41 A) of the Bankruptcy Code. [However], [n]o "consumer privacy ombudsman" need be appointed under section 363(b)(1) of the Bankruptcy Code because Purchaser has agreed to adhere to any such privacy policies applicable to the Debtors." *In re Velocity Express Corp.*, Case No. 09-13294 (MFW), 2009 WL 6690931, at *7 (Bankr. D. Del. 2009).

f.   Business Records.   Pursuant to section 1.1(k) the Sellers' Business Records are an Acquired Asset.  Under Section 7.3, Buyer agrees to make such records available to Seller.

g.   Due Diligence or Financing Condition.   There are no due diligence or financing conditions.

i.   Closing and Other Deadlines.   The Closing shall occur on or before the second Business Day following the satisfaction or waiver by the appropriate Party of all the conditions contained in Article 11 of the Agreement.

k.   Good Faith Deposit.   On the Agreement date, Buyer made a deposit in the amount of Three Million Five Hundred Thirty Thousand Dollars ($3,530,000) (plus any interest accrued thereon, the "*Deposit*") to the Escrow Agent

l.   Termination.   The rights of Buyer and Seller to terminate the Agreement are set forth in Article 12.

m.   Successor Liability.   The Agreement provides that the Sale Order shall contain a determination that Buyer is not a successor to any Seller or otherwise liable for any of the Seller's Liabilities (other than the Assumed Liabilities) and permanently enjoin all Persons from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, Action or Lien against Buyer or the Acquired Assets

o.   No Stay.   Relief from the ten-day stay of Bankruptcy Rule 6004(h) is requested herein.

p.   Non-Solicitation. Section 9.4 of the Agreements provides limitations of Seller's ability to solicit outside of the Bid Procedures.

19.   The Debtors believe that the Sale will provide the best restructuring alternative for all of their creditor constituencies.   Upon approval of the Bid Procedures the Debtors will continue to market their assets to and negotiate with all potential purchasers, including the Stalking Horse Bidder, in an effort to achieve maximum value for the benefit of all of their constituents.

**Relief Requested**

20.   By this Motion, the Debtors seek the entry of two orders of this Court: (a) the Bid Procedures Order (i) approving the Bid Procedures, including the Break-Up Fee (as defined

NY240,554,153v8

below), with respect to the Sale of the Acquired Assets, (ii) scheduling the Sale Hearing and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of the Auction, (iv) establishing procedures to determine cure amounts and deadlines for objections to the Assumed and Assigned Agreements, and (v) granting related relief; and (b) the Sale Order (i) authorizing the Sale free and clear of liens, claims, encumbrances, and interests, pursuant to the Agreement, with such liens, claims, encumbrances and interests to attach to the Sale Proceeds and the Net Sale Proceeds to be paid over to the First Lien Agent at the closing of the Sale, (ii) authorizing and approving the form of Agreement, (iii) authorizing the assumption and sale of the Assumed and Assigned Agreements, and (iv) granting related relief.

21.    As described above, the Board, after extensive pre- and post-petition efforts to maximize value, a review of various reorganization, liquidation and sale options and discussions with the Debtors' professionals, ultimately determined in the exercise of its reasonable business judgment that the most effective way to maximize the value of the Debtors' estates for the benefit of their constituents would be (i) to sell their business and assets in the Auction and (ii) to complete a prompt and orderly liquidation of the Debtors' remaining assets. The Debtors believe that the proposed Sale will maximize the value of the Debtors' assets for all stakeholders and reduce potential risks, contingencies and uncertainties in the proposed wind-down.

### Proposed Bid Procedures

22.    The Debtors believe that it is imperative that they promptly move forward with the Auction and the Sale, in order to generate and retain potential purchasers' strong interests in the Acquired Assets. In addition, because the Debtors have little to no liquidity, the Debtors have no choice but to sell their assets in an expedited manner to preserve and maximize the value of their estates. Accordingly, the Bid Procedures (as summarized below) were developed

11

consistently with the Debtors' need to expedite the sale process, but with the objective of promoting active bidding that will result in the highest or best offer for the Acquired Assets while affording appropriate protection for the Stalking Horse Bidder. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Acquired Assets by financially-capable, motivated bidders who are likely to close the transaction.

