# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRC PARENT CORPORATION, *et al.* | ) | Case No. 10-11567 (MFW) |
| f/k/a CHEM RX CORPORATION, *et al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors.[1] | ) | |

**FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO THE FIRST AMENDED JOINT PLAN OF LIQUIDATION FOR CRC PARENT CORPORATION AND ITS AFFILIATED DEBTORS PROPOSED BY CANADIAN IMPERIAL BANK OF COMMERCE, NEW YORK AGENCY, AS ADMINISTRATIVE AGENT AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Dated: Wilmington, Delaware
      February 7, 2011

KAYE SCHOLER LLP
Madlyn Gleich Primoff
425 Park Avenue
New York, New York 10022
Telephone: (212) 836-8000
Facsimile: (212) 836-6525
E-mail: mprimoff@kayescholer.com

--and--

POTTER ANDERSON & CORROON LLP
Laurie Selber Silverstein (DE Bar No. 2396)
1313 North Market Street, 6th Floor
Wilmington, Delaware 19899
Telephone: (302) 984-6033
Facsimile: (302) 658-1192
E-mail: lsilverstein@potteranderson.com

*Co-Counsel for Canadian Imperial Bank of Commerce, New York Agency, as First Lien Agent*

WHITE & CASE LLP
John K. Cunningham
Wachovia Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
E-mail: jcunningham@whitecase.com

--and--

FOX ROTHSCHILD LLP
Jeffrey M. Schlerf (DE Bar No. 3047)
Citizens Bank Center
919 North Market Street, Suite 1600
P.O. Box 2323
Wilmington, Delaware 19899-2323
Telephone: (302) 654-7444
Facsimile: (302) 656-8920
E-mail: jschlerf@foxrothschild.com

*Co-Counsel for the Official Committee of Unsecured Creditors*

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: CRC Parent Corporation f/k/a Chem Rx Corporation (8469), B.J.K. Inc. (5997), CRC NJ, LLC f/k/a ChemRx New Jersey, LLC (9370), CRC PA, LLC f/k/a ChemRx / Salerno's, LLC (5981), CRC BR, LLC f/k/a ChemRx-Boca Raton, LLC (8021) and CRC CT, LLC f/k/a ChemRx Care, LLC (0826).

# TABLE OF CONTENTS

Page

ARTICLE I. INTRODUCTION .................................................................................. 1

ARTICLE II. NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS.................. 1

ARTICLE III. EXPLANATION OF CHAPTER 11 ...................................................... 4
    3.1    Overview of Chapter 11 ...........................................................................4

ARTICLE IV. HISTORY OF THE DEBTORS ............................................................ 5
    4.1    Debtors' Background; Merger ....................................................................5
    4.2    Creditors' Committee's Investigation Regarding the Merger ...................7
    4.3    Financing Arrangements ...........................................................................8
    4.4    Events Leading up to the Debtors' Chapter 11 Filings............................8
    4.5    The Chapter 11 Cases Including Authorization to Use Cash Collateral
          and Sale Process.......................................................................................9
    4.6    Formation and Representation of the Official Unsecured Creditors'
          Committee................................................................................................11
    4.7    Creditors' Committee Challenge ............................................................11
    4.8    First Lien Agent's Adversary Proceeding Against SAC and AIG .........12
    4.9    Settlement Between First Lien Agent and the Creditors' Committee .................13
    4.10   Releases under the Settlement and Plan...................................................15
    4.11   Potential Causes of Action to be Brought by Litigation Trustee............16
    4.12   Cash Assets .............................................................................................18
    4.13   Case Administration; the Debtors' Schedules and Statements;
          Establishing a Bar Date..........................................................................18

ARTICLE V. THE PLAN......................................................................................... 18
    5.1    Overview of the Plan ..............................................................................18
    5.2    Summary of Classification and Treatment Under the Plan .....................20
          5.2.1.   Allowed Administrative Claims.............................................. 20
          5.2.2.   Allowed Priority Tax Claims .................................................. 20
          5.2.3.   Class 1:  Priority Claims......................................................... 21
          5.2.4.   Class 2:  Other Secured Claims.............................................. 21
          5.2.5.   Class 3:  Secured Lender Claims ............................................ 22
          5.2.6.   Class 4:  General Unsecured Claims....................................... 23
          5.2.7.   Class 5:  Subordinated Claims................................................ 24
          5.2.8.   Class 6: Equity Interests ......................................................... 24
          5.2.9.   Distributions by Plan Administrator or Litigation Trustee ...... 24
    5.3    The Litigation Trust ...............................................................................25
          5.3.1.   Introduction ............................................................................ 25
          5.3.2.   Execution of Litigation Trust Agreement .............................. 25
          5.3.3.   Purpose of Litigation Trust..................................................... 25
          5.3.4.   Litigation Trust Assets ........................................................... 25
          5.3.5.   Governance of Litigation Trust............................................... 26
          5.3.6.   Role of the Litigation Trustee ................................................. 26

| | | | |
|---|---|---|---|
| | 5.3.7. | Litigation Trust Recoveries Account | 26 |
| | 5.3.8. | Cash | 26 |
| | 5.3.9. | Fees, Costs and Expenses of the Litigation Trust | 27 |
| | 5.3.10. | Distribution of the Litigation Trust Recoveries | 27 |
| | 5.3.11. | Time of Litigation Trust Distributions | 28 |
| | 5.3.12. | Litigation Trust Reserve | 28 |
| | 5.3.13. | Federal Income Tax Treatment of Litigation Trust | 28 |
| | 5.3.14. | Oversight Committee | 30 |
| 5.4 | | Reservation of Rights, Discharges, Releases, Injunctions, and Exculpations | 30 |
| | 5.4.1. | Rights of Action/Reservation of Rights | 30 |
| | 5.4.2. | Satisfaction of Claims and Termination of Equity Interests | 31 |
| | 5.4.3. | Term of Injunctions or Stays | 31 |
| | 5.4.4. | Injunction Against Interference With Plan | 32 |
| | 5.4.5. | Releases and Injunction Related to Releases | 32 |
| | 5.4.6. | Injunction Related to Releases | 33 |
| | 5.4.7. | Settlement of Claims and Estate Causes of Action | 34 |
| | 5.4.8. | Disallowed Claims And Disallowed Interests | 35 |
| | 5.4.9. | Exculpation | 35 |
| | 5.4.10. | AIG Release | 35 |
| | 5.4.11. | SEC Reservation of Rights | 35 |
| 5.5 | | Other Provisions of the Plan | 36 |
| | | | |
| **ARTICLE VI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | | | 36 |
| 6.1 | | Consequences to Debtors | 37 |
| 6.2 | | Consequences to Holders of Secured Lender Claims and General Unsecured Claims | 37 |
| | 6.2.1. | Gain or Loss | 37 |
| | 6.2.2. | Distributions in Discharge of Accrued Interest | 38 |
| | 6.2.3. | Information Reporting and Withholding | 39 |
| 6.3 | | Tax Treatment of the Litigation Trust and Holders of Beneficial Interests | 39 |
| | 6.3.1. | Classification of the Litigation Trust | 39 |
| | 6.3.2. | General Tax Reporting by the Trust and Beneficiaries | 40 |
| | 6.3.3. | Allocation of Taxable Income and Loss | 41 |
| | | | |
| **ARTICLE VII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** | | | 41 |
| 7.1 | | Liquidation under Chapter 7 of the Bankruptcy Code | 41 |
| 7.2 | | Alternative Chapter 11 Plan | 42 |
| | | | |
| **ARTICLE VIII. CONCLUSION** | | | 42 |

WM1A 981622v1 02/03/11
1000155v.1

# **EXHIBITS**

First Amended Joint Plan of Liquidation for CRC Parent Corporation and its Debtor Affiliates                                                    EXHIBIT A

Disclosure Statement Order                                                    EXHIBIT B

WM1A 981622v1 02/03/11
1000155v.1

# ARTICLE I.

## INTRODUCTION

The First Lien Agent[2] and the Creditors' Committee in these Chapter 11 Cases pending before the Bankruptcy Court hereby collectively and jointly submit this Disclosure Statement pursuant to section 1125 of chapter 11 of the Bankruptcy Code with respect to the Plan. This Disclosure Statement is to be used in connection with the solicitation of votes on the Plan by the Plan Proponents.

Attached as Exhibits to this Disclosure Statement are the following documents:

- The Plan (<u>Exhibit A</u>).

- Order of the Bankruptcy Court, dated February 8, 2011 (the "<u>Disclosure Statement Order</u>") pursuant to section 1125 of the Bankruptcy Code, (i) approving the Disclosure Statement relating to the Plan; (ii) fixing the date, time and place for voting on the Plan, (iii) approving the form and manner of notice thereof; (iv) approving the form of Ballot and proposed solicitation and tabulation procedures; (v) fixing the last date for filing objections to the Plan; and (vi) scheduling a hearing to consider confirmation of the Plan (<u>Exhibit B</u>).

In addition, if you are entitled to vote to accept or reject the Plan, the Ballot for acceptance or rejection of the Plan is enclosed with this Disclosure Statement.

THE SECURED LENDERS HAVE AUTHORIZED CANADIAN IMPERIAL BANK OF COMMERCE, NEW YORK AGENCY, AS ADMINISTRATIVE AGENT UNDER THE CREDIT AGREEMENT, TO FILE THE PLAN AND SOLICIT ACCEPTANCES THEREOF ON THEIR BEHALF; PROVIDED, HOWEVER, THAT THE FILING OF THE PLAN DOES NOT CONSTITUTE A VOTE IN FAVOR OF THE PLAN BY THE SECURED LENDERS OR ANY OF THEM.

# ARTICLE II.

## NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

---

[2]  Unless otherwise defined herein, terms used herein have the meaning ascribed thereto in the Plan (<u>see</u> Article I of the Plan entitled "Definitions and Interpretation").

THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. TO THE EXTENT ANY INCONSISTENCIES EXIST BETWEEN THE SUMMARY CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS SET FORTH IN THE PLAN, THE PLAN CONTROLS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

NEITHER THIS DISCLOSURE STATEMENT NOR ANY STATEMENT CONTAINED HEREIN MAY BE USED IN THESE CHAPTER 11 CASES OR IN ANY ACTION OTHER THAN IN CONNECTION WITH CONFIRMATION OF THE PLAN. IN THE EVENT THAT THE PLAN IS NOT CONFIRMED, OR IS CONFIRMED BUT DOES NOT BECOME EFFECTIVE, THIS DISCLOSURE STATEMENT AND THE STATEMENTS CONTAINED HEREIN SHALL HAVE NO FORCE OR EFFECT, AND NEITHER THE DISCLOSURE STATEMENT NOR ANY STATEMENT CONTAINED HEREIN SHALL BE ADMISSABLE IN ANY COURT OR LEGAL FORUM FOR ANY PURPOSE WHATSOEVER. NOTHING IN THIS DISCLOSURE STATEMENT SHALL BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

IN THE EVENT THE CONDITIONS SPECIFIED IN SECTION 10.2 OF THE PLAN HAVE NOT BEEN SATISFIED OR WAIVED IN ACCORDANCE WITH SECTION 10.3 OF THE PLAN, AND UPON NOTIFICATION SUBMITTED BY THE PLAN PROPONENTS, EACH IN THE EXERCISE OF ITS SOLE AND ABSOLUTE DISCRETION, TO THE BANKRUPTCY COURT (A) THE CONFIRMATION ORDER SHALL BE VACATED; (B) NO PLAN DISTRIBUTIONS OR LITIGATION TRUST DISTRIBUTIONS, AS APPLICABLE, UNDER THE PLAN SHALL BE MADE; (C) THE DEBTORS AND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHALL BE RESTORED TO THE STATUS QUO ANTE AS OF THE DAY IMMEDIATELY PRECEDING THE CONFIRMATION DATE AS THOUGH THE CONFIRMATION

2

**DATE NEVER OCCURRED; AND (D) ALL OF THE DEBTORS' OBLIGATIONS WITH RESPECT TO THE CLAIMS AND EQUITY INTERESTS SHALL REMAIN UNCHANGED AND NOTHING CONTAINED IN THE PLAN SHALL BE DEEMED TO CONSTITUTE A WAIVER OR RELEASE OF ANY CLAIMS BY OR AGAINST THE DEBTORS OR ANY OTHER ENTITY OR TO PREJUDICE IN ANY MANNER THE RIGHTS OF THE DEBTORS OR ANY OTHER ENTITY IN ANY PROCEEDINGS FURTHER INVOLVING THE DEBTORS.**

On February 8, 2011, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order, among other things, approving this Disclosure Statement because it contains information of a kind, in sufficient detail, and adequate to enable a hypothetical, reasonable investor typical of the solicited Class of Claims to make an informed judgment with respect to the acceptance or rejection of the Plan.

**APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Plan Proponents, no Person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Plan Proponents. You should not rely on any information relating to the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement and the exhibits hereto.

**HOLDERS OF SECURED LENDER CLAIMS AND GENERAL UNSECURED CLAIMS SHOULD CAREFULLY READ AND CONSIDER THE PLAN AND THIS DISCLOSURE STATEMENT.**

The First Lien Agent is the Administrative Agent for the Secured Lenders under the Credit Agreement. The Creditors' Committee is the statutory committee appointed by the Office of the United States Trustee for the District of Delaware to represent the interests of unsecured creditors. Accordingly, the First Lien Agent and the Creditors' Committee have limited knowledge with regard to certain facts uniquely available to the Debtors. The First Lien Agent and the Creditors' Committee therefore rely on the Debtors with regard to the truth and accuracy of the statement of such facts and makes no representations regarding such statements except that the First Lien Agent and the Creditors' Committee believe the statements contained herein to be true but have not conducted any due diligence of any kind or nature to confirm the truth or accuracy of statements regarding facts uniquely available to the Debtors.