23.     The Debtors seek to conduct an open sales process pursuant to which the winning bidder will enter into an asset purchase agreement, substantially in the form of the Agreement attached hereto as **Exhibit "D"** (unless the winning bid is a credit bid submitted by the First Lien Agent), for the purchase of substantially all of the Debtors' assets, free and clear of liens, claims, and encumbrances, with such liens, claims and encumbrances to attach to the Sale Proceeds and the Net Sale Proceeds to be paid over to the First Lien Agent at the closing of the Sale. The Debtors have drafted the Agreement for the proposed bidders to model their Bid. The key provisions of the Agreement are summarized above, but are qualified in their entirety by reference to the actual Agreement, which terms may change pursuant to negotiation with the Successful Bidder at the Sale Hearing.

## A.      *Bid Procedures*

24.     Attached to this Motion are the proposed Bid Procedures. Pursuant to Local Rule 6004-1: (i) each bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale; (ii) the Auction will be conducted openly, but only the Debtors, the Stalking Horse Bidder, any representative of the Official Committee of Unsecured Creditors in the Cases (the "**Committee**"), the First Lien Agent, and any Qualified Bidder who has timely submitted a Qualified Bid (and professional advisors to each of these parties) may attend the Auction, and (iii) bidding at the Auction will be

12

transcribed. The Bid Procedures are typical for asset sales of this size and nature, require a deposit, include provisions for consultation with the Committee and the First Lien Agent, and require that a bidder be a **"Qualified Bidder"** as defined in the Bid Procedures.

25.     The following paragraphs in this section summarize key provisions of the Bid Procedures, but are qualified in their entirety by reference to the actual Bid Procedures.[5]

    a.    <u>Participation Requirements</u>.

        i.    <u>Confidentiality Agreement</u>. Except for the First Lien Agent, an executed confidentiality agreement in form and substance reasonably acceptable to the Debtors (each a **"Confidentiality Agreement"**); and

        ii.    <u>Proof of Financial Ability to Perform</u>. Except for the First Lien Agent, the most current audited and latest unaudited financial statements (collectively, the **"Financials"**) of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of the Proposed Sale, Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure evidencing the Potential Bidder's ability to close the Transaction, the sufficiency of which shall be determined by the Debtors in their reasonable discretion.

    b.    <u>Qualified Bid</u>.[6]

        i.    <u>Modified Agreement</u>. A Bid must include fully executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated Transaction. A Bid shall include a black-lined copy of the Agreement (the **"Modified Agreement"**) to show all changes requested by the Bidder.

        ii.    <u>Acquired Assets</u>. Each Bid must be for all of the Acquired Assets or such portion of the Acquired Assets as the Qualified Bidder wishes to purchase; <u>provided, however</u>, that the aggregate purchase price in any Bid(s) for less than all of the Acquired Assets must equal or exceed the Minimum Initial Bid (defined below).

        iii.    <u>Contingencies</u>. A Bid may not be conditioned on obtaining internal approval, obtaining financing or on the outcome or review of due diligence after the Auction.

---

[5] Capitalized terms not defined in the below sub-paragraphs shall have the meanings ascribed to them in the Bid Procedures attached hereto as Exhibit "B", or the Agreement, as applicable.

[6] The First Lien Agent shall be deemed a Qualified Bidder and its credit-bid is a Qualified Bid.

iv.   <u>Authorization to Bid</u>. Each Bid must include evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Agreement.

v.   <u>Good Faith Deposit</u>. Each Bid must be accompanied by a cash deposit in an amount equal to five percent (5%) of the highest proposed purchase price offered by the Qualified Bidder in its Qualified Bid (the "**Good Faith Deposit**").

vi.   <u>No Fees Payable to Qualified Bidder</u>. A Bid may not request or entitle the Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.

vii.   <u>Financing Sources</u>. A Bid must contain evidence of the ability to consummate the Transaction satisfactory to the Debtors with appropriate contact information for all such financing sources.