After carefully reviewing this Disclosure Statement, including the attached exhibits, if you are entitled to vote to accept or reject the Plan, please indicate your acceptance or

3

rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot for acceptance or rejection of the Plan and return the same to the address set forth on the Ballot, in the enclosed, postage prepaid, return envelope so that it will be received by the balloting agent (the "Balloting Agent") no later than 5:00 p.m., Prevailing Pacific Time, on March 10, 2011 (the "Voting Deadline").

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED NO LATER THAN **5:00 p.m.**, PREVAILING PACIFIC TIME ON MARCH 10, 2011. For a general description of the voting instructions and the name, address and phone number of the person you may contact if you have questions regarding the voting procedures, see the Disclosure Statement Order attached hereto as Exhibit B.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a Confirmation Hearing on **March 17, 2011 at 2:00 p.m.**, Prevailing Eastern Time, before the Honorable Mary F. Walrath, United States Bankruptcy Judge. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before **March 10, 2011 at 5:00 p.m.**, Prevailing Eastern Time, in the manner described in the related order.

**THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLASSES OF CLAIMS. THE CREDITORS' COMMITTEE IS A PROPONENT OF THE PLAN, SUPPORTS CONFIRMATION OF THE PLAN AND URGES ALL HOLDERS OF GENERAL UNSECURED CLAIMS TO VOTE IN FAVOR OF THE PLAN. THE FIRST LIEN AGENT, FOR THE BENEFIT OF THE SECURED LENDERS, IS ALSO A PROPONENT OF THE PLAN, SUPPORTS CONFIRMATION OF THE PLAN AND URGES ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

**THE DEBTORS ARE NOT PROPONENTS OF THE PLAN. THE LITIGATION TRUST TO BE ESTABLISHED UNDER THE PLAN ANTICIPATES COMMENCING LITIGATION AGAINST THE DEBTORS' FORMER MANAGEMENT, INCLUDING STEVEN AND JERRY SILVA, AND CURRENTLY THE SILVAS OPPOSE SUCH PLAN.**

## ARTICLE III.

## EXPLANATION OF CHAPTER 11

### 3.1    Overview of Chapter 11

Chapter 11 of the Bankruptcy Code permits the filing of a chapter 11 plan of liquidation. The Plan sets forth the means for satisfying the holders of Claims against and interests in the Debtors' Estates. A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a

4

debtor's assets. In either event, upon confirmation of the chapter 11 plan, it becomes binding on a debtor and all of its creditors and equity holders, and the obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the chapter 11 plan.

After a chapter 11 plan has been filed, the holders of impaired claims against and interests in a debtor may be permitted to vote to accept or reject the chapter 11 plan, although impaired Subordinated Claims and Equity Interests in the Debtors are not permitted to vote here. Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires the proponents of the chapter 11 plan to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the chapter 11 plan. **This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of votes by the Plan Proponents on the Plan.**

The bankruptcy court may confirm a chapter 11 plan even though fewer than all of the classes of impaired Claims and equity interests accept such chapter 11 plan. For a chapter 11 plan to be confirmed, despite its rejection by a class of impaired Claims or equity interests, the chapter 11 plan must be accepted by at least one class of impaired Claims (determined without counting the vote of insiders) and the proponent of the chapter 11 plan must show, among other things, that the chapter 11 plan does not "discriminate unfairly" and that the chapter 11 plan is "fair and equitable" with respect to each impaired class of Claims or equity interests that has not accepted the chapter 11 plan. **The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting Class of Claims or Equity Interests (other than Class 3, which consists of the Secured Lender Claims) and can therefore be confirmed, if necessary, over the objection of any Class of Claims, except the Secured Lender Claims, and the Class of Equity Interests.**

## ARTICLE IV.

## HISTORY OF THE DEBTORS

### 4.1     Debtors' Background; Merger

Founded approximately 50 years ago, the Debtors were a leading long-term care pharmacy serving multiple institutions, including skilled nursing homes, group homes, correctional institutions and other long-term care facilities. The Debtors provided prescription and non-prescription drugs, intravenous medications, durable medical equipment items and surgical supplies for residents of these institutions in New York, New Jersey, Pennsylvania, and Florida. Annually, the Debtors provided over six million prescriptions to more than 69,000 residents of more than 400 institutional customers. The Debtors' operations were conducted as a single business segment through separate corporate entities in each jurisdiction in which they were licensed to provide pharmacy services.

In 2005, a special purpose acquisition company known as Paramount Acquisition Corp. ("Paramount") was created, with the sole purpose of identifying and acquiring an operating business, and underwent an initial public offering (the "IPO"). On June 1, 2007,

5

Paramount entered into a Stock Purchase Agreement whereby it acquired 100% of the equity of BJK Inc. from the following persons and/or entities: Jerry Silva, Steven Silva, Jerry Silva as life tenant and Steven Silva as remainderman, the Jody R. Silva Trust and the Jerry Silva 2007 Annuity Trust (collectively, the "Silvas"). In exchange for their stock, the Silvas received 1.5 million shares of Paramount stock, $107,411,680.92 in cash, and subordinated promissory notes in the amount of $8,258,748. In addition, Steven Silva received a "transaction bonus" in the amount of $5,650,000. The Plan Proponents believe that all of this consideration was paid directly to the Silvas on October 26, 2007, the date the transaction closed. On the same day, Paramount merged with certain of the Debtors, changed its name to "Chem Rx Corporation" and became the parent holding company for all of the Debtors' operating subsidiaries (the "Merger"). The Plan Proponents believe this transaction was funded from a number of sources. In addition to the IPO proceeds, the Debtors received certain term and revolving loans from the Secured Lenders and the Second Lien Lenders (defined below) to fund both the acquisition and their on-going operations. The total amount of the secured debt incurred by the Debtors in connection with the stock purchase and Merger or thereafter was $177 million and included a first lien credit facility and a second lien facility in the amount of $37 million (the "Financing"). Approximately $105 million of first lien secured indebtedness remained outstanding at the time of the filing of these Cases, and in fact precipitated the filing of these Chapter 11 Cases.

Based on its investigation,[3] the Creditors' Committee believes that immediately prior to consummating the Merger, the Debtors learned that they would not have the requisite shareholder approval to consummate the Merger and began to consider potential transactions to incentivize additional shareholders of Paramount who were considering voting against the Merger to vote in favor of the Merger. Jerry Silva and Steven Silva, Chem Rx's chief executive officer and chief operating officer, respectively, and Chem Rx's principal stockholders in their individual capacities, entered into three separate put option agreements (the "Put Options") individually and in their respective capacities as life tenant and remainderman of a life tenancy (collectively, the "Silva Put Parties") with certain institutional investors pursuant to which each investor was granted an option to require the Silva Put Parties to purchase up to a total of 5,169,749 shares of the Debtors. Beginning July 22, 2008, and ending October 27, 2008, each institutional investor exercised its Put Option causing the Silva Put Parties to purchase all 5,169,749 shares in Chem Rx for $30,196,225 which resulted in the Silvas and their affiliates owning 54.22% of Chem Rx's outstanding shares of common stock.

Based on its investigation, the Creditors' Committee believes that at approximately the same time that the Merger took place, Jerry Silva and Steven Silva personally provided a letter of credit and cash deposit totaling $11 million to AmerisourceBergen (the "Amerisource L/C"), one of the Debtors largest suppliers, to secure the Debtors' line of credit with AmerisourceBergen. The Amerisource L/C was required by AmerisourceBergen as a condition precedent for AmerisourceBergen's consenting to the Merger, which would otherwise constitute an event of default under AmerisourceBergen's supply contract with ChemRx.

Based on its investigation, the Creditors' Committee believes that as of the Petition Date, Chem Rx has approximately 14,000,000 shares of stock outstanding with approximately 52% of the outstanding shares owned by the Silvas or their affiliated trusts. The

---

[3]   As described below, the Creditors' Committee undertook an investigation of the Merger transaction.

Debtors' stock has been delisted from the NASDAQ Stock Market is now trading over-the-counter on the Pink Sheets Electronic Quotation Service.

### 4.2    Creditors' Committee's Investigation Regarding the Merger

In evaluating potential claims relating to the Merger, the Creditors' Committee conducted discovery under Rule 2004 of the Federal Rules of Bankruptcy Procedure. This discovery was taken of the Debtors, AmeriSource Bergen, and the Put Parties. The discovery involved the production of documents from each of these parties, as well as a deposition of the Debtors' corporate representative.[4] The investigation allowed the Creditors' Committee to examine the exact nature of the LBO transaction, the funds transferred as part of that transaction, and the fact that the funds transferred to the Silvas were transferred directly to the Silvas and not through a securities intermediary. The investigation also identified at least five parties with a financial interest in the post-acquisition debtor who refused to approve the LBO unless they were provided with put options.

Based upon this independent investigation by the Creditors' Committee of the facts and circumstances surrounding the Merger, the Creditors' Committee believes that the estate has colorable Avoidance Actions against parties who received fraudulent transfers in connection with the purchase of the Silvas' BJK Inc. stock and the Merger. The Creditors' Committee also believes that the estate has colorable Avoidance Actions against, among others, the First Lien Agent the Secured Lenders arising from the financing they provided and liens they obtained in connection with the Merger, which claims will be released pursuant to the Settlement described herein. As discussed below, the Creditors' Committee believes that the Settlement together with the payments being made by the Secured Lenders under the Plan is in the best interest of the Debtors, their estates and their creditors. There may be other Causes of Action relating to these facts.

Pursuant to sections 544(b) and 550 of the Bankruptcy Code, the Creditors' Committee may avoid any transfer of an interest of the Debtors in property or any obligation incurred by the Debtors that is voidable under applicable state law by a creditor holding an unsecured claim and may recover the property transferred, or the value of such property, for the benefit of the Debtors' estates and creditors.

The applicable state law pursuant to which the Creditors' Committee has sought to challenge the Credit Agreement is Article 10 of New York Debtor and Creditor Law ("Article 10"). Pursuant to section 278 of Article 10, a creditor may set aside any conveyance or annul any obligation which is fraudulent, to the extent necessary to satisfy its claim. The Creditors' Committee maintains that there were conveyances made and obligations incurred in connection with the Merger which may be fraudulent under New York law. The Creditors' Committee believes that after the Merger transaction, the property remaining in the Debtors' hands constituted unreasonably small capital. In addition, the Merger resulted in a number of transfers for which the Creditors' Committee believes ChemRx did not receive fair consideration. Such transfers include, but are not necessarily limited to, the approximately $138 million paid out to the Silvas and their affiliates and the liens granted to the First Lien Agent, the

---

[4]    Documents were also produced by the First Lien Agent.

Secured Lenders and the Second Lien Lenders as part of the Merger. If the Creditors' Committee's allegations prove true, those of these transfers for which the transferee has not been released pursuant to this Plan may be avoidable for the benefit of the Debtors' estates.

On October 22, 2010, the Creditors' Committee filed the Motion of Official Committee of Unsecured Creditors for Entry of Order Granting Leave, Standing, and Authority to Prosecute Estate Causes of Action Under Chapter 5 of the Bankruptcy Code on Behalf of the Debtors' Estates [Docket No. 432] (the "Committee's Standing Motion") in which the Creditors' Committee sought authority to, among other things, commence certain actions relating to the Merger. These actions included, but were not limited to, claims to avoid the liens the First Lien Agent and the Secured Lenders received in the same Merger transaction by which the Silvas received cash for their stock. Both the First Lien Agent and the Debtors objected to the Committee's Standing Motion. As argued in its objection, the First Lien Agent on behalf of the Secured Lenders would vigorously defend against any efforts to challenge or avoid its Claims under the Credit Agreement in connection with such litigation. However, prior to ruling on the Committee's Standing Motion, the Creditors' Committee and the First Lien Agent reached the terms of the settlement described in Section 4.9.

### 4.3    Financing Arrangements

CRC Parent is the borrower under the Credit Agreement. Under the Credit Agreement, the Secured Lenders made term loans and revolving loans to finance the Merger, repay existing indebtedness and fund the Debtors' working capital needs. The Debtors are parties to certain other documents, notes, instruments and other agreements (including each of the Loan Documents (as defined in the Credit Agreement) and the ISDA Master Agreement), executed, delivered or filed pursuant to or in connection with the Credit Agreement.

The Debtors' primary source of funding prior to the Petition Date was loans and advances under the Credit Agreement.

CRC Parent is also the borrower under the Second Lien Credit Agreement. Under the Second Lien Credit Agreement, the Second Lien Lenders made term loans to finance the Merger and repay existing indebtedness. The Debtors are parties to certain other documents, notes, instruments and other agreements (including each of the Loan Documents (as defined in the Second Lien Credit Agreement)), executed, delivered or filed pursuant to or in connection with the Second Lien Credit Agreement.

Finally, on or about October 26, 2007, CRC Parent entered into five subordinated notes (collectively, the "Sub Notes") with various payees - Jerry Silva, Steven Silva, the Jody R. Silva Trust, the Jerry Silva 2007 Annuity Trust, and Jerry Silva as life tenant and Steven Silva as remainderman (collectively, the "Sub Note Payees"). The Sub Notes are contractually subordinated, and each Sub Note sets forth the respective rights and obligations between the Secured Lenders and the respective Sub Note Payee.