viii.   <u>Minimum Initial Bid Requirement</u>. Each Qualified Bidder's Bid shall have an initial minimum bid requirement equal to the Stalking Horse Bidder's Purchase Price, in cash (or cash equivalents), plus the sum of (i) the amount of the Break-Up Fee (as defined below); and (ii) two million one hundred thousand dollars ($2,100,000) (the "**Minimum Initial Bid**").

ix.   <u>Other Evidence</u>. Each Bid must contain evidence satisfactory to the Debtors (based on availability of financing, experience and other considerations) that the bidder will be able to timely consummate the Transaction if selected as the Successful Bidder.

c.   <u>Bid Deadline</u>. The deadline for submitting bids by a Qualified Bidder, other than the Stalking Horse Bidder or the First Lien Agent, shall be - October 25, 2010, at 12:00 p.m. (Prevailing Eastern Time) (the "**Bid Deadline**"). A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

d.   <u>Auction</u>. Only in the event that the Debtors receive at least one (1) Qualified Bid (other than that of any Stalking Horse Bidder) by the Bid Deadline, other than from the Stalking Horse Bidder, the Debtors shall conduct the Auction of the Acquired Assets to determine the highest and otherwise best bid with respect to the Acquired Assets (the "**Baseline Bid**"). No later than October 26, 2010, at 4:00 p.m. (Prevailing Eastern Time), the Debtors will notify all Qualified Bidders of (i) the Baseline Bid, and (ii) the time and place of the Auction. The Auction shall commence at 9:00 a.m. (prevailing Eastern time) on October 27, 2010 at the offices of Greenberg Traurig, LLP, The Nemours Building, 1700 North Orange Street, Suite 1200, Wilmington, DE 19801.

14

e. <u>Sale Hearing</u>. The Sale Hearing shall be conducted by the Bankruptcy Court on or before [October 28], 2010.

f. <u>Modifications</u>. The Bid Procedures may not be modified except upon order of the Bankruptcy Court or the express written consent of the Debtors, the First Lien Agent, the Committee, and the Stalking Horse Bidder.

26. The Debtors, with the consent of the First Lien Agent, expressly reserve the right to modify the relief requested herein. Moreover, the Debtors, with the consent of the First Lien Agent, reserve the right, upon notice to all Notice Parties and those parties that have demonstrated an interest in bidding on the Acquired Assets, to: (a) waive terms and conditions set forth herein with respect to any or all potential bidders, (b) impose additional terms and conditions with respect to any or all potential bidders, (c) extend the deadlines set forth herein or the date for the Auction, (d) cancel or extend the sale of the Acquired Assets and/or Sale Hearing in open court without further notice; and (e) amend the Bid Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

27. The Stalking Horse Bidder is a Qualified Bidder, and its bid is a Qualified Bid. Notwithstanding any provisions to the contrary herein, the First Lien Agent is entitled to credit bid all or a portion of its claims against the Debtors, without otherwise complying with the Bid Procedures, to the fullest extent permissible under section 363(k) of the Bankruptcy Code, and further provided that, in the event it is the Successful Bidder, it pays to the Stalking Horse Bidder the Break-Up Fee in full, in cash.

## B. *Break-Up Fee*

28. The Debtors seek approval to pay a break-up fee (the "**Break-Up Fee**") of 2% of the cash portion of the consideration of the Stalking Horse Bidder's initial bid to the Stalking Horse Bidder in the event that the Stalking Horse Bidder is not the Successful Bidder at the

Auction in recognition of the Stalking Horse Bidder's substantial expenditure of time, energy and resources, and the benefits to the Debtors' estates of securing a "stalking horse" or guaranteed minimum bid.

29.     The Break-Up Fee is required by the Agreement. The Debtors believe that the Break-Up Fee is fair and reasonable, given the benefits to the estates of having a definitive Agreement and the risk to the Stalking Horse Purchaser that a third-party offer ultimately may be accepted, and are necessary to preserve and enhance the value of the Debtors' estates.