### 4.4    Events Leading up to the Debtors' Chapter 11 Filings

In the fourth quarter of 2008, the Debtors recorded certain delinquent charges in their books (the "Fourth Quarter Charges"), which, along with other factors, led to the Debtors'

8

violation of certain financial covenants under the Credit Agreement as of December 31, 2008 (the "Covenant Violations"). The Fourth Quarter Charges and Covenant Violations caused the Debtors to delay filing their 2008 annual report on form 10-K ("10-K") with the SEC. The Debtors have not filed a 10-K with the SEC since April 7, 2008.

As a result of the Covenant Violations, the First Lien Agent on behalf of the Secured Lenders suspended the Debtors' access to the revolving line of credit under the Credit Agreement. Upon the announcement of the Covenant Violations and the inability of CRC Parent to timely file the 10-K with the SEC, the Debtors' vendors began to significantly limit their trade credit to the Debtors. In the first half of 2009, the Debtors' trade credit diminished by more than $15 million. In addition to these financial constraints, the Debtors were also negatively affected by broader economic changes, including modifications to New York State Medicaid reimbursement policies on branded drug sales in New York (the "NY Medicaid Reimbursement Changes"). The Debtors' loss of customers and the negative impact of the NY Medicaid Reimbursement Changes resulted in a downward adjustment in the Debtors' revenue, profit projections and gross margin.

The Debtors and the First Lien Agent entered into negotiations in early 2009 in an attempt to address the Covenant Violations. As a result of these negotiations, the Debtors and the First Lien Agent entered into a forbearance agreement (the "Forbearance Agreement") to facilitate a discussion to devise an overall solution in connection with the Covenant Violations. The Forbearance Agreement, which became effective as of April 30, 2009, first expired on June 15, 2009, and was later extended to June 26, 2009. The Debtors have been operating without an effective forbearance agreement since that time.

On May 10, 2010, the First Lien Agent filed an action in New York State Court, inter alia, to enjoin the Debtors' use of cash that is subject to the First Lien Agent's Liens. As a result of the commencement of this action, the Debtors initiated the Chapter 11 Cases.

At various time up to and after the Petition Date, the Debtors acknowledged that certain defaults and events of default occurred under the Credit Agreement.

### 4.5    The Chapter 11 Cases Including Authorization to Use Cash Collateral and Sale Process

On May 11, 2010, the Debtors commenced their Chapter 11 Cases by filing their voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases were commenced without financing in place or a proposed asset purchase agreement. Immediately after the filing and prior to the "first day" hearing in the Chapter 11 Cases, the Debtors negotiated a stipulation with the First Lien Agent for authorization to use cash collateral to make certain payments related to payroll and purchase prescription medications to keep the Debtors' businesses running through the first day hearing. The Bankruptcy Court approved the stipulation by and between the Debtors and the First Lien Agent on May 12, 2010 [Docket No. 19].

The Debtors negotiated an interim order authorizing the use of cash collateral, which the Bankruptcy Court entered on May 13, 2010 [Docket No. 37], and thereafter, the final

9

cash collateral order authorizing the use of cash collateral, which the Bankruptcy Court entered on June 3, 2010 [Docket No. 110] (collectively, the "Cash Collateral Orders"). The Creditors' Committee filed an objection to final approval of the use of cash collateral. Following the hearing, the Bankruptcy Court sustained the objection in part. In addition, the Debtors obtained approval of other "first day" relief.

As an integral part of the Cash Collateral Orders, the Debtors and the First Lien Agent agreed that the Debtors would expeditiously pursue a process to sell substantially all of the Debtors' assets (the "Sale Process"). The Debtors had determined in the exercise of their business judgment that the most effective way to maximize the value of the Debtors' estates for the benefit of their constituents would be (i) first, to sell their viable business in an auction conducted under the supervision of the Bankruptcy Court and (ii) thereafter, to complete a prompt and orderly liquidation of substantially all of the Debtors' remaining assets. The Debtors retained Lazard Middle Market LLC ("LMM"), as their investment banker to identify potential parties as purchasers of the Debtors' ongoing businesses.[5]

After a lengthy marketing process, LMM identified PharMerica Corporation ("PharMerica") as the stalking horse bidder and, on September 26, 2010, the Debtors entered into an agreement to sell substantially all of their assets to Chem Rx Pharmacy Services, LLC f/k/a Chem Rx Acquisition Sub, LLC, an affiliate of PharMerica (the "PharMerica Affiliate"), with PharMerica as guarantor. On October 6, 2010, the Bankruptcy Court entered an order approving bid and notice procedures for an auction of the Debtors' assets [Docket No. 390] (the "Bid Procedures Order"). Pursuant to the Bid Procedures Order, LMM notified additional interested parties of the auction with regard to the sale of the Debtors' assets and sought additional bids. No bidder other than the PharMerica Affiliate submitted a qualified bid by the deadline set by the Bid Procedures Order, and the auction was cancelled. The Creditors' Committee objected to the distribution of the sale proceeds while the Committee Litigation (defined below) was pending. On November 4, 2010, the Bankruptcy Court entered an order approving the sale of substantially all of the Debtors' assets to the PharMerica Affiliate for $70,600,000 plus the assumption of certain liabilities [Docket No. 490] (the "PharMerica Transaction"). The sale closed on November 4, 2010, but at the direction of the Bankruptcy Court $70,600,000 in sale proceeds were deposited into the Wells Fargo Account rather than being distributed to the First Lien Agent and the Secured Lenders. These funds remain in the Wells Fargo Account.

In addition to the assets purchased by the PharMerica Affiliate, the Debtors also offered for sale their 49.9% membership interests (the "Membership Interests") in Chem Rx Chicago, LLC (the "Chicago JV"). In conjunction with the Sale Process, the Debtors and LLM received one such offer from the 50.1% joint venture partner in the Chicago JV, New York Boys Management, LLC ("NY Boys"), which offered to purchase the Membership Interests for $2,525,000 (the "Purchase Price"). The Purchase Price exceeded the amount offered by any other bidder, including the PharMerica Affiliate, and thus the Debtors determined that it was in the best interests of the Debtors' Estates to enter into a Membership Interest Purchase Agreement

---

[5] The Court also approved the retention of Greenberg Traurig as the Debtors' bankruptcy counsel, Robert Rosenfeld as the Debtors' chief restructuring officer and Cypress Associates LLC as the Debtors' financial advisor.

with NY Boys on October 29, 2010, which was subject to higher and better offers at an auction. No bidder other than NY Boys submitted a qualified bid and the Bankruptcy Court entered an order approving the sale of the Membership Interests to the NY Boys on November 5, 2010 [Docket No. 502] (the "Chicago Transaction"). The sale closed on November 8, 2010, and $2,525,000.00 in proceeds from the sale were deposited into the Escrow Account. These funds remain in the Escrow Account.

As part of the PharMerica Transaction, executory contracts of three members of the Creditors' Committee were assumed and assigned: HealthEx Corp ("HealthEx"); Integra NV, Inc. ("Integra"); and UFCW Local 348 Health & Welfare Fund (the "Union"). The Creditors' Committee's professionals have been advised that the pre- and post-petition claims of HealthEx and Integra have been fully cured. Both HealthEx and Integra resigned from the Creditors' Committee on February 4, 2011. The Creditors' Committee professionals previously were advised that following the PharAmerica Transaction, the Union's pre-petition claim equaled $474.20, and it is expected that the Union will agree to resign from the Creditors' Committee. Other members of the Creditors' Committee and the filed or scheduled amounts of their General Unsecured Claims are as follows: SAC Domestic Capital Funding, Ltd. ("SAC") ($37,245,685.40); Anda, Inc. ("Anda") ($4,597,617.60); Healthsource Dist. LLC ("Healthsource") ($196,249.90).[6]

### 4.6 Formation and Representation of the Official Unsecured Creditors' Committee

On or about May 21, 2010, the United States Trustee appointed the Creditors' Committee. The Creditors' Committee is currently comprised of SAC Domestic Capital Funding, Ltd., Anda, HealthEx, Healthsource, Integra NV and the Union. AIG Management (U.S.), LLC as advisor for Western National Life Insurance Co. ("AIG") was conditionally appointed by the United States Trustee to become a member of the Creditors' Committee subject to meeting certain conditions required by the United States Trustee, which AIG did not meet. The Creditors' Committee retained White & Case LLP ("White & Case")[7] and Fox Rothschild LLP as counsel. Chanin Capital Partners, LLC has acted as the Creditors' Committee's financial advisor.

### 4.7 Creditors' Committee Challenge

On October 1, 2010, the Creditors' Committee commenced Adversary Proceeding No. 10-53163 (MFW) (the "Committee Litigation"), by filing a complaint (the "Original Complaint") against the First Lien Agent and the Secured Lenders challenging the validity, priority and extent of the Claims and security interests of the First Lien Agent and the Secured

---

[6]   In addition, Anda and Healthsource have additional filed or scheduled prepetition claims in the amounts of $1,200,634.73 and $192,235.80, respectively, pursuant to section 503(b)(9) of the Bankruptcy Code.

[7]   Prior to the formation of the Creditors' Committee, White & Case represented SAC and its affiliates as holders of claims in excess of $30 million under the Second Lien Credit Agreement. SAC is a member of the Creditors' Committee. As a consequence of its retention by the Creditors' Committee which was approved by the Bankruptcy Court, White & Case no longer represents SAC in connection with the Debtors and these Chapter 11 Cases.

Lenders.[8] The Original Complaint alleged, among other things, that the First Lien Agent's security interests in certain of the Debtors' deposit accounts, leasehold interests and Medicare and Medicaid accounts receivables were not properly perfected or were otherwise invalid. On November 2, 2010, the Creditors' Committee filed an amended complaint ("the Amended Complaint") to add an additional claim for relief, alleging that the indebtedness incurred in connection with the Credit Agreement constituted a fraudulent transfer under the Bankruptcy Code and applicable state law. The First Lien Agent, on behalf of the Secured Lenders, argued that such additional claim was time barred under the Cash Collateral Orders. The Plan, if confirmed, constitutes a settlement of the Committee Litigation, as described below. Pending confirmation of the Plan and approval of the settlement, the First Lien Agent and the Secured Lenders entered into a stipulation with the Creditors' Committee which was approved by the Bankruptcy Court extending the Creditors' Committee's time to serve the Amended Complaint and the time for the First Lien Agent and the Secured Lenders to answer or move with respect to the Amended Complaint.

The Second Lien Lenders were not defendants in the Committee Litigation, as SAC, one of the Second Lien Lenders, had agreed to waive its security interests at the beginning of these cases. It is unclear from the record in these Chapter 11 Cases whether AIG, the other Second Lien Lender, similarly waived its security interests. Neither SAC nor AIG have agreed to disgorge the fees and expenses they were paid in connection with the financing they provided, which payments could, if the Creditors' Committee's allegations regarding the Merger and its effects prove to be correct, be contended to be avoidable transfers. To date, the Creditors' Committee has not conducted an investigation of potential claims against the Second Lien Lenders to avoid and recover the fees and expenses paid to them in connection in connection with the financing they provided and such claims would be released pursuant to the Plan.

### 4.8     First Lien Agent's Adversary Proceeding Against SAC and AIG

On August 3, 2010, the First Lien Agent commenced Adversary Proceeding No. 10-52358 (MFW) (the "First Lien Agent Litigation"), and filed a complaint against SAC and AIG (collectively the "Second Lien Lenders") challenging the Second Lien Lenders' right to waive or release their security interests under the Debtors' $37 million second lien credit facility until the Debtors' obligations to the (first lien) Secured Lenders were fully satisfied.

In an Order issued on October 6, 2010, (the "October 6th Order"), the Bankruptcy Court granted summary judgment to the Second Lien Lenders. On October 19, 2010, the First Lien Agent appealed (the "Appeal") the October 6th Order to the United States District Court for the District of Delaware (the "District Court").[9] As set forth in section 4.9 herein and in the Plan the Appeal will be dismissed on the Effective Date.

---

[8]     The Cash Collateral Orders granted standing to the Creditors' Committee to pursue this action.

[9]     On December 20, 2010, the District Court entered a stay of the Appeal after the parties stipulated to a stay while they attempted to reach a settlement.

### 4.9    Settlement Between First Lien Agent and the Creditors' Committee

At a hearing held on November 9, 2010, the terms of a settlement (the "Settlement") between the Creditors' Committee and the First Lien Agent were read into the record. Counsel advised the Bankruptcy Court that the Settlement would be reflected in a liquidating plan to be prepared by the Creditors' Committee and the First Lien Agent. At that same hearing, the Bankruptcy Court approved the termination of exclusivity to permit the Creditors' Committee and First Lien Agent to jointly file and solicit acceptances of a plan incorporating the settlement terms read into the record. The term sheet ("Term Sheet") agreed to by the Creditors' Committee and First Lien Agent was attached to the Court's Order regarding exclusivity dated November 24, 2010 [Docket No. 560].