30.     The Agreement and the Stalking Horse Bidder's monetary offer will form the basis upon which other bids will be submitted and evaluated. The establishment of the Break-Up Fee permits the Debtors to insist that competing bids for the Acquired Assets be higher or otherwise better than the purchase price under the Agreement, which is a clear benefit to the Debtors' estates. Thus, even if the Stalking Horse Bidder is ultimately not the Successful Bidder, and thus is paid the Break-Up Fee, the Debtors will still have benefited significantly from the Agreement, due to the floor established by the Stalking Horse Bidder leading to an improved bid and increasing the likelihood that the price at which the Acquired Assets will be sold.

C.     *Notice of Auction*

31.     The Debtors seek to have the Auction scheduled for a date no later than October 27, 2010. The value of the Acquired Assets may decline substantially if the Sale process is not completed on an expedited basis. The Debtors' key customers and vendors may terminate their relationships with the Debtors, and potential bidders may lose confidence in the certainty of the Sale process and decide to stop pursuing the purchase of the Acquired Assets. As such, it is imperative to move forward with the Auction and the Sale promptly.

NY240,554,153v8

32.     Not later than three business days after the entry of the Bid Procedures Order, the

Debtors will serve copies of the Sale Notice, substantially in the form attached hereto as

**Exhibit "E"** (the "**Sale Notice**"), the Bid Procedures, and the Bid Procedures Order by mail,

postage prepaid to: (a) all entities known to have expressed a *bona fide* interest in acquiring the

Acquired Assets (by overnight mail); (b) counsel to the First Lien Agent, (c) the Office of the

United States Trustee for the District of Delaware; (d) known entities holding or asserting a

security interest in or lien against any of the Acquired Assets; (e) taxing authorities whose rights

may be affected by a sale of the Acquired Assets; (f) counsel to the Committee, (g) all Attorneys

General for the states in which the Debtors conduct business; and (h) all parties that have

requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the

Bid Procedures Order.

33.     The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if

any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local

Rules; (c) be filed with the Clerk of the United States Bankruptcy Court for the District of

Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801; and (d) be served so as to

be received by: (i) the Debtors; (ii) counsel to the Debtors; (iii) counsel to the First Lien Agent;

(iv) the Office of the United States Trustee; (v) counsel to any Stalking Horse Bidder; and (vi) all

parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local

Bankruptcy Rule 2002-1(b).

34.     Not later than three (3) business days after entry of the Bid Procedures Order, the

Debtors will publish the Sale Notice in the national edition of *The Wall Street Journal* or *The

New York Times.*

NY240,554,153v8

***D.*** ***Procedures to Determine Cure Amounts and Deadlines for Objection to Assumption and Assignment of the Assumed and Assigned Agreements***

35.     To facilitate and effect the Sale, the Debtors will be required to assume and/or assign the Assumed and Assigned Agreements, to the Stalking Horse Purchaser, or as applicable, to the Successful Bidder.

36.     Given the large number of executory contracts and unexpired leases to which the Debtors are a party, the Debtors seek to establish (a) procedures for determining cure amounts through the closing date of the Sale (the "**Cure Amounts**"), and (b) the deadline for objections to the assumption and/or assignment of contracts and leases to be assumed and/or assigned in connection with the Sale (collectively, the "**Cure Procedures**").

37.     The Debtors shall prepare and distribute to non-Debtor parties to the Assumed and Assigned Agreements a notice, substantially in the form annexed hereto as **Exhibit "F"** (a "**Cure Notice**"), listing (i) the Assumed and Assigned Agreement(s); and (ii) the Cure Amount(s), if any, no later than two (2) business days after the Auction, to be assigned to the Successful Bidder.

38.     To facilitate a prompt resolution of cure disputes and objections relating to the assumption and assignment of the Assumed and Assigned Agreements, the Debtors propose the following deadlines and procedures:

>       a.      The non-Debtor parties to the Assumed and Assigned Agreements shall have until October 25, 2010 (the "**Contract Objection Deadline**"), which deadline may be extended in the sole discretion of the Debtors, to object (a "**Contract Objection**") to (i) the Cure Amounts listed by the Debtors and to propose alternative cure amounts, and/or (ii) the proposed assumption and/or assignment of the Assumed and Assigned Agreements in connection with the Sale; provided, however, if the Debtors amend the Cure Notice to add a contract or lease or to reduce the Cure Amount thereof, except where such reduction was upon mutual agreement of the parties, the non-Debtor parties to the added contract or lease or to the reduced Cure Amount contract or lease shall have until seven (7) days after such amendment to submit a Contract Objection (the "**Amended Contract Objection Deadline**").