The Settlement resolves various disputes in these Chapter 11 Cases, including the Committee Litigation and the First Lien Agent Litigation commenced against the Second Lien Lenders. Below are the terms contained in such Term Sheet:

- Secured Lenders will fund administrative claims and wind-down costs in excess of the current balance of the M &T Account up to $3.6 million and an additional $1 million, if necessary (subject to reimbursement below);

- Secured Lenders will provide $2 million to fund the Litigation Trust;

- Litigation Trust to pursue all Estate Causes of Action;

- First proceeds of all Estate Causes of Action to re-pay $1 million (if the $1 million of funds for administrative claim above the $3.6 million amount is funded by the Secured Lenders) and to re-pay the $2 million if funded by the General Unsecured Creditors, pro rata;

- After the initial distribution from the proceeds of the Estate Causes of Action, all proceeds from non-management Estate Causes of Action, including D&O Insured Causes of Action, shall be shared 50% to the General Unsecured Creditors and 50% to the Secured Lenders;

- After the initial distribution from the proceeds of the Estate Causes of Action, the first $12 million of proceeds from Management Causes of Action shall be shared 60% to the General Unsecured Creditors and 40% to the Secured Lenders;

- Any recovery above $12 million from Management Causes of Action shall be shared 70% to the General Unsecured Creditors and 30% to the Secured Lenders;

- Secured Lenders shall have full releases from Estate Causes of Action and the members of the Creditors' Committee. Releases to be mutual as to the Creditors' Committee;

- Creditors' Committee to appoint Meade A. Monger of AlixPartners as Litigation Trustee or other Litigation Trustee of their choice;

- An Oversight Committee shall be appointed to include one member approved by the Creditors' Committee and one member appointed by the Secured Lenders;

- Creditors' Committee member and the Litigation Trustee to direct litigation to be commenced by the Litigation Trust;

- Settlements of Estate Causes of Action to be approved by each member of the Oversight Committee and the Litigation Trustee with disputes to be resolved by the Bankruptcy Court;

- Litigation Trustee may request approval from the Oversight Committee to surcharge litigation recoveries to pay for administrative costs of the Litigation Trust; provided, however, that the Litigation Trustee may not surcharge recoveries to the General Unsecured Creditors or the Secured Lenders without the consent of the respective designee;

- Parties to move expeditiously to prepare and file a liquidating plan of reorganization. Counsel to the Secured Lenders to draft the Plan. Counsel to the Creditors' Committee to prepare Litigation Trust Documents; and

- Debtors, First Lien Agent and Creditors' Committee to agree to administrative claims budget.

The Settlement was negotiated by the Creditors' Committee and its advisors with the First Lien Agent and its advisors. The Creditors' Committee concluded that the Settlement was in the best interests of unsecured creditors. The Creditors' Committee, with the advice of its professionals, determined that the benefits to be realized for the Settlement outweighed the potential gains if it prevailed in the Committee Litigation. The Creditors' Committee negotiated a resolution which they concluded provides sufficient funding from the Secured Lenders to confirm a liquidating chapter 11 plan. Moreover, the Plan creates a Litigation Trust with a $2 million reserve to fund litigation, including without limitation the Causes of Action referenced in Section 4.11 of the Disclosure Statement. While there is no certainty regarding a successful outcome for any given action, the same would apply if the Creditors' Committee did not enter into its Settlement and prosecuted the Committee Litigation against the First Lien Agent and the Secured Lenders. Similarly, the cost of any given action brought by the Litigation Trust may be high, as it would be if the Committee Litigation continued. The difference is that not only is the Litigation Trust funded with $2 million, but the Plan provides for a surcharge of Litigation Trust Recoveries to pay administrative costs of the Litigation Trust; provided, however, that the Litigation Trustee may not surcharge any Litigation Trust Recoveries to the General Unsecured Creditors or the Secured Lenders without the consent of the Unsecured Creditors' Designee or the Lenders' Designee, respectively. On the other hand, the Creditors' Committee believes that no other funding was available for the Committee Litigation. In sum, the Creditors' Committee

believes the Settlement falls well within the range of reasonableness and is in the best interests of its constituency.

In connection with the Settlement, whereby the Secured Lenders are funding up to $4.6 million for the payment of various claims and $2 million to fund the Litigation Trust, the Secured Lenders and the First Lien Agent are being released from all Estate Causes of Action as described below, including Causes of Action arising out of the same Merger, whereby it is contemplated the Litigation Trustee will commence litigation against the Silvas. The injunction against Barred Claims, as set forth in Section 11.5.7 of the Plan, further implements these releases. Neither the First Lien Agent nor the Secured Lenders would agree to the Settlement without the releases and injunctions contained in the Plan. In addition, holders of Claims that do not opt out on their Ballots will also be deemed to have released the First Lien Agent and the Secured Lenders. The Plan Proponents contend that these releases are likewise supported by the consideration that the First Lien Agent and the Secured Lenders are providing under the terms of the Settlement and the Plan.

Of the up-to $6.6 million which the Secured Lenders will contribute pursuant to the Settlement, $4.6 million would be distributed to satisfy claims other than General Unsecured Claims, and the remaining $2 million will fund the Litigation Trust. It is unlikely that the initial $2 million funding will be distributed to holders of General Unsecured Claims. If the anticipated litigation to be brought by the Litigation Trustee is successful, distributions may be made to holders of General Unsecured Claims as well as the Secured Lenders from litigation recoveries in accordance with the terms of the Settlement. Under such circumstances, the Secured Lenders will share in litigation recoveries and get a return on the $2 million they are contributing to the Litigation Trust as well as a distribution in respect of their Secured Claims.

**4.10    Releases under the Settlement and Plan**

**As described in Section 4.9 of the Disclosure Statement, the terms of the Settlement included releases. Section 11.5.1 of the Plan provides a release by the Debtors and their Estates of each and all of the Released Parties. For avoidance of Doubt, the Released Parties and Related Persons shall not include Jerry or Steven Silva.**

**The term *"Released Parties"* is defined in 1.1.93 of the Plan.**

**The term *"Related Persons"* is defined in 1.1.91 of the Plan.**

**Section 11.5.2 of the Plan provides a release by Holders of Claims and Interests of each and all of the Released Parties. Any party that votes on the Plan or accepts a distribution pursuant to the Plan who did not opt out of the Releases by marking the appropriate box on their Ballot will be deemed to have released the Released Parties.**

**The Settlement also provides for full releases for the First Lien Agent, the Secured Lenders, AIG and SAC and the other members of the Creditors' Committee, some of whom may have received avoidable transfers. For instance, the Statements of Financial Affairs filed in the Chapter 11 cases indicates that the following remaining members of the Creditors' Committee received payments from the Debtors in the following amounts during the ninety-day period immediately prior to the Petition Date:**

15

(i) Anda - $6,533,325.55

(ii) Healthsource - $952,289.39

The Creditors' Committee has not conducted an analysis of potential claims under sections 547 and 550 of the Bankruptcy Code against these Creditors' Committee members to avoid and recover these payments as preferential transfers and such claims would be released pursuant to the Plan.

The Creditors' Committee and the First Lien Agent and Secured Lenders agreed as part of the Settlement to releases and the preparation of a liquidating plan reflecting that Settlement. The Plan as proposed provides for Debtor and non-Debtor releases of current and former members of the Creditors' Committee. The Creditors' Committee believes that the Committee Litigation and the agreement by members of the Creditors' Committee to release any direct claims they may have had against the First Lien Agent and the Secured Lenders led directly to the Settlement, which the Creditors' Committee and its members believe greatly increases the probability of enhanced recoveries to General Unsecured Creditors that they would otherwise receive absent the Settlement. Moreover, the Plan which the Creditors' Committee negotiated provides for releases by third parties, but creditors voting on the Plan can "opt out" of such releases. The Creditors' Committee and its members are prepared to meet their burden of proof to get approval for the proposed releases at the Confirmation Hearing.

The Creditors' Committee believes there are additional grounds for SAC to be granted releases. SAC in addition to being a member of the Creditors' Committee and an unsecured creditor, has informed the Creditors' Committee that it believes it has direct claims against the Silvas in connection with the Merger and related transactions described in Section 4.01 and 4.02 above arising out of alleged misstatements of the financial information provided to SAC in connection with the transaction, specifically with respect to the aging of accounts receivable owed to the Debtors.

SAC has agreed to contribute any such direct claims to the Litigation Trust to be formed under the Plan. The Creditors' Committee, has examined SAC's allegations and believes that the contribution of those direct claims to the Litigation Trust has value to the estates.

SAC and AIG received periodic interest payments under the Second Lien Credit Agreement. SAC was entitled to be reimbursed for expenses incurred as administrative agent under the Second Lien Credit Facility. A substantial amount of such expenses remain unpaid by the Debtors. Claims to avoid these payments would be released if the Plan is approved.

## 4.11 Potential Causes of Action to be Brought by Litigation Trustee

As to Estate Causes of Action, there are potential claims against various parties arising from or relating to the purchase of the Silvas' BJK Inc. stock and the Merger. The facts and circumstances giving rise to these claims are set forth more fully in section 4.01 and 4.02, above. The claims that may be prosecuted by the Litigation Trustee as a result of this transaction

16

include, but are not necessarily limited to, claims for fraud, negligent misrepresentation and breach of fiduciary duty against certain of the Debtors' officers and directors (including, but not necessarily limited to, Jerry and Steven Silva). In addition, the Litigation Trustee may seek to avoid the following transfers pursuant to sections 544(b) and 550 of the Bankruptcy Code: (i) the October 26, 2007 transfer of $18.99 million to Jerry Silva in exchange for his BJK Inc. stock; (ii) the October 26, 2007 transfer of $10.75 million to Steven Silva in exchange for his BJK Inc. stock; (iii) the October 26, 2007 transfer of $23.55 million to Jerry Silva as life tenant, in exchange for his trust's BJK Inc. stock; (iv) the October 26, 2007 transfer of $6.04 million to the Jody Silva Trust in exchange for its BJK Inc. stock; (v) the October 26, 2007 transfer of $11.4 million to the Jerry Silva Annuity Trust in exchange for its BJK Inc. stock; and (vi) the October 26, 2007 "transaction bonus" to Steven Silva in the amount of $5.65 million. In addition to these specific transfers, the Litigation Trustee may choose to pursue litigation to avoid and recover additional consideration paid to the Silvas by the Debtors. This could include the recovery of funds paid to third parties on the Silva's behalf and the avoidance of the $8.26 million of Sub Notes. The Litigation Trustee may also seek to pursue causes of action against the Debtors' management for conduct, including potential breaches of fiduciary duty arising out of the management of the Debtors' business following the Merger, but prior to the filing of these Chapter 11 Cases. These claims arise out of the purchase of the Silvas' BJK Inc. stock. This transaction also gave rise to certain of the Creditors' Committee's claims against the First Lien Agent and the Secured Lenders, which are being settled as part of the Settlement and the Plan (whether or not such claims arose in the context of the purchase and sale of the Silva's BJK Inc. stock or the Merger or any related transaction). The settlement with the First Lien Agent and the Secured Lenders is more fully described in Section 4.9 above. The claims against the Silvas will remain and could be asserted by the Litigation Trust following the Effective Date.

In addition, transfers within 90 days of the Petition Date to non-Insiders and within one year of the Petition Date to Insiders may be challenged as avoidable preferential transfers. Prior to the Petition Date, the Debtors made transfers to charitable organizations which the Creditors' Committee believes can be challenged as fraudulent transfers. There are other potential Causes of Action, and these specific Causes of Action should not be construed as an exhaustive list of same. Any and all Causes of Action shall be vested in the Litigation Trust as of the Effective Date in accordance with the terms of the Plan and the Litigation Trust Documents, and thereafter, the Litigation Trustee and the Unsecured Creditors' Designee shall direct any litigation brought on behalf of the Litigation Trust

**PLEASE BE ADVISED THAT THE LITIGATION TRUSTEE MAY COMMENCE AND PROSECUTE ESTATE CAUSES OF ACTION (EXCEPT THOSE CAUSES OF ACTION THAT ARE RELEASED CLAIMS) AGAINST ANY PERSON OR ENTITY (EXCEPT THOSE PERSONS OR ENTITIES THAT ARE RELEASED PARTIES OR THEIR RELATED PERSONS), INCLUDING BUT NOT LIMITED TO, ANY CREDITOR. SUCH ESTATE CAUSES OF ACTION MAY INCLUDE ACTIONS TO AVOID PREFERENTIAL TRANSFERS OR FRAUDULENT TRANSFERS AGAINST ANY PERSON OR ENTITY (INCLUDING BUT WITHOUT LIMITATION A CREDITOR) RECEIVING TRANSFERS FROM ANY OF THE DEBTORS PRIOR TO THE PETITION DATE, INCLUDING BUT NOT LIMITED TO TRANSFERS SET FORTH IN THE DEBTORS' STATEMENTS OF FINANCIAL AFFAIRS [CASE NO. 10-11567 (MFW) DOCKET NOS. 197-208].**

17

Because of its uncertain nature, there are inherent risks involved in litigation, including that defendants in such actions will assert defenses.[10] In pursuing such litigation, the Litigation Trust Reserve will be utilized to pay litigation expenses and will not be available for distribution to unsecured creditors.

### 4.12    Cash Assets

As a result of the Debtors' operations and the sale of their Assets to the PharMerica Affiliate and the NY Boys, there is approximately $1,974,761 in the M&T Account, $2,525,000 in the Escrow Account and $70,600,000 in the Wells Fargo Account. The Plan Proponents are not aware of any other material Assets other than the Estate Causes of Action.