18

b.    Any party objecting to (i) any Cure Amount and/or (ii) the proposed assumption and assignment of any Assumed and Assigned Agreement in connection with the Sale shall file and serve a Contract Objection, in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the Assumed and Assigned Agreements(s), as applicable, and/or any and all objections to the potential assumption and/or assignment of such agreements, together with all documentation supporting such cure claim or objection, upon the Notice Parties, so that the Contract Objection is received no later than 4:00 p.m., on the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable. Where a non-Debtor counterparty to an Assumed and Assigned Agreement files an objection asserting a cure amount higher than the proposed Cure Amounts (the "**Disputed Cure Amount**"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the consent of the Successful Bidder, of such consensual resolution, the Debtors shall promptly provide the Successful Bidder notice and opportunity to object to such proposed resolution; (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then such objection will be heard at the Sale Hearing or thereafter; or (c) the Successful Bidder may remove the contract to which the Contract Objection relates from the schedule of contracts to be assumed and assigned.

39.    Unless an objection to the assumption and assignment of an Assumed and Assigned Agreement is filed and served before the Contract Objection Deadline, or the Amended Contract Objection Deadline, as applicable, all counterparties to the Assumed and Assigned Agreements shall be (i) forever enjoined and barred from objecting to the proposed Cure Amounts and from asserting any additional cure or other amounts with respect to the Assumed and Assigned Agreements, and the Debtors, their estates, the Stalking Horse Bidder or the Successful Bidder shall be entitled to rely solely upon the proposed Cure Amounts set forth in the Cure Notices; (ii) deemed to have consented to the Cure Amount; and (iii) forever barred and estopped from asserting or claiming against the Debtors and the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed and Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assumed and Assigned Agreements.

19

## Basis for Relief Requested

**A.      *The Sale is Within the Sound Business Judgment of the Debtors and Should Be Approved***

40.      Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C.  §  363(b)(1).   Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors.  *See In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.),* 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D.D.C. 1991).

41.      The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business; (b) that adequate and reasonable notice has been provided to interested persons; (c) that the debtors have obtained a fair and reasonable price; and (d) good faith.  *Abbotts Dairies,* 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club),* 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd,* 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).  The Debtors submit that the decision to proceed with the Sale and the Bid Procedures related thereto is based upon their sound business judgment and should be approved.  A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is

20

"simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel,* 722 F.2d at 1071; *Montgomery Ward,* 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

42.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian),* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

43.     The Debtors submit that sound business justification exists to sell the Acquired Assets to the Successful Bidder pursuant to the Bid Procedures. Absent a sale of their assets, the Debtors lack sufficient cash resources to continue to operate the business and pay their debts as

they are due, and the value of the Acquired Assets will continue to decline absent a prompt sale. Moreover, as set forth above, the Debtors retained LMM who has engaged in extensive marketing efforts to identify potential parties as purchasers for the sale of substantially all of the Debtors' assets.

44.     Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

45.     The notice of Auction is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Acquired Assets. Indeed, the Debtors have and, upon approval of the Bid Procedures, will continue to market the Acquired Assets and will solicit the most likely interested competing bidders. Accordingly, the proposed Sale satisfies the second prong of the *Abbotts Dairies* standard.

46.     Moreover, the Bid Procedures are designed to maximize the value received for the Acquired Assets. The process set forth in the Bid Procedures allows for a timely and efficient auction process given the circumstances facing the Debtors, while providing bidders with ample time and information to submit a timely bid and perform diligence. The Bid Procedures are designed to ensure that the Acquired Assets will be sold for the highest or otherwise best possible purchase price. The Debtors are subjecting the value of the Acquired Assets to market testing and permitting prospective purchasers to bid on the Acquired Assets. The proposed Sale will be further subject to a market check through the solicitation of competing bids in a court-supervised Auction process as set forth in the Bid Procedures. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Acquired Assets will be fair and reasonable, and, thereby satisfying the third prong of the *Abbotts Dairies* standard. The "good faith" prong of the *Abbotts Dairies* standard is also satisfied as discussed further below.