### 4.13    Case Administration; the Debtors' Schedules and Statements; Establishing a Bar Date

On July 16, 2010, each of the Debtors filed their schedules of assets and liabilities (the "Schedules"). In the aggregate, the Debtors scheduled unsecured claims totaling $21,106,523.17, including duplication but excluding any estimated amounts for unliquidated claims. The Debtors scheduled secured claims totaling $149,668,456.41 for each Debtor.

On July 19, 2010, the Debtors filed a motion to fix a deadline to file all proofs of claim against the Debtors (the "Bar Date"). The Bankruptcy Court signed an Order (the "Bar Date Order") establishing a Bar Date of September 13, 2010. The Bar Date Order approved the form of the proof of claim to be served on all known creditors and the form of publication notice. As of January 7, 2011, a total of nearly 499 proofs of claim have been filed against the Debtors asserting claims in the approximate amount of $377,351,618.48, in each case including duplication but excluding any estimated amounts for unliquidated claims. As described in Section 5.2, the Plan Proponents believe the total allowed claims will be substantially less.

In addition, a bar date of December 13, 2010 was established for Administrative Claims.

### ARTICLE V.

### THE PLAN

### 5.1    Overview of the Plan

The Plan provides for the treatment of Claims against and Equity Interests in all of the Debtors in the Chapter 11 Cases.

The central component of the Plan is the Settlement, subject to the occurrence of the Effective Date. Additionally, the Plan contemplates the establishment of a Litigation Trust to prosecute Estate Causes of Action.

---

[10] For instance, Steven and Jerry Silva assert that a defense under section 546(e) of the Bankruptcy Code is available. The Creditors' Committee asserts there is no basis for the position that there was a "settlement payment" to them.

The Plan is the product of extensive arms' length negotiations between the Creditors' Committee and the First Lien Agent (on behalf of the Secured Lenders) to maximize recoveries to the Debtors' creditors and provides for a fair allocation of the Debtors' remaining Assets as a consequence of the PharMerica Transaction and Chicago Transaction. The Plan effectuates this goal by implementing the Settlement, which embodies the global settlement negotiated by and among the Creditors' Committee and the First Lien Agent (on behalf of the Secured Lenders).

The Plan provides for full payment of all Allowed Administrative Claims, Allowed Priority Claims, if any, Allowed Priority Tax Claims, if any, and Allowed Other Secured Claims, if any, in accordance with the provisions of the Bankruptcy Code, as well as for the cancellation of any all of the existing Equity Interests in, and the discharge of all Claims against, the Debtors.

Following confirmation of the Plan, the Plan will become effective (as such term is used in section 1129 of the Bankruptcy Code) on the first Business Day on which all the conditions to the occurrence of the Effective Date, as specified in Section 10.2 of the Plan have been satisfied or waived in accordance with the provisions of Section 10.3 of the Plan. It is a condition to the effectiveness of the Plan that the Effective Date will occur on or before March 22, 2011. Of course, A RISK FACTOR ASSOCIATED WITH THE PLAN IS THAT there can be no certainty that the Effective Date will occur by such date. The satisfaction of certain of the conditions to the occurrence of the Effective Date is beyond the control of the Plan Proponents and there is no assurance that the Plan Proponents will waive or extend the March 22, 2011 deadline for the occurrence of the Effective Date or any other condition. Thus, it is possible that the Plan will not be confirmed and consummated in the time contemplated.

Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of a compromise and settlement of the Committee Litigation and any and all Claims or Estate Causes of Action that the Debtors (or the Creditors' Committee acting on behalf of the Debtors) could assert against the First Lien Agent and the Secured Lenders. Pursuant to such settlement, the First Lien Agent and the Secured Lenders have agreed, among other things, to pay (a) in an amount not to exceed the amounts set forth therefor in the Consummation Budget, all Allowed Administrative Claims, Allowed Priority Claims, Allowed Other Secured Claims, and Allowed Priority Tax Claims, and (b) to provide a $2 million recovery to holders of Allowed General Unsecured Claims (which will be used to fund the Litigation Trust Reserve), and (c) to waive their distributions on account of the Secured Lender Deficiency Claims, all subject to and in accordance with the provisions of the Plan. In addition, pursuant to the Plan, and upon the occurrence of the Effective Date, (w) the Secured Lender Claims shall be deemed Allowed in full as provided in Section 4.4 of the Plan, (x) the Committee Litigation shall be dismissed with prejudice, (y) the holders of Allowed Secured Lender Claims shall receive the treatment accorded such Claims pursuant to the Plan as described below, and (z) the holders of Allowed Secured Lender Deficiency Claims shall waive any right to a distribution on account of such Claims.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the Settlement and authorize the parties to take all actions that are necessary or appropriate to implement and give effect to the Settlement.

## 5.2    Summary of Classification and Treatment Under the Plan

The following is a summary of the distributions under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as Exhibit A. The claim amounts set forth below are based on information contained in the Debtors' Schedules and Claims register.

### 5.2.1.    Allowed Administrative Claims

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Claims are not classified and are not entitled to vote to accept or reject the Plan. The Debtors' Claims register reflects that approximately $17,063,279.16 in Administrative Claims have been filed including duplication but excluding any estimated amounts for unliquidated claims. The financial advisors for the Creditors' Committee and First Lien Agent reviewed information provided by the Debtors and such claims and have concluded that based upon current estimates, the maximum funding to be provided under the Plan into the Consummation Account is sufficient to satisfy these claims. Subject to the occurrence of the Effective Date, each holder of an Allowed Administrative Claim (which includes the fees, costs and expenses of the Chapter 11 Cases for the Debtors and expenses of operation as specified in section 503(b), shall receive except to the extent that a holder of an Allowed Administrative Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, a Plan Distribution of Cash from the Consummation Account in an amount equal to such Allowed Administrative Claim, without interest, on or as soon as practicable after the latest to occur of (i) the Effective Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim; and (iii) the date or dates agreed to by the Plan Administrator and the holder of the Allowed Administrative Claim. All distributions from the Consummation Account shall be made by the Plan Administrator, in consultation with the First Lien Agent. The Plan Proponents estimate that the total Allowed Administrative Claims will be in the range of $3.6[11] to 4.1 million.

### 5.2.2.    Allowed Priority Tax Claims

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims are not classified and are not entitled to vote to accept or reject the Plan. The Debtors' Claims register reflects that there are approximately $54,857.51 in filed or scheduled Priority Tax Claims, including duplication but excluding any estimated amounts for unliquidated claims. The financial advisors for the Creditors' Committee and First Lien Agent reviewed information provided by the Debtors and such claims and have concluded that based upon current estimates, the maximum funding to be provided under the Plan into the Consummation Account is sufficient to satisfy these claims. Subject to the occurrence of the Effective Date, each holder of an Allowed Priority Tax Claim which includes all Claims entitled to priority under section

---

[11]    This $3.6 million figure includes $1.5 million of budgeted professional fees.

507(a)(8) of the Bankruptcy Code shall receive, except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, a Plan Distribution of Cash from the Consummation Account in an amount equal to such Allowed Priority Tax Claim, without interest, on or as soon as practicable after the latest to occur of (i) the Effective Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date or dates agreed to by the Plan Administrator and the holder of the Allowed Priority Tax Claim. The Plan Proponents estimate that the total Allowed Priority Tax Claims will be approximately $22,000.

### 5.2.3.  Class 1:  Priority Claims

Priority Claims are classified as Class 1 under the Plan and are unimpaired and thus not entitled to vote to accept or reject the Plan. The Debtors' Claims register reflects that there are approximately $152,430.00 in filed or scheduled Priority Claims, including duplication but excluding any estimated amounts for unliquidated claims. The financial advisors for the Creditors' Committee and First Lien Agent reviewed information provided by the Debtors and such claims and have concluded that based upon current estimates, the maximum funding to be provided under the Plan into the Consummation Account is sufficient to satisfy these claims. Subject to the occurrence of the Effective Date, each holder of an Allowed Priority Claim shall receive, except to the extent that a holder of an Allowed Priority Claim agrees to a less favorable treatment of such Allowed Priority Claim, a Plan Distribution of Cash in an amount equal to such Allowed Priority Claim, without interest, on or as soon as practicable after the latest to occur of (i) the Effective Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Claim becomes an Allowed Priority Claim; and (iii) the date or dates agreed to by the Plan Administrator and the holder of the Allowed Priority Claim. The Plan Proponents estimate that the total Allowed Priority Claims will be approximately $28,000.

### 5.2.4.  Class 2:  Other Secured Claims

Other Secured Claims are classified as Class 2 of the Plan. Class 2 Claims, if any, are impaired and are entitled to vote to accept or reject the Plan. The Plan constitutes an objection to the Allowance of any and all Other Secured Claims, and accordingly all Other Secured Claims are Contested Claims. The Debtors' Claims register reflects that there are approximately $347,060.59 in filed or scheduled Other Secured Claims, including duplication but excluding any estimated amounts for unliquidated claims. The financial advisors for the Creditors' Committee and First Lien Agent reviewed information provided by the Debtors and such claims and have concluded that based upon current estimates, the maximum funding to be provided under the Plan into the Consummation Account is sufficient to satisfy these claims. To the extent that any Other Secured Claim becomes an Allowed Other Secured Claim, and except to the extent that a holder of an Allowed Other Secured Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Other Secured Claim shall receive, at the option of the First Lien Agent in the exercise of its sole and absolute discretion (a) a Plan Distribution of Cash in an amount equal to the net proceeds of the sale or disposition of the Collateral securing such holder's Allowed Other Secured Claim, without interest, on or as soon as practicable after the latest to occur of (i) the Effective Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Claim

21

becomes an Allowed Other Secured Claim; and (iii) the date or dates agreed to by the Plan Administrator and the holder of the Allowed Other Secured Claim; or (b) the Collateral securing such holder's Allowed Other Secured Claim; or (c) such other Plan Distribution necessary to satisfy the requirements of the Bankruptcy Code. Any portion of any Other Secured Claim that is not secured by Collateral or the proceeds thereof shall constitute a General Unsecured Claim to the extent it is Allowed. The Plan Proponents believe that there should be no Allowed Other Secured Claims.

### 5.2.5. Class 3: Secured Lender Claims

a. Secured Lender Claims (other than the Secured Lender Deficiency Claims) are classified as Class 3 Claims, are impaired under the Plan and are entitled to vote to accept or reject the Plan. The Plan Proponents estimate that there will be $104.6 million in Allowed Secured Lender Claims. Subject to the occurrence of the Effective Date, each holder of an Allowed Secured Lender Claim shall receive under the Plan in full and complete satisfaction of such Claim:

i. Promptly following the Effective Date, but subject to Section 4.4.3 of the Plan, its Pro Rata share of (i) 100% of the Available Proceeds; (ii) beneficial interests in the Litigation Trust which shall entitle such holder to receive a Litigation Trust Distribution in accordance with and pursuant to Section 6.3.9 of the Plan and the terms and provisions of the Litigation Trust Documents; and (iii) pursuant to Section 6.12 of the Plan, any Assets of the Debtors remaining on the Effective Date, except for (x) the Consummation Account (which shall be subject to Section 4.4.2(b) of the Plan), (y) the Estate Causes of Action and (z) the Litigation Trust Reserve, which Estate Causes of Action and Litigation Trust Reserve shall automatically be transferred to the Litigation Trust on the Effective Date pursuant to Section 6.3.3 of the Plan and the Litigation Trust Documents;

ii. upon satisfaction of all Allowed Administrative Claims, Allowed Priority Claims, Allowed Priority Tax Claims and Allowed Other Secured Claims, its Pro Rata share of the amounts remaining in the Consummation Account; provided, however, that the Plan Administrator shall be entitled to deduct from the amounts to be distributed to the Secured Lenders pursuant to Section 4.4.2(b) of the Plan an amount equal to the accrued and unpaid fees, costs and expenses of the Plan Administrator, counsel to the Plan Administrator or any other professional retained by the Plan Administrator pursuant to the Plan or any Plan Document;

iii. tax refunds or any other refund of any kind or nature; and

iv. the releases relating to the Released Claims.

b. *First Lien Agent's Expenses.* The First Lien Agent shall be entitled to deduct from the amounts to be distributed to the Secured Lenders pursuant to Section 4.4.2 of the Plan an amount equal to the accrued and unpaid fees, costs and expenses of its

counsel (Kaye Scholer LLP and Potter Anderson & Corroon LLP) and Capstone Advisory Group, LLC, its financial advisors, and estimates for any ongoing work in connection with implementation of the Plan.

        c.    *Vesting of Assets.* Upon the occurrence of the Effective Date and except as otherwise provided in the Plan, title to all of the Assets of the Debtors other than the Estate Causes of Action, amounts in the Consummation Account (subject to Section 4.4.2(b) of the Plan) and the Litigation Trust Reserve shall vest in the First Lien Agent for the benefit of the Secured Lenders, free and clear of all Claims, Equity Interests, Liens, security interests, encumbrances, and other interests.

### 5.2.6.  Class 4: General Unsecured Claims

General Unsecured Claims, including the Secured Lender Deficiency Claims, are classified as Class 4 Claims, are impaired under the Plan and are entitled to vote to accept or reject the Plan. The Debtors' Claims register reflects that there are approximately $397,882,070.80 in filed or scheduled General Unsecured Claims, including $38.1 million in Secured Lender Deficiency Claims, and also including duplication but excluding any estimated amounts for unliquidated claims. The Creditors' Committee estimates that ultimately the total allowed General Unsecured Claims will be in the $56 million range plus the Secured Lender Deficiency Claims (which Secured Lender Deficiency Claims are being waived except for voting purposes).