NY240,554,153v8

**B.  The Sale is Proposed in "Good Faith" 363(m) of the Bankruptcy Code**

47.    The Debtors request that the Court find that the Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

48.    Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

49.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Acquired Assets.

50.    The Debtors submit, and will present evidence at the Sale Hearing, if necessary, that as set forth above, the Agreement was an arm's-length transaction, in which the Successful Bidder acted in good faith.  The Auction is an open sale process, and the Debtors will have their own separate legal counsel to negotiate on their behalf throughout the Auction and the Sale.  Accordingly, the Debtors request that the Court make the finding at the Sale Hearing that the Successful Bidder has purchased the Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**C.  The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code**

51.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property

if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

52.     The First Lien Lenders have consented to the form of the Bid Procedures and the Agreement in substantially the forms attached hereto. The First Lien Lenders also consent to the release of their liens in the Acquired Assets, provided that Net Sale Proceeds are paid over to the First Lien Agent at the closing of the Sale.

53.     The Debtors expect that they will satisfy, at minimum, the second and fifth of the requirements of section 363(f) of the Bankruptcy Code, if not others as well, approving the sale of the Acquired Assets free and clear of all adverse interests is warranted. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). *See, e.g., In re Trans World Airlines, Inc.,* 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987). As a result, the Acquired Assets may be sold free and clear of the Prepetition Liens, provided that the Net Sale Proceeds are paid over to the First Lien Agent.

NY240,554,153v8

### D. The Break-Up Fee is Reasonable and Appropriate

54.    Bid incentives such as the Break-Up Fee encourage a potential buyer to invest the time, money and effort required to negotiate with a debtor, and perform the necessary due diligence attendant to the acquisition of a debtor, despite the inherent risks and uncertainties of the chapter 11 process.  The Debtors submit that approval of the Break-Up Fee is justified by the facts and circumstances of this case, whether considered under the business judgment rule or as an administrative expense of the estates.

55.    Approval of the Break-Up Fee is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999).  In *O'Brien*, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under section 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."  *O'Brien*, 181 F.3d at 535.  Here, the Break-Up Fee should be approved because it will provide a benefit to the Debtors' estates.  The Third Circuit identified at least two instances in which bidding incentives may benefit the estate.  First, a break-up fee may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *Id.* at 537.  Second, "if the availability of break-up fees expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id.*

56.     In recognition of this expenditure of time, energy and resources, and the benefits to the Debtors' estates of securing a "stalking horse" or minimum bid, the Debtors have agreed to seek the Bid Protections for the Stalking Horse Bidder. The Debtors' ability to offer the Break-Up Fee enables the Debtors to ensure the sale of the acquired Assets to a contractually-committed bidder at a price the Debtors believe to be fair while, at the same time, providing the Debtors with the potential of an even greater return to the estates. Moreover, the Stalking Horse Bidder has spent, and likely will continue to spend, considerable time, money and energy pursuing the Sale and has engaged in extended and lengthy good faith negotiations under extremely stressful time pressure. The Debtors and the Stalking Horse Bidder are not related, and each has acted in good faith throughout this process. The amount of the fee is relatively small compared to the Purchase Price, comprising only 2% of the cash portion of the Purchase Price , and is not so high that it would cause any chilling effect on other prospective purchasers, and will have no adverse effect on any creditors.

57.     Indeed, the Break-Up Fee induced the Stalking Horse Purchaser to submit a bid that will serve as a minimum floor bid on which the Debtors, their creditors and other bidders may rely. The Debtors' ability to continue to shop the Acquired Assets for a higher or better offer without risk of losing the Stalking Horse Purchaser—a "bird-in-the-hand"—would be eliminated if the Debtors are not authorized to remit the Break-Up Fee. Therefore, absent authorization of the payment of the Break-Up Fee, the Debtors might lose the opportunity to obtain the highest and best available offer for the Acquired Assets and the downside protection that will be afforded by the Agreement.