The Secured Lender Deficiency Claims are being waived (e.g., for distribution purposes) but not for voting purposes. The Secured Lenders are recovering out of the Litigation Trust Recoveries (as described in Section 6.3.9 of the Plan and above) on account of their Secured Claims and the Settlement.

Subject to the occurrence of the Effective Date, the holders of Allowed General Unsecured Claims shall be entitled to receive under the Plan in full and complete satisfaction of their Allowed General Unsecured Claims their Pro Rata share of the beneficial interests in the Litigation Trust and receive Litigation Trust Distributions in accordance with and pursuant to Section 6.3.9 of the Plan and the terms and provisions of the Litigation Trust Documents. The Litigation Trust Reserve shall be used by or on behalf of the Litigation Trust for fees, costs and expenses incurred in connection with the prosecution of the Estate Causes of Action and the administration of the Litigation Trust. In view of the distribution of Litigation Trust Proceeds to the First Lien Agent, for the benefit of the Secured Lenders, pursuant to Section 6.3.9 of the Plan in respect of the Secured Lender Claims, the Secured Lenders are waiving their distribution with respect to the Secured Lender Deficiency Claims. There is no way to predict whether and to what extent distributions shall be made to the holders of Allowed General Unsecured Claims from the Litigation Trust. The Litigation Trust shall be funded with $2 million for the Litigation Trust Reserve on the Effective Date.

The Unsecured Creditors' Designee, in consultation with the Litigation Trustee, shall decide whether, when, and in what amounts Litigation Trust Distributions shall be made to the holders of Allowed General Unsecured Claims and shall direct the Litigation Trustee (subject

to the provisions of the Plan and the Litigation Trust Documents), to make any such Litigation Trust Distributions.

The Creditors' Committee believes that the Litigation Trust will have viable Causes of Action against the Debtors' present and former Management, Insiders, etc.

### 5.2.7. Class 5: Subordinated Claims

The Subordinated Claims are unsecured claims and are contractually subordinated to all Secured Lender Claims, Secured Lender Deficiency Claims and Second Lien Lender Claims. The Subordinated Claims consist of the Sub Notes described herein, held by the Silvas and related persons. On the Effective Date, if and to the extent that a Subordinated Claim becomes an Allowed Claim, and not a Disallowed Claim or a Claim subordinated to General Unsecured Claims by Order of this Bankruptcy Court, the Litigation Trustee shall be authorized and directed to transfer any interest in the Litigation Trust Distributions that a holder of such Subordinated Claim is entitled to receive on account of such Subordinated Claim to the holders of the Secured Lender Claims, Secured Lender Deficiency Claims and Second Lien Lender Claims in accordance with the terms of the notes underlying such Subordinated Claims until such time as the holders of the Secured Lender Claims, Secured Lender Deficiency Claims and Second Lien Lender Claims are paid in full on account of such Claims. Upon the payment in full of such Secured Lender Claims, Secured Lender Deficiency Claims and Second Lien Lender Claims, the Litigation Trustee shall be authorized and directed to transfer any remaining interest in the Litigation Trust Distributions to the holder of such Subordinated Claim; provided, however, that to the extent a Subordinated Claim is a Disallowed Claim or a Claim subordinated to General Unsecured Claims by Order of this Bankruptcy Court, such Subordinated Claim shall not be entitled to any distribution pursuant to the Plan. Holders of Subordinated Claims shall not be required to surrender their notes or other instruments evidencing ownership of such Subordinated Claims.

### 5.2.8. Class 6: Equity Interests

With respect to holders of Equity Interests in the Debtors, all such Equity Interests shall be canceled and extinguished.

### 5.2.9. Distributions by Plan Administrator or Litigation Trustee

All Plan Distributions to the holders of Allowed Administrative Claims, Allowed Priority Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims and Allowed Secured Lender Claims (which distributions to the Secured Lenders shall be made to the First Lien Agent for the benefit of the holders of Secured Lender Claims) under the Plan shall be made by the Plan Administrator as disbursing agent. The Plan Administrator, as disbursing agent, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

All Litigation Trust Distributions shall be made by the Litigation Trustee subject to and in accordance with Article VI of the Plan and the provisions of the Litigation Trust Documents. The Litigation Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

At the sole option of the Plan Administrator or Litigation Trustee, as the case may be, any Cash payment to be made under the Plan may be made by a check or wire transfer; provided that any Plan Distributions or Litigation Trust Distributions, as applicable, of Cash to the First Lien Agent for the benefit of the Secured Lenders shall be made to the First Lien Agent by wire transfer of immediately available funds for further disbursement to the Secured Lenders, subject to Section 4.4.3 of the Plan.

### 5.3    **The Litigation Trust**

#### 5.3.1.  Introduction

On the Effective Date, the Litigation Trust Agreement and any other Litigation Trust Documents will be executed and will govern the Litigation Trust. Following the occurrence of the Effective Date, the Debtors shall automatically be dissolved, such dissolution shall be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the holders of Equity Interests or directors of any of the Debtors, unless applicable law requires otherwise. Effective automatically on the Effective Date, and without the necessity of any other or further act, instrument or Bankruptcy Court order, the Chapter 11 Cases shall be closed, except for Case Nos. 10-11567 and 10-5997. On the Effective Date, the Debtors shall transfer all of the Litigation Trust Assets to the Litigation Trust free and clear of all Liens, Claims, and encumbrances, except to the extent set forth in Sections 6.3.9, 6.3.11 and the other provisions of the Plan or in the Litigation Trust Documents. On the Effective Date, the holders of Allowed Secured Lender Claims and Allowed General Unsecured Claims will receive a beneficial interest in the Litigation Trust entitling them to share in the Litigation Trust Recoveries as described in Section 6.3 of the Plan.

#### 5.3.2.  Execution of Litigation Trust Agreement

On or before the Effective Date, the Debtors, on their own behalf and on behalf of the beneficiaries, shall execute the Litigation Trust Documents, in a form acceptable to the First Lien Agent and the Creditors' Committee, each in the exercise of its sole and absolute discretion, and all other necessary steps shall be taken to establish the Litigation Trust. Section 6.3 of the Plan sets forth certain of the rights, duties, and obligations of the Litigation Trustee.

#### 5.3.3.  Purpose of Litigation Trust

The Litigation Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

#### 5.3.4.  Litigation Trust Assets

The Litigation Trust shall consist of the Litigation Trust Assets and the proceeds thereof, including the Litigation Trust Recoveries. On the Effective Date, the Debtors shall transfer all of the Litigation Trust Assets to the Litigation Trust free and clear of all Liens, Claims, and encumbrances, except to the extent set forth in Sections 6.3.9, 6.3.11 and the other provisions of the Plan or in the Litigation Trust Documents.

### 5.3.5. Governance of Litigation Trust

The Litigation Trust shall be governed and administered by the Litigation Trustee, subject to the terms of the Plan and the Litigation Trust Documents, including the rights of the Oversight Committee. The Litigation Trustee and the Unsecured Creditors' Designee shall direct any litigation brought on behalf of the Litigation Trust.

It is expected that Meade A. Monger will be appointed to serve as the Litigation Trustee.

### 5.3.6. Role of the Litigation Trustee

In furtherance of and consistent with the purpose of the Litigation Trust and the Plan, the Litigation Trustee shall, subject to the terms of the Plan and the Litigation Trust Documents, (A) have the power and authority to hold, manage, sell, and distribute the Litigation Trust Assets to the holders of Allowed Claims, (B) hold the Litigation Trust Assets for the benefit of the holders of Allowed Claims, (C) have the power and authority to hold, manage, sell, and distribute Cash or non-Cash Litigation Trust Assets obtained through the exercise of its power and authority, (D) subject to Section 6.9 of the Plan, have the power and authority to threaten, assert, prosecute and resolve, in the names of the Debtors and/or the name of the Litigation Trust, the Estate Causes of Action pursuant to the direction of the Unsecured Creditors' Designee, (E) have the power and authority to perform such other functions as are provided in the Plan or Litigation Trust Documents, and (F) have the power and authority to administer the closure of Case Nos. 10-11567 and 10-5997. The Litigation Trustee shall be responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets, subject to the terms of the Plan and the Litigation Trust Documents. In all circumstances, the Litigation Trustee shall act in the best interests of all beneficiaries of the Litigation Trust and in furtherance of the purpose of the Litigation Trust.

### 5.3.7. Litigation Trust Recoveries Account

The Litigation Trustee shall deposit and maintain any and all proceeds of the Litigation Trust in a segregated account for distribution solely in accordance with Section 6.3.9 of the Plan and the Litigation Trust Documents. In no event and under no circumstance (except as expressly set forth in Section 6.3 of the Plan) shall the Litigation Trust be permitted to spend any Litigation Trust Recoveries for any purpose, including payment of professional fees, costs and expenses, which payment shall be made solely from the Litigation Trust Reserve or a surcharge as provided in Section 6.3.8(d) of the Plan.

### 5.3.8. Cash

The Litigation Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code, provided, however, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

5.3.9. Fees, Costs and Expenses of the Litigation Trust

        a.      Any and all fees, costs and expenses of the Litigation Trust, including those of the Litigation Trustee and any and all professionals retained by the Litigation Trustee shall be paid solely out of the Litigation Trust Reserve or a surcharge as provided in Section 6.3.8(d) of the Plan.

        b.      The Litigation Trustee shall be entitled to reasonable compensation subject to the terms and provisions of the Litigation Trust Documents (including disclosure of the Litigation Trustee's compensation arrangements).

        c.      The Litigation Trustee may retain and reasonably compensate counsel and other professionals to assist it in its duties as Litigation Trustee on such ordinary and customary and commercially reasonable terms as the Litigation Trustee deems appropriate without Bankruptcy Court approval. The Litigation Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases. The fees, costs and expenses of these professionals shall be paid solely out of the Litigation Trust Reserve or a surcharge as provided in Section 6.3.8(d) of the Plan.

        d.      To the extent the Litigation Trust Reserve is (or is anticipated to be) exhausted or insufficient to fund the prosecution of the Estate Causes of Action or administer the Litigation Trust, the Litigation Trustee may request that the Litigation Trust Recoveries be surcharged; provided, however, that neither the Litigation Trust Recoveries designated for the benefit of the First Lien Agent for the benefit of the Secured Lenders nor the Litigation Trust Recoveries designated for the benefit of the holders of Allowed General Unsecured Claims, shall be surcharged without the express written consent of the Lenders' Designee (in the case of the Litigation Trust Recoveries designated for the benefit of the First Lien Agent for the benefit of the Secured Lenders) or the Unsecured Creditors' Designee, (in the case of the Litigation Trust Recoveries designated for the benefit of the holders of Allowed General Unsecured Claims).

5.3.10. Distribution of the Litigation Trust Recoveries

        The Litigation Trustee shall distribute the Litigation Trust Recoveries in accordance with the Litigation Trust Documents, beginning on the Effective Date in the following order:

        a.      First, on a Pro Rata basis, to the extent not reimbursed previously, (i) to reimburse the First Lien Agent for the benefit of the Secured Lenders for any amounts expended from the Consummation Account in excess of the sum of the amounts transferred out of the M&T Account to the Consummation Account and $3.6 million; and (ii) to reimburse the Litigation Trustee for the benefit of the holders of Allowed General Unsecured Claims for any amounts expended from the Litigation Trust Reserve.

        •   For example, if $4.6 million is disbursed from the Consummation Account (in excess of the funds transferred from the M&T Account) for payments, disbursements and expenses in connection with the consummation of the Plan, and

27

- $2 million is disbursed from the Litigation Trust Reserve to fund the prosecution of Estate Causes of Action by the Litigation Trustee, then

- For every $3 dollars recovered by the Litigation Trustee, $1 dollar shall be reimbursed to the First Lien Agent for the benefit of the Secured Lenders and $2 dollars shall be reimbursed to the Litigation Trustee for the benefit of the holders of Allowed General Unsecured Claims.

b.      Second, (i) with respect to any Litigation Trust Recoveries but excluding Management Cause of Action Recoveries (other than D&O Insured Causes of Action), fifty percent (50%) of such Litigation Trust Recoveries shall be distributed to the holders of Allowed General Unsecured Claims and fifty percent (50%) of such Litigation Trust Recoveries shall be distributed to the First Lien Agent for the benefit of the Secured Lenders; it being understood that the Litigation Trust Recoveries with respect to D&O Insured Causes of Action shall be allocated one-half to the First Lien Agent for the benefit of the Secured Lenders and one half ratably to the holders of Allowed General Unsecured Claims; and (ii) with respect to any Management Cause of Action Recoveries, (A) the first $12 million of Management Cause of Action Recoveries (after reimbursement of the amounts specified in Section 6.3.9(a) of the Plan) shall be distributed sixty percent (60%) ratably to the holders of Allowed General Unsecured Claims and forty percent (40%) to the First Lien Agent for the benefit of the Secured Lenders; and (B) any Management Cause of Action Recoveries in excess of $12 million (after reimbursement of the amounts specified in Section 6.3.9(a) of the Plan) shall be distributed seventy percent (70%) ratably to the holders of Allowed General Unsecured Claims and thirty percent (30%) to the First Lien Agent for the benefit of the Secured Lenders.