58.     The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that Debtors will receive the best possible price for the Acquired Assets. Moreover, the Debtors' customers and employees will take comfort that

the Stalking Horse Bidders' bid will ensure the continuation of the Debtors' business and not seek alternative manufacturers. Accordingly, the Break-Up Fee is reasonable and appropriate and represents the best method for maximizing value for the benefit of the Debtors' estates. In light of the benefit to the Debtors' estates that will be realized by having a signed purchase agreement, enabling the Debtors to preserve the value of their estates and promote more competitive bidding, ample support exists for the approval of the Break-Up Fee. In addition, approval of the Bid Procedures, including the Break-Up Fee, is a condition to the Stalking Horse Bidder's obligation to proceed with the transaction contemplated in the Agreement. *See In re Reliant Energy Channelview, L.P.*, 594 F.3d 200 (3d Cir. 2010).

59. The Debtors' payment of the Break-Up Fee under the circumstances described herein would be (i) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code; (ii) of substantial benefit to the Debtors' estates; and (iii) reasonable and appropriate in light of the efforts and the significant due diligence costs and expenses that have been and will be expended by the Stalking Horse Bidder. Thus, the Debtors request that this Court approve and authorize payment of the Break-Up Fee pursuant to the terms of the Agreement.

### E. The Cure Procedures Provide Adequate Notice and Opportunity to Object and Should be Approved

60. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of

27

an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.*, 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

61.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

62.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes,*

28

*Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

63. Additionally, as set forth above, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11, provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *See In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Accordingly, pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., In re Chinichian,* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

64. The Debtors respectfully submit that the proposed Cure Procedures are appropriate and reasonably tailored to provide non-Debtor parties to Assumed and Assigned Agreements with adequate notice in the form of the Cure Notice, of the proposed assumption

and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable. Such non-Debtor parties to the Assumed and Assigned Agreements will then be given an opportunity to object to such notice. The Cure Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues (including any adequate assurance of future performance issues). Accordingly, the Debtors submit that implementation of the proposed Cure Procedures is appropriate in these Cases.

## F. *Relief from the Fourteen Day Waiting Periods Under Bankruptcy Rules 6004(h) is Appropriate*

65. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the fourteen-day stay under Bankruptcy Rules 6004(h) is waived.

66. The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

67. As described above, time is clearly of the essence, since the Debtors have insufficient cash to operate the business on a prolonged basis, and the continuing over-all market uncertainty and volatility are causing a decline of the value of the Debtors' estates. Since a

30

prompt closing of the Sale is of critical importance, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h).

## No Prior Request

68.     No prior Motion for the relief requested herein has been made to this or any other court.

## Notice

69.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Committee; (c) counsel to the agent for the Debtors' prepetition First Lien Lenders; (d) all taxing authorities having jurisdiction over any of the Acquired Assets subject to the sale, including the Internal Revenue Service; (e) the Environmental Protection Agency; (f) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (g) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of this order; (h) all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Acquired Assets; (i) all Contract Parties; (j) counsel to the Stalking Horse Bidder; (k) all Attorneys General for the states in which the Debtors conduct business; and (l) all potential bidders previously identified or otherwise known to the Debtors. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

NY240,554,153v8

WHEREFORE, the Debtors respectfully request (i) entry of the proposed Bid Procedures Order, substantially in the form attached hereto as **Exhibit "A"**; (ii) entry of the proposed Sale Order, substantially in the form attached hereto as **Exhibit "C"**; and (iii) such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
September 27, 2010

GREENBERG TRAURIG, LLP

Scott D. Cousins (DE Bar No. 3079)
Dennis A. Meloro (DE Bar No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email: cousinss@gtlaw.com
        melorod@gtlaw.com

-and-

Nancy A. Mitchell
Maria J. DiConza
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: mitchelln@gtlaw.com
        diconzam@gtlaw.com

Counsel for the Debtors
and Debtors-in-Possession

NY240,554,153v8