### 5.3.11. Time of Litigation Trust Distributions

The Litigation Trustee shall distribute Litigation Trust Recoveries to the First Lien Agent for the benefit of the Secured Lenders at least annually and at any time, and from time to time, that there are Litigation Trust Recoveries in an amount that, when applying the distribution methodology set forth in Section 6.3.9(b) of the Plan, would result in a distribution of at least $1 million to the First Lien Agent for the benefit of the Secured Lenders.

### 5.3.12. Litigation Trust Reserve

The Litigation Trust Reserve shall be held in an account maintained by the Litigation Trustee, to fund the prosecution of Estate Causes of Action, the fees, costs and expenses of the Litigation Trust and the Litigation Trustee pursuant to the Plan and the Litigation Trust Documents. Any amounts remaining in the Litigation Trust Reserve, if any, upon termination or dissolution of the Litigation Trust shall be distributed by the Litigation Trustee to the holders of Allowed General Unsecured Claims.

### 5.3.13. Federal Income Tax Treatment of Litigation Trust

a.      *Litigation Trust Assets Treated as Owned by Certain Creditors.* For all federal income tax purposes, all parties (including the Debtors, the Litigation Trustee, the holders of Secured Lender Claims and the holders of General Unsecured

28

Claims) shall treat the transfer of the Litigation Trust Assets to the Litigation Trust for the benefit of the holders of Allowed Claims, whether Allowed on or after the Effective Date, as (A) a transfer of the Litigation Trust Assets directly to the holders of Allowed Claims in satisfaction of such Claims followed by (B) the transfer by such holders to the Litigation Trust of the Litigation Trust Assets in exchange for beneficial interests in the Litigation Trust. Accordingly, the holders of such Claims shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the Litigation Trust Assets.

b.    *Tax Reporting*

i.    The Litigation Trustee shall file returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 6.4.2 of the Plan. The Litigation Trustee shall also annually send to each record holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and shall instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The Litigation Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Litigation Trust that are required by any Governmental Unit.

ii.    Allocations of Litigation Trust taxable income shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described in the Plan) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Litigation Trust interests, taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

iii.    As soon as possible after the Effective Date, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets. Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties (including the Debtors, the Litigation Trustee, and the holders of Allowed Secured Lender Claims, and Allowed General Unsecured Claims) for all federal income tax purposes.

29

iv.     The Litigation Trustee may request an expedited
determination of taxes of the Litigation Trust under section 505(b) of the
Bankruptcy Code for all returns filed for, or on behalf of, the Litigation Trust for
all taxable periods through the dissolution of the Litigation Trust.

### 5.3.14. Oversight Committee

On the Effective Date, the Oversight Committee shall be formed, which
committee shall consist of two (2) members, the Unsecured Creditors' Designee and the
Lenders' Designee. The Oversight Committee shall oversee the administration and
implementation of the Plan and the liquidation and distribution of the Litigation Trust Assets in
accordance with the Plan and the Litigation Trust Documents, including the settlement of any
Estate Causes of Action upon receiving a proposal of settlement from the Litigation Trustee in
accordance with Section 6.9 of the Plan. The Litigation Trustee shall produce such periodic
reports as requested by the Oversight Committee with respect to the status of the Litigation Trust
Documents to the holders of Allowed Secured Lender Claims or Allowed General Unsecured
Claims. Oversight Committee decisions shall be made with unanimous approval. In the event of
a dispute, the dispute shall be resolved by the Bankruptcy Court upon motion of any Oversight
Committee member or the Litigation Trustee. The rights, obligations and duties of the Oversight
Committee are described in the Plan. Except as otherwise set forth in the Plan and to the extent
permitted by applicable law, the members of the Oversight Committee in the performance of
their duties under the Plan (the "Indemnified OC Parties") shall be defended, held harmless and
indemnified from time to time by the Litigation Trust to the extent such duties relate to the
Litigation Trust (and not any other Person) against any and all losses, Claims, costs, expenses
and liabilities to which such Indemnified OC Parties may be subject by reason of such
Indemnified OC Party's execution of duties pursuant to the discretion, power and authority
conferred on such Indemnified OC Party by the Plan or the Confirmation Order; provided,
however, that the indemnification obligations arising pursuant to Section 6.9 of the Plan shall not
indemnify the Indemnified OC Parties for any actions taken by such Indemnified OC Parties
which constitute fraud, gross negligence or intentional breach of the Plan or the Confirmation
Order. Satisfaction of any obligation of the Litigation Trust arising pursuant to the terms of
Section 6.9 of the Plan shall be payable only from the Litigation Trust Assets, including, if
available, any insurance maintained by the Litigation Trust.

### 5.4     Reservation of Rights, Discharges, Releases, Injunctions, and Exculpations

#### 5.4.1.  Rights of Action/Reservation of Rights

Except as otherwise provided in the Plan or the Confirmation Order, or in any
contract, instrument, release, indenture or other agreement entered into in connection with the
Plan, and except with respect to the Released Parties, in accordance with section 1123(b) of the
Bankruptcy Code, the Litigation Trustee shall reserve, retain and may enforce, sue on, settle,
compromise, transfer or assign (or decline to do any of the foregoing) all Estate Causes of
Action. Except as otherwise expressly set forth herein or in the Plan, nothing contained in the
Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any right
or Estate Causes of Action that the Debtors may have or which the Litigation Trustee may
choose to assert under any provision of the Bankruptcy Code or any applicable nonbankruptcy

law, including any and all Claims against any Person, to the extent such Person asserts a cross-claim, counterclaim and/or Claim for setoff which seeks affirmative relief against any of the Debtors, their officers, directors or representatives. The Litigation Trustee shall be deemed the appointed representative to, and may pursue, litigate, compromise, settle, transfer or assign any such rights, Claims, Causes of Action, suits or proceedings as appropriate, in accordance with the best interests of the Plan Proponents or their respective successors who hold such rights.

### 5.4.2. Satisfaction of Claims and Termination of Equity Interests

a.      Subject to the occurrence of the Effective Date, as of the Effective Date, except as provided in the Plan, the distributions and rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be in exchange for and in complete satisfaction of all Claims against the Debtors, and in satisfaction of all Equity Interests and the termination of Equity Interests in the Debtors. Except as otherwise specifically provided in the Plan, as of the Effective Date any interest accrued on Claims against the Debtors from and after the Petition Date shall be cancelled. Accordingly, except as otherwise provided in the Plan or the Confirmation Order, confirmation of the Plan shall, as of the Effective Date, satisfy, terminate and cancel all Claims against the Debtors and Equity Interests and other rights of equity security holders in the Debtors.

b.      Subject to the occurrence of the Effective Date, as of the Effective Date, except as provided in the Plan, all Persons shall be precluded from asserting against the Debtors, the Litigation Trust, or their respective successors or property, any other or further Claims, debts, rights, Causes of Action, liabilities or Equity Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date.

c.      No Person holding a Claim may receive any payment from, or seek recourse or recovery against, any Assets that are to be distributed under the Plan, other than Assets required to be distributed to that Person under the Plan.

### 5.4.3. Term of Injunctions or Stays

a.      **Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt or liability against the Debtors or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such Claims, debts or liabilities, or terminated Equity Interest or rights (other than actions brought to enforce any rights or obligations under the Plan or the Confirmation Order): (i) commencing or continuing any action or other proceeding against the Debtors, the Litigation Trust or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Debtors, the Litigation Trust or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Debtors, the Litigation Trust or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of**

any kind against any debt, liability or obligation due the Debtors, the Litigation Trust or their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of the Plan.

        b.      **All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

        5.4.4.   Injunction Against Interference With Plan

        **Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employers, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.**

        5.4.5.   Releases and Injunction Related to Releases

        a.      ***Releases by Debtors and Estates.***  **On and as of the Effective Date, the Debtors on their own behalf and as representatives of their respective Estates and any Person seeking to exercise the rights of the Debtors' Estates (including, the Plan Administrator and Litigation Trustee on behalf of the Litigation Trust, or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), release unconditionally, and are hereby deemed to release unconditionally, each and all of the Released Parties of and from any and all Claims, obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever (including actions arising under the Bankruptcy Code, Avoidance Actions and the Committee Litigation), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are in connection with the Debtors or any of them, or their respective Assets, property and Estates, the Chapter 11 Cases or the Plan, or this Disclosure Statement (the "Debtor Released Claims").**

        b.      ***Releases by Holders of Claims and Interests.***  **Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of the Plan, each Person (a) that has voted to accept the Plan or is deemed to have accepted the Plan and has not opted out from granting the releases in Section 11.5.2 of the Plan, (b) that has voted to reject the Plan but has opted to grant the releases in Section 11.5.2 of the Plan, or (c) who otherwise agrees to provide the releases set forth in Section 11.5.2 of the Plan, shall be deemed to have unconditionally released each and all of the Released Parties of and from any and all Claims, obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or**

32

unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan or this Disclosure Statement (the "Holder Released Claims"); provided, however, that the First Lien Agent does not by virtue of giving its own release under the Plan, release individual Claims, if any, of Secured Lenders for which it acts or acted as agent; and provided further that the First Lien Agent shall not be deemed to have released any Secured Lender for which it acts or acted as agent from any obligations under the Credit Agreement.

           c.    ***Failure to Grant Release.*** Any holder of a Claim that has timely submitted to the Balloting Agent a Ballot opting not to grant the releases set forth in Section 11.5.2 of the Plan shall not receive the benefit of the releases set forth in Section 11.5.2 of the Plan (even if for any reason otherwise entitled).

      5.4.6.   <u>Injunction Related to Releases</u>

        Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt, right, Cause of Action or liability that is released pursuant to the provisions of the Plan are permanently enjoined from taking any of the following actions on account of or based upon the Released Claims: (i) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Released Parties or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Released Parties or against their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of the Plan.

           a.    ***Deemed Consent.*** By voting to accept the Plan or accepting any Plan Distributions or Litigation Trust Distributions, as applicable, under the Plan, and not opting out from granting the releases in Section 11.5.2 of the Plan, each holder of a Claim will be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the exculpations, releases and injunctions set forth in the Plan.

           b.    ***No Waiver.*** All Estate Causes of Action, except for Estate Causes of Action against Released Parties, are expressly reserved and shall not be subject to the releases set forth in Sections 11.5.1 and 11.5.2 of the Plan; provided, however, that the Estate Causes of Action shall be subject to the provisions of Section 11.5.7 of the Plan.

1000155v.1

c.    *Injunction Against Barred Claims*.  All (i) Released Parties; (ii) Persons who have voted for or against the Plan or who are presumed to have voted for or against the Plan under section 1126(f)-(g) of the Bankruptcy Code; (iii) any other Persons that hold, have held or may hold a Claim or other debt or liability, or an Equity Interest, against, in or relating to any of the Debtors or their respective Estates; and (iv) present or former members of Management (collectively, the "Barred Persons") are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Bankruptcy Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any Claim for non-contractual indemnity or contribution against any Released Party (including any other non-contractual Claim against the Released Parties, whether or not denominated as for contribution or indemnity, where the injury to the Barred Person is the liability of the Barred Person to the Litigation Trust), arising out of or reasonably flowing from the Claims or allegations in any of the Released Claims or the Estate Causes of Actions, whether arising under state, federal or foreign law as Claims, cross-claims, counterclaims, or third-party Claims (collectively, the "Barred Claims").

The Litigation Trustee and the Litigation Trust shall not be entitled to recover from any Released Party, and no Released Party shall have any obligation, in whole or in part, for, any amount that the Litigation Trustee and the Litigation Trust seeks to recover from any Person.  The Confirmation Order shall provide that if at a trial (or by settlement) where the issue of relative fault, responsibility or liability, including but not limited to contribution or indemnity, is determined between any of the Released Parties on the one hand and any Person on the other hand, if any of the Released Parties are found to be liable for a portion of the damages awarded to the Litigation Trustee or the Litigation Trust, then any Person shall be liable only for that amount or percentage of the damages awarded for which the Person is found to be at fault or responsible and not for any amount or percentage of the damages awarded which is found to be the fault or responsibility of the Released Parties.

If the Litigation Trust enters into a settlement with any Person with respect to one or more Estate Causes of Action based upon, arising from, or related to the Released Claims or any transaction underlying any Released Claim, then the Litigation Trust shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement.

5.4.7.   Settlement of Claims and Estate Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, as described herein and in the Plan, the Plan provides for the settlement of all Estate Causes of Action that have been or could have been asserted against any one or more of the Released Parties.  The First Lien Agent, on behalf of itself and the Secured Lenders, and the Creditors' Committee acknowledge and agree that the releases, exculpations and injunctions afforded the Released Parties pursuant to the terms and provisions of the Plan are (i) supported by consideration,

(ii) integral parts of the settlement embodied in the Plan and (iii) necessary to the liquidation that is the subject of the Plan.

### 5.4.8. Disallowed Claims And Disallowed Interests

On and after the Effective Date, the Debtors and the Litigation Trust shall be fully and finally discharged of any and all liability or obligation on a Disallowed Claim or a disallowed Equity Interest, and any Order disallowing a Claim or an Equity Interest which is not a Final Order as of the Effective Date solely because of an entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided in the Plan, shall constitute an Order: (a) disallowing all Claims and Equity Interests to the extent such Claims and Equity Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Equity Interests, and Claims for unmatured interest and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

### 5.4.9. Exculpation

**The Released Parties and each of their respective Related Persons, the CRO and the Debtors' professionals (collectively, the "Exculpated Parties") shall not be liable for any Cause of Action arising in connection with or out of the administration of the Chapter 11 Cases, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court. The Confirmation Order shall enjoin all holders of Claims and Equity Interests from asserting or prosecuting any Claim or Cause of Action against the Exculpated Parties as to which such Person has been exculpated from liability pursuant to the preceding sentence. The Debtors' directors and officers have not been designated as Exculpated Parties. The Plan Proponents are investigating whether such parties should be designated as Exculpated Parties and will reach a determination prior to the Confirmation Hearing.**

### 5.4.10. AIG Release

AIG shall be a Released Party only if it shall agree to provide the releases set forth in Section 11.5.2 of the Plan.

### 5.4.11. SEC Reservation of Rights

Notwithstanding anything to the contrary contained in the Disclosure Statement, the Plan, and/or the Confirmation Order, no provision of the Plan or Confirmation Order shall release any non-debtor, including any of the Released Parties, from liability in connection with any legal action or claim brought by the United States Securities and Exchange Commission.

**5.5** **Other Provisions of the Plan**

In addition the provisions of the Plan described herein, the Plan also contains provisions regarding distributions to creditors (Article VII), the treatment of Contested Claims (Article VIII), the treatment of Claims arising from the rejection of Executory Contracts (Article IX), the conditions precedent to confirmation of the Plan and the occurrence of the Effective Date (Article X), the retention post-confirmation of jurisdiction by the Bankruptcy Court (Article XII) and other miscellaneous provisions (Article XIII).

## ARTICLE VI.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE MARKETING OR PROMOTION (WITHIN THE MEANING OF CIRCULAR 230) BY THE PLAN PROPONENTS OF THE TRANSACTION OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims.

The following summary is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, governmental authorities or agencies and investors in pass-through entities).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

**6.1    Consequences to Debtors**

The Debtors may incur federal income tax liability as a result of the transactions contemplated by the Plan, based in part on the value of the assets transferred to the Litigation Trust, the amount of the Debtors' net operating losses and the application of the federal tax rules regarding alternative minimum tax. Such tax liability, if any, shall be treated in accordance with the terms and provisions of the Plan.

**6.2    Consequences to Holders of Secured Lender Claims and General Unsecured Claims**

The Plan Proponents believe that the Plan should be treated as a plan of liquidation for federal income tax purposes because the Litigation Trust is being created solely for the purpose of litigating the Estate Causes of Action and winding up the Debtors' affairs (including, but not limited to, resolving any outstanding Administrative and Priority Claims or Contested Claims).

6.2.1.  Gain or Loss

In general, a holder of an Allowed Secured Lender Claim or an Allowed General Unsecured Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in such Claim (other than any Claim representing accrued but unpaid interest). For a discussion of the federal income tax treatment of any Claim for accrued but unpaid interest, *see* "Distributions in Discharge of Accrued Interest," Section 6.2.2 below.

In general, the "amount realized" by a holder will equal the sum of (a) the amount of any Cash received by such holder (excluding any portion required to be treated as imputed interest due to the post-Effective Date distribution of such Cash, as discussed below) and (b) the fair market value of its undivided interest in the other underlying assets of the Litigation Trust (subject to any liabilities assumed by the Litigation Trust or to which such assets are subject) on the Effective Date. Although subject to significant uncertainty, the Plan Proponents believe that any distributions of Cash by the Plan Administrator to a holder of a Claim after the Effective Date (in contrast to a distribution from the Litigation Trust, as discussed below) should be treated as a distribution in liquidation (satisfaction) of such holder's Claim.

As discussed herein and in the Plan, on the Effective Date, substantially all of the Debtors' Assets not otherwise distributed on the Effective Date (including the Estate Causes of Action) will be transferred to the Litigation Trust. The holders will receive a

37

beneficial interest in the Litigation Trust entitling them to share in any proceeds from such assets on the same relative basis as would have been received absent such transfer. However, for federal income tax purposes, because the Litigation Trust has been structured to qualify as a "grantor trust," each holder of an Allowed Secured Lender Claim or an Allowed General Unsecured Claim will be treated as directly receiving, and as a direct owner of, its allocable percentage of the Litigation Trust Assets, and the proceeds thereof. See "Tax Treatment of the Litigation Trust and Holders of Beneficial Interests" Section 6.3 below. Accordingly, as noted above, each holder would take into account in determining the "amount realized" in respect of its Claim its share of any cash and the fair market value of its undivided interest in the other underlying assets of the Litigation Trust (subject to any liabilities assumed by the Litigation Trust or to which such assets are subject) as if received and held directly. Pursuant to the Plan, the Litigation Trustee will make a good faith valuation of the Litigation Trust Assets, and all parties must consistently use such valuation for all federal income tax purposes. The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

Any amount a holder receives following the Effective Date as a distribution in respect of an interest in the Liquidating Trust should not be included for federal income tax purposes in the holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such holder's interest in the Liquidating Trust. See "Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests," Section 6.3 below.

Where gain or loss is recognized by a holder in respect of its Allowed Secured Lender Claim or Allowed General Unsecured Claim, the character of such gain or loss (as long-term or short-term capital, or ordinary) will be determined by a number of factors, including the tax status of the holder, whether the Claim in respect of which any property was received constituted a capital asset in the hands of the holder and how long it had been held, the manner in which a holder acquired such Claim, whether such Claim is an installment obligation for U.S. federal income tax purposes, whether such Claim was originally issued at a discount or acquired at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim.

A holder's initial aggregate tax basis in its undivided interest in the underlying assets of the Litigation Trust generally will equal the fair market value of such interest when received. A holder's holding period in any property received generally will begin the day following the Effective Date (or such later date as the holder's Claim was Allowed).

### 6.2.2. Distributions in Discharge of Accrued Interest

Pursuant to the Plan, all distributions in respect of a Claim will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes), with any excess allocated to the portion of the Claim representing accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent any amount received (whether stock, cash or other property) by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent

any accrued interest claimed was previously included in its gross income and is not paid in full. Such loss may be ordinary, but the tax law is unclear on this point. Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

### 6.2.3. Information Reporting and Withholding

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding (including employment tax withholding). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate. Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, Treasury Regulations promulgated in early 2003 require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated after January 1, 2003, including, among other types of transactions, the following: (a) certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds; and (b) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year. These categories are very broad; however, there are numerous exceptions. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

## 6.3    Tax Treatment of the Litigation Trust and Holders of Beneficial Interests

Upon the Effective Date, the Litigation Trust shall be established for the benefit of holders of Allowed Secured Lender Claims and Allowed General Unsecured Claims, whether Allowed on or after the Effective Date.

### 6.3.1. Classification of the Litigation Trust

The Litigation Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust, which is a disregarded entity.

However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Litigation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtors, the Litigation

Trustee, and holders of Secured Lender Claims and General Unsecured Claims) are required to treat, for federal income tax purposes, the Litigation Trust as a grantor trust of which the holders are the owners and grantors. The following discussion assumes that the Litigation Trust will be so respected for federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS successfully to challenge such classification, the federal income tax consequences to the Litigation Trust, the holders of Secured Lender Claims and General Unsecured Claims, and the Debtors could vary from those discussed herein (including the potential for an entity level tax on any income of the Litigation Trust).

### 6.3.2. General Tax Reporting by the Trust and Beneficiaries

For all federal income tax purposes, all parties (including the Debtors, the Litigation Trustee, and the holders of Secured Lender Claims and General Unsecured Claims) must treat the transfer of Litigation Trust Assets to the Litigation Trust as a transfer of such assets directly to the holders, followed by the transfer of such assets by the holders to the Litigation Trust. Consistent therewith, all parties must treat the Litigation Trust as a grantor trust of which such holders are the owners and grantors. Thus, such holders (and any subsequent holders of interests in the Litigation Trust) will be treated as the direct owners of an undivided interest in the assets of the Litigation Trust for all federal income tax purposes. Pursuant to the Plan, the Litigation Trust will determine the fair market value of the assets of the Litigation Trust as of the Effective Date, and all parties, including the holders, must consistently use such valuation for all federal income tax purposes, such as in the determination of gain, loss, and tax basis. The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

Accordingly, each holder will be required to report on its federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Litigation Trust. *See* "Allocation of Taxable Income and Loss" Section 6.3.3 below. The character of items of income, deduction, and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The federal income tax reporting obligations of a holder are not dependent upon the Litigation Trust distributing any cash or other proceeds. Therefore, a holder may incur a federal income tax liability with respect to its allocable share of the income of the Litigation Trust even if the Litigation Trust has not made a concurrent distribution to the holder. In general, a distribution of Cash by the Litigation Trust to a holder will not be taxable to the holder as such holder is regarded for federal income tax purposes as already owning the underlying assets or realizing the income.

The Litigation Trustee will file with the IRS returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Litigation Trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction, or credit and will instruct the holder to report such items on its federal income tax return or to forward the

appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. Such items generally would be reported on the holder's state and/or local tax returns in a similar manner.

### 6.3.3.  Allocation of Taxable Income and Loss

The Plan provides that allocations of Litigation Trust taxable income shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein or in the Plan) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Litigation Trust interests, taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the regulations and any other applicable administrative and judicial authorities and pronouncements.

### ARTICLE VII.

### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the Plan Proponents' alternatives include (i) seeking a liquidation of the Debtors under chapter 7 of the Bankruptcy Code or (ii) the preparation and presentation of an alternative chapter 11 plan.

### 7.1     Liquidation under Chapter 7 of the Bankruptcy Code

If the Plan is not confirmed and these Chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code, the Settlement contemplated by the Plan would not be effective. In such event, a chapter 7 trustee could assert, in addition to the claims against the Silvas and others described in Section 4.11 of this Disclosure Statement, the claims against the Released Parties that would be released if the Plan becomes effective, including (i) claims against the First Lien Agent, the Secured Lenders and the Second Lien Lenders in connection with their involvement with the Merger and (ii) claims against Creditors' Committee members Anda and Healthsource for avoidance and recovery as preferential transfers the approximately $7.5 million of payments they, in the aggregate, received from the Debtors within the 90-days prior to the Petition Date. On the other hand, the monetary contributions the First Lien Agent and the Secured Lenders are offering in connection with the Settlement would not be made if the Plan is not confirmed and these Chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code.

The Debtors no longer have the right to use the cash collateral of the First Lien Agent and the Secured Lenders. Thus, it is possible that if the Plan is not confirmed, both the Creditors' Committee and the First Lien Agent on behalf of the Secured Lenders would be ensnared in contentious litigation and the Chapter 11 Cases could be converted to cases under

chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate and distribute the Debtors' Assets to creditors in accordance with the priorities established by the Bankruptcy Code. It is likely that certain creditors would encourage the chapter 7 trustee to pursue unbridled litigation against, among others, the First Lien Agent and the Secured Lenders, including the claims asserted by the Creditors' Committee in the Committee Litigation. The First Lien Agent on behalf of the Secured Lenders would vigorously defend against such litigation. The First Lien Agent would argue that the First Lien Agent and the Secured Lenders have a first priority perfected security interest in substantially all of the Debtors' Assets and would not agree to fund distributions to holders of Allowed Administrative Claims, Allowed Priority Claims, Allowed Priority Tax Claims, or Allowed Other Secured Claims and would not fund $2 million into the Litigation Trust Reserve. In addition, the Plan Proponents believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (i) the increased costs and expenses under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisers to such trustee, (ii) the time required to make distributions in a chapter 7 case, and (iii) the substantial increases in Claims that would be satisfied on a priority basis or on a parity with creditors in these Chapter 11 Cases. Accordingly, the Plan Proponents believe that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than the amount such holder would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**7.2**     **Alternative Chapter 11 Plan**

If the Plan is not confirmed, the Plan Proponents or any other party in interest could attempt to formulate a different chapter 11 plan. The Plan Proponents are not aware of any other plan to which their respective constituencies would agree. Nevertheless, alternatives to the Plan include differing treatment to General Unsecured Creditors whereby they might receive a cash distribution of $2 million in lieu of litigation being brought by a trust. (Such $2 million distribution is estimated to amount to a 4% recovery for the holders of General Unsecured Claims before factoring in costs of claims administration and related expenses prior to making a distribution.) However, after factoring in the risks and costs of litigation, the Creditors' Committee concluded that the Settlement it negotiated is the best alternative for General Unsecured Creditors. Although the Creditors' Committee cannot provide any assurance that the Litigation Trust Proceeds after expenses will exceed $2 million, the Creditors' Committee believes that the various Estate Causes of Action are meritorious. Accordingly, the Plan Proponents believe that the Plan enables creditors to realize the highest recoveries under the circumstances.

**ARTICLE VIII.**

**CONCLUSION**

The Plan Proponents urge holders of impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received on or before the Voting Deadline.

Dated: Wilmington, Delaware
February 7, 2011

Respectfully submitted,

Canadian Imperial Bank of Commerce, New
York Agency, as First Lien Agent

By: _____
    Name:
    Title:

Official Committee of Unsecured Creditors

By: S.A.C. Domestic Capital Funding, Ltd.

By: _____
    Name:    Peter A. Nussbaum
    Title:    Authorized Signatory

Dated: Wilmington, Delaware
February 7, 2011

Respectfully submitted,

**Canadian Imperial Bank of Commerce, New
York Agency, as First Lien Agent**

By: _____
    Name:
    Title:      E. Lindsay Gordon
              Canadian Imperial Bank of Commerce
              Executive Director

**Official Committee of Unsecured Creditors**

By: _____
    Name:
    Title